**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANTHONY L. SLAPIKAS<br>and ALICE B. SLAPIKAS, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 2:06-CV-00084JFC |
| FIRST AMERICAN TITLE<br>INSURANCE COMPANY, | ) |
| | ) |
| | ) JUDGE JOY FLOWERS CONTI |
| Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| MEZZO LAND SERVICES, LLC, | ) |
| | ) |
| Third-Party Defendant. | ) |

**DEFENDANT'S MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

I.   INTRODUCTION .......................................................................................................... 1

II   STATEMENT OF FACTS ............................................................................................. 2

    A.   Plaintiffs' Lawsuit ................................................................................................ 2

    B.   Title Insurance and Premiums .............................................................................. 3

    C.   First American Title and Its Independent Agents .................................................. 4

    D.   The TIRBOP Manuals .......................................................................................... 6

        1.   1999 TIRBOP Rate Manual ...................................................................... 6

        2.   2005 TIRBOP Manual ............................................................................... 7

        3.   2006 TIRBOP Manual ............................................................................... 8

    E.   Public Knowledge of the Reissue and Refinance Rates ........................................ 8

    F.   Administrative Remedies Exist ............................................................................ 10

    G.   The Slapikases' Transaction ............................................................................... 11

    H.   Slapikases' Knowledge of the Availability of the Discounts ............................... 11

    I.   First American's Relationship with Mezzo Land Services, LLC .......................... 11

    J.   There is No 'Typical' Reissue or Refinancing Closing Because Agents'
        Practices Vary Substantially ............................................................................... 13

        1.   First American's Direct Operations .......................................................... 13

        2.   Independent Agents' Practices ................................................................. 14

    K.   First American Does Not Have Data to Identify Putative Class Members ............ 16

        1.   First American's Direct Operations System (FAST) ................................ 16

        2.   Agent Computer Capabilities (WINGS) ................................................... 17

        3.   Neither FAST Nor WINGS Can Identify the Class .................................. 19

**Page**

L.  Plaintiffs' Statistical Review of Mezzo's Files is Inaccurate, Contains Glaring
    Miscalculations and Is Inadmissible ............................................................... 21

III. ARGUMENT ................................................................................................................ 23

A.  This Court Must Undertake a Rigorous Analysis ............................................. 23

B.  Individual Issues Predominate .......................................................................... 24

    1.  <u>Ricciardi</u> Shows That the 2005 TIRBOP Manual Was a Change To
        (Not a Clarification of) the 1999 TIRBOP Manual ................................. 25

    2.  Individual Issues as to Who Was Allegedly Overcharged and,
        Therefore, Injured Overwhelm Each of Plaintiffs' Claims (All Counts) ........... 26

    3.  Individual Issues Pervade Plaintiffs' Breach of Contract Claims
        (Counts I and II) ....................................................................................... 34

    4.  Individual Issues of Misrepresentation, Reliance and Injury Preclude
        Plaintiffs' Fraud and UTPCPL Claims (Counts III and IV) ..................... 36
        (a)  There is No Common Evidence of a Fraudulent Scheme ................ 38
        (b)  Proof of Misrepresentation is Individualized ............................... 39
        (c)  Failure to Disclose the Existence of the Reissue or Refinance
             Rate Is an Individual Issue ........................................................... 39
        (d)  Proof of Reliance Depends on a Fact-Intensive Inquiry into
             What Information Each Class Member Had .................................. 41
        (e)  There is No Common Evidence of Injury ....................................... 44

    5.  Plaintiffs' Unjust Enrichment Claim Is Also Fraught with Individual
        Issues (Count V) ...................................................................................... 44

C.  Plaintiffs' Claim for Punitive Damages Cannot be Certified for Classwide
    Adjudication ...................................................................................................... 45

D.  A Class Action Is Not the Superior Method of Adjudicating Plaintiffs' Claims ......... 45

E.  If Certified, This Case Would Be Unmanageable ............................................. 47

F.  Plaintiffs Are Inadequate Class Representatives ............................................... 48

G.  Plaintiffs' Proposed Class Definition Is Defective ........................................... 48

IV. CONCLUSION ............................................................................................................. 50

CERTIFICATE OF SERVICE .............................................................................................. 51

## TABLE OF AUTHORITIES

**Page**

### CASES

Adashunas v. Negley, 626 F.2d 600 (7th Cir. 1980) ...................................................... 48, 49

Amchem Prods. Inc. v. Windsor, 521 U.S. 591 (1997) ................................................... 23, 25

Andrews v. AT&T, 95 F.3d 1014 (11th Cir. 1996) ........................................................ 46

Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392 (E.D. Pa. 2006) ............... 37, 42, 43, 44

Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331 (4th Cir. 1998) ..................... 42, 47

Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir. 1996) ........................................ 46

Clay v. American Tobacco Co., 188 F.R.D. 483 (S.D. Ill. 1999) ....................................... 49

Commerce Bank/Pennsylvania v. First Union Nat'l Bank, 911 A.2d 133
(Pa. Super. Ct. 2006) ................................................................................ 44

Dass v. Epplen, 162 Colo. 60, 424 P.2d 779 (Colo. 1967) ............................................. 35

Dubin v. Security Union Title Ins. Co., 832 N.E.2d 815 (Ohio Ct. App. 2005) ..................... 30

Dunn v. Midwest Buslines, Inc., 94 F.R.D. 170 (E.D. Ark. 1982) ..................................... 49

Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974) ................................................... 46

Feingold v. Southeastern Penn. Transp. Auth., 512 Pa. 567, 517 A.2d 1270 (1986) ............... 45

Fisher v. Bristol-Myers Squibb Co., 181 F.R.D. 365 (N.D. Ill. 1998) .................................. 47

Forman v. Data Transfer, Inc., 164 F.R.D. 400 (E.D. Pa. 1995) ..................................... 49

Gardner v. First Am. Title Ins. Co., 2003 WL 221844 (D. Minn. Jan. 27, 2003) ................... 35, 46

Gariety v. Grant Thornton, LLP, 368 F.3d 356 (4th Cir. 2004) ....................................... 24, 36

Gavron v. Blinder Robinson & Co., Inc., 115 F.R.D. 318 (E.D. Pa. 1987) ............................ 42

General Tel. Co. of Southwest v. Falcon, 457 U.S. 147 (1982) ........................................ 23, 30

Gunnells v. Healthplan Services, Inc., 348 F.3d 417 (4th Cir. 2003) .................................. 41

Hagen v. City of Winnemucca, 108 F.R.D. 61 (D. Nev. 1985) ........................................ 49

**Page**

Halstead v. Motorcycle Safety Found., Inc., 71 F. Supp. 2d 455 (E.D. Pa. 1999) ................................ 34

Hampden Real Estate, Inc. v. Metropolitan Management Group, 2003 WL 23206072 (E.D. Pa. 2003) ................................................................................................................... 35

In re Am. Med Sys., Inc., 75 F.3d 1069 (6th Cir. 1996) ................................................................ 23

In re Coordinated Title Ins. Cases, 2004 WL. 690380 (N.Y. Sup. Jan. 8, 2004) ....................... 41

In re Fields, 2006 WL. 2191342 (E.D. Pa. July 31, 2006) .......................................................... 29

In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360 (E.D. La. 1997) ............... 46

In re Initial Public Offering Sec. Litig., 471 F.3d 24 (2d Cir. 2006) .......................................... 30

International Union v. Clark, 2006 WL. 2687005 (D. D.C. 2006) ............................................... 47

Intratex Gas Co. v. Beeson, 22 S.W.3d 398 (Tex. 2000) ............................................................ 48

Jones v. CBE Group, Inc., 215 F.R.D. 558 (D. Minn. 2003) ...................................................... 46

Kirkbride v. Lisbon Contractors, 521 Pa. 97, 555 A.2d 800 (1989) .......................................... 45

Lawson v. Brown, 349 F. Supp. 203 (W.D. Va. 1972) ................................................................ 36

Lockwood Motors, Inc. v. General Motors Corp., 162 F.R.D. 569 (D. Minn. 1995) ................. 25

Moore v. PaineWebber, Inc., 306 F.3d 1247 (2d Cir. 2002) ....................................................... 36

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154 (3d Cir. 2001) ............................................................................................ 23, 24, 26, 27, 30, 44

Nicodemus v. Union Pac. Corp., 204 F.R.D. 479 (D. Wyo. 2001) ...................................... 36, 48

Omicron Sys., Inc. v. Weiner, 860 A.2d 554 (Pa. Super. Ct. 2004) ........................................... 34

Randleman v. Fidelity Nat'l Title Ins. Co., 2006 WL. 3411529 (N. D. Ohio Nov. 17, 2006) .......................................................................................................... 29

Ricciardi v. Ameriquest Mortg. Co., 164 Fed. Appx. 221 (3d Cir. 2006) ............................ *passim*

Rogers v. Coburn Fin. Corp., 53 F.R.D. 182 (N.D. Ga. 1971) ................................................... 35

Rosenberg v. Digilog, Inc., 648 F. Supp. 40, 43-44 (E.D. Pa. 1985) ......................................... 42

Sanneman v. Chrysler, 191 F.R.D. 441 (E.D. Pa. 2000) ................................................. 27, 44, 46

**Page**

Santana Prods., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123 (3d Cir. 2005) ........................37

Sperberg v. Firestone Tire & Rubber Co., 61 F.R.D. 70 (N.D. Ohio 1973) ............................................49

Szabo v. Bridgeport Machs., Inc., 249 F.3d 672 (7th Cir. 2001) ................................................24

Thorn v. Jefferson-Pilot Ins. Co., 445 F.3d 311 (4th Cir. 2006) ......................................... 25, 43

TransPenn Wax Corp. v. McCandless, 50 F.3d 217 (3d Cir. 1995) ...........................................40

Trecker v. Manning Implement, Inc., 73 F.R.D. 554 (N.D. Iowa 1976) ...................................36

Tunis Brothers v. Ford Motor Co., 952 F.2d 715 (3d Cir. 1991) ............................................45

Wachtel v. Guardian Life Ins. Co. of America, 453 F.3d 179 (3d Cir. 2006)...............................3, 24, 30

Wilson v. Donegal Mut. Ins. Co., 410 Pa. Super. 312, 598 A.2d 1310 (1991) ................................ 36, 44

## STATUTES

12 U.S.C. § 2607 et. seq. ........................................................................................................................8

28 U.S.C. § 1292(b) ............................................................................................................ 10, 48

40 P.S. § 910-44(b) ...............................................................................................................10, 46, 48

40 P.S. § 910-46(d) ............................................................................................................... 10, 46

12 C.F.R. § 226.23(a)..............................................................................................................15

24 C.F.R. § 3500.6 .............................................................................................................8, 11, 42

Fed.R.Civ.P. 23(a)..........................................................................................................24, 25, 47

Fed.R.Civ.P. 23(b)(3) ........................................................................................... 23, 24, 26, 35, 45

## OTHER AUTHORITIES

HUD Brochure............................................................................................................................8

1999 TIRBOP Rate Manual..............................................................................................6, 25, 28, 41

2005 TIRBOP Manual..............................................................................................................passim

2006 TIRBOP Manual.........................................................................................................................8

## I.        <u>INTRODUCTION</u>

Plaintiffs' Motion for Class Certification is based on several false premises.  First, the TIRBOP Rate Manual that First American allegedly violated was not uniform throughout the class period.  Rather, the integral terms of the Manual were substantially amended in August 2005.  The Third Circuit's <u>Ricciardi</u> decision makes it clear that, prior to August 2005, a customer did not qualify for a discounted rate unless he presented evidence of a prior policy to the closing agent.  Prior to August 2005, there was *no* presumption that an unsatisfied mortgage or a deed to a bona fide purchaser was proof of a prior policy. Contrary to Plaintiffs' lynchpin assumption, every customer who may have been entitled to a discounted rate after the 2005 amendments did not necessarily qualify for the discount prior to the amendment.  The fact that the August 2005 amendment altered the requirements for customers to receive the discounts cannot be overstated.  When the proper standard is employed, a statistical review of First American's agent files indicates that only a *de minimis* 4.4% of customers were overcharged - a far cry from the staggering 81% alleged by Plaintiffs.  There is no credible evidence to support Plaintiffs' contention that First American's agents and employees routinely overcharge customers for title insurance. Indeed, the facts reveal a very different picture.  The methods by which First American and its agents informed customers of, and provided customers with, the discounted rates varied greatly from agent to agent, direct operation to direct operation, and time period to time period.  Although Plaintiffs cite to several cases from other states for the propositions that class certification is appropriate, none of these cases involved the TIRBOP Rate Manual, its amendments, similar requirements or the evidence before this Court.  The fact customers were required to <u>present</u> evidence of the prior policy during much of the class period raises a host of individual issues that cannot be tried on a classwide basis.

Critically, the evidence the Slapikases will present to prove they were overcharged will not prove that the next class member, or another was certainly overcharged.  Obviously the Slapikases' HUD-1 Settlement Statement – the only "common" evidence Plaintiffs point to – does not prove that any other class member was overcharged.  Nor does First American maintain any data or system to determine whether a customer was overcharged.  This can be found, if at all, only by an individual file-by-file review of each transaction to determine if: (1) the transaction was, in fact, a refinance or reissue; (2) there was any evidence of a prior policy; (3) the prior policy involved the same property; (4) there was no change in the fee simple ownership; and (5) the prior policy was within three or ten years of the later policy. Even if a class member qualified for a discounted rate, other individual factors must be analyzed to determine if the class member should have received it including:  (1) when the transaction occurred (prior to or after the 2005 amendment); (2) if the class member presented the prior policy; and if not, (3) whether there was an unsatisfied institutional mortgage or deed from a bona fide purchaser during the prior three or ten year period. Unquestionably, determining whether each putative class member was overcharged requires a manual, detailed, file-by-file review of each transaction – a tedious process that would take an untold number of years.  This case is simply not amenable to class certification.

## II.   <u>STATEMENT OF FACTS</u>

### A.   **Plaintiffs' Lawsuit**

Plaintiffs, Anthony and Alice Slapikas, paid for a title insurance policy insuring their mortgage lender, and the premium for that policy was governed by the rates published in the Title Insurance Rating Bureau of Pennsylvania's ("TIRBOP") Official Rate Manual ("Rate Manual").  Plaintiffs allege they were entitled to receive a discount on the policy premium (the "Refinance Rate"), which First American knew, but charged them the higher "Basic

Rate" (Am. Comp. ¶¶ 23-27).  Plaintiffs assert five causes of action:  (i) breach of contract;

(ii) breach of implied contract; (iii) fraud; (iv) violation of Pennsylvania's Unfair Trade

Practices and Consumer Protection Law ("UTPCPL"); and (v) unjust enrichment (Am.

Comp. ¶¶ 74-114).

        First American denies that Plaintiffs were entitled to the Refinance Rate for the title

insurance policy insuring the lender in their 2003 refinancing transaction or its agent, Mezzo

Land Services, LLC ("Mezzo"), failed to comply with the TIRBOP Rate Manual in

connection with the 2003 refinancing and that it is liable to Plaintiffs.

        On January 15, 2007, Plaintiffs filed a Renewed Motion for Class Certification

(Docs. 95, 97), which asks this Court to certify a class of:

> All persons in the Commonwealth of Pennsylvania who, at any time
> after December 19, 1999: (a) paid premiums for the purchase of title
> insurance from Defendant First American Title Insurance Company;
> (b) qualified for the Reissue Rate or Refinance Rate discounts
> provided in the Title Insurance Rate Manual filed by the Title
> Insurance Rating Bureau of Pennsylvania; and (c) did not receive the
> discount specified in the Manual.

        Their motion, however, fails to include a trial plan as suggested in Wachtel v.

Guardian Life Ins. Co. of America, 453 F.3d 179, 187-88 (3d Cir. 2006).

## B.      Title Insurance and Premiums

        Owners and lenders purchase title insurance to insure against, among other things,

losses arising from defects in the title to real property.  The two most common types of title

insurance are owner's policies and loan policies (also known as mortgage or lender's policies)

(Evan Zanic Declaration ¶ 3 (hereinafter "Zanic Dec. ¶ ____")) (Exh. 1).  An owner's policy

of title insurance insures risk to the owner from: loss if title to the property is vested other

than as set forth in the title policy, any defect in or encumbrance on the title, the

unmarketability of the title and lack of access to and from the property (Zanic Dec. ¶ 4)

(Exh. 1).  A loan policy of title insurance insures a mortgage lender against the same perils and, in addition, the invalidity or unenforceability of the lien of the insured mortgage and the priority of any lien or encumbrance over the insured mortgage (Zanic Dec. ¶ 4) (Exh. 1). Lenders often, but not always, require homeowners to purchase insurance protecting the lender's interest (Zanic Dec. ¶ 4) (Exh. 1).  The premium for the loan policy may be borne by the borrower.  Also, the lender, or mortgage broker may pay it in a "no-cost" refinance. (Zanic Dec. ¶ 5) (Exh. 1).

The premium, a one-time charge, is paid to the settlement agent (Zanic Dec. ¶ 5) (Exh. 1).  The policy remains in force indefinitely (Zanic Dec. ¶ 5) (Exh. 1).  The agent retains a portion of the premium as compensation for its work and remits the remainder of the premium to the underwriter (Zanic Dec. ¶ 5) (Exh. 1).  Because the agent performs the majority of the work to discover, eliminate, and cure title risks for the insureds, it retains most of the premium (Zanic Dec. ¶ 5) (Exh. 1).  In Pennsylvania, First American's agents retain up to XX%[1] of the premium charged for title insurance (Zanic Dec. ¶ 5) (Exh. 1). The specific percentage is specified in each agent's agency agreement with First American (Zanic Dec. ¶ 5) (Exh. 1).

## C.      First American Title and Its Independent Agents

First American is a national title insurance underwriter (Zanic Dec. ¶ 1) (Exh. 1).  It issues title insurance policies throughout the Commonwealth of Pennsylvania directly and through a network of independent agents (Zanic Dec. ¶ 7) (Exh. 1).  First American has 16 direct operation branch offices in Pennsylvania and 740 independent agents (Zanic Dec. ¶ 7, Exhs. A, B) (Exh. 1).  Several former and present First American agents are recognized and

---

[1]      Agent commissions are trade secrets and confidential commercial information which, if disclosed, would cause harm to First American (Zanic Dec. ¶ 4) (Exh. 1).   First American has included the specific commission data in Evan Zanic's Declaration filed under seal.

well-respected lawyers, law firms, judges and public office holders (Zanic Dec. ¶ 9, Exh. C)

(Exh. 1).  Approximately XX%[2] of First American's residential title business is conducted by

direct operations (Zanic Dec. ¶ 8) (Exh. 1).  The remaining XX% is from hundreds of

independent agents (Zanic Dec. ¶ 8) (Exh. 1).

In Pennsylvania, agents are licensed by the Commonwealth, must pass a licensing

exam, and are required to take continuing education classes (Zanic Dec. ¶ 10) (Exh. 1).  First

American provides additional training to them through seminars, bulletins and other training

materials, visits from agency representatives, and on-call assistance (Zanic Dec. ¶ 10) (Exh.

1).  Although the agents have an agreement with First American to sell and to issue title

policies, they are independent businesses and deal directly with customers (Zanic Dec. ¶ 12)

(Exh. 1).  The independent agents: (1) receive the applications for title work, (2) process the

orders for title policies, (3) perform all services necessary to issue title policies, (4) examine

or cause the title evidence to be examined, (5) obtain information from customers' prior

lender(s) to pay off any prior loan as part of a refinancing transaction, (6) obtain information

from customers' lenders, (7) issue title insurance commitments, (8) prepare HUD-1

Settlement Statements, (9) prepare other necessary closing documents, (10) conduct the

closing of the transactions, and (11) receive funds from customers or their lenders at closing

for the title insurance premium as shown on the HUD-1 Settlement Statements (Zanic Dec.

¶ 12) (Exh. 1).  Critically, the agents also calculate the premium to be charged for title

insurance (Zanic Dec. ¶ 12) (Exh. 1).  First American is not informed about any particular

policy an agent sells until it is issued and it receives its portion of the premium (Zanic Dec. ¶

12) (Exh. 1).

---

[2]     The percentage of First American business conducted by independent agents is also trade secret
and confidential commercial information contained in Zanic's Declaration filed under seal
herewith.

D.      **The TIRBOP Manuals**

First American's title insurance premium rates, including the basic rate and all

discounted rates, are published in the TIRBOP Manual. 40 P.S. § 910-41.  TIRBOP amends

its manual from time to time (Zanic Dec. ¶ 13, Exhs. E-G) (**Exh. 1**).  Before being

published in the TIRBOP Rate Manual, rates must be approved by the Pennsylvania

Insurance Commissioner.  40 P.S. § 910-37(a).  Once approved, an insurer may not deviate

from the filed rates.  <u>Id</u>.

1.      **1999 TIRBOP Rate Manual**

In 1999, when the proposed class period starts, TIRBOP published a rate manual

that provided two discounted title insurance premium rates, the "Reissue" and the

"Refinance" rates.  ("1999 TIRBOP Manual") (Zanic Dec. ¶ 13, Exh. E  ¶¶ 5.3, 5.6) (**Exh.**

**1**).  Under the 1999 TIRBOP Manual, a customer was entitled to purchase title insurance at

the discounted Reissue rate "if the real property to be insured is identical to or is part of real

property insured 10 years immediately prior to the date the insured transaction closes <u>when</u>

<u>evidence of the earlier policy is produced</u> notwithstanding the amount of coverage provided

by the prior policy" (Zanic Dec. ¶ 13, Exh. E § 5.3) (**Exh. 1**).  Similarly, the Refinance rate

was available "[w]hen a refinance or substitution loan is made within 3 years from the date

of closing of a previously insured mortgage or fee interest and the premises to be insured are

identical to or part of the real property previously insured and there has been no change in

the fee simple ownership" (Zanic Dec. ¶ 13, Exh. E ¶ 5.6) (**Exh. 1**).  Under the 1999

TIRBOP Manual, actual evidence of prior insurance was required to be produced before a

customer could receive the Reissue or Refinance rates.  <u>E.g.</u>, <u>Ricciardi v. Ameriquest Mortg.</u>

<u>Co.</u>, 164 Fed. Appx. 221, 225-26 (3d Cir. 2006).  Indeed, the Department of Insurance cited

agents that provided customers the Reissue or Refinance rate without first obtaining

evidence of prior insurance (Evan Zanic Deposition., p. 193) (Exh. 2) (hereinafter "Zanic Dep."). The 1999 Manual did not specify what "evidence" must be produced to prove the issuance of prior insurance. (Zanic Dep., pgs. 185-88) (Exh. 2). Although First American issued non-binding guidelines (known as Bulletins) suggesting what evidence constituted sufficient proof of prior insurance, the agents had discretion whether to follow those guidelines (Zanic Dep., pgs. 77-82) (Exh. 2). Under the First American guidelines, evidence of a prior deed or mortgage was not sufficient to presume the existence of prior insurance (Zanic Dep., pgs. 185-86) (Exh. 2). The TIRBOP Manual was amended in 2000, 2002, 2003, and January 2005. The Reissue and Refinance rate provisions remained unchanged in those versions of the Manual (Zanic Dec. ¶ 13) (**Exh. 1**).

> ### 2.    2005 TIRBOP Manual

In August 2005, the Reissue and Refinance rate provisions of the TIRBOP Manual were amended (hereinafter the "2005 TIRBOP Manual") (Zanic Dec. ¶ 13, Exh. F ¶ 2.8) (**Exh. 1**). The 2005 amendment lessened the "evidentiary" requirements customers must satisfy to be entitled to Reissue or Refinance discounts. Id. It provides, in relevant part, that the Reissue and Refinance rates "are applicable when evidence of previous insurance" is provided.

As evidence of previous insurance, an Insurer shall rely upon:

   (a)   the recording (within the period of time specified within the applicable Section of the Manual) of either:
         (1)   a deed to a bona fide purchaser for value, or
         (2)   an unsatisfied mortgage to an institutional lender; or in the alternative,
   (b)   any of the following documents produced by or on behalf of the purchaser of the title insurance policy:
         (1)   a copy of the prior policy;
         (2)   a copy of the marked-up commitment;
         (3)   a settlement sheet showing payment of a title insurance premium; or

> (4)   other written evidence acceptable to the Insurer that title insurance
> coverage was purchased for the property.

Id.  Although the 2005 TIRBOP Manual still nominally requires customers to provide

evidence of a prior mortgage, it actually creates the presumption that prior insurance exists if

a deed or unsatisfied mortgage was recorded during the applicable time period.  Id.

### 3.     2006 TIRBOP Manual

To further complicate matters, TIRBOP amended the manual again effective May 1,

2006.  The 2006 amendment did not change the presumptions regarding proof of prior

insurance, but it did change the time periods within which the Refinance rate is available.

Instead of one 80% reduced rate available within three years of a prior policy, the 2006

manual provides a 70% rate within two years and a 80% rate within four years.  Zanic Dec. ¶

13, Exh. G) (Exh. 1).

### E.     Public Knowledge of the Reissue and Refinance Rates

The rates in the TIRBOP Manual are a matter of public record and readily available

to consumers (Zanic Dec. ¶ 14) (Exh. 1).  The current version of the manual is available

online at www.titlelawannotated.com/TIRBOP/4.03%20TIRBOP%20Rating%20

Manual1.pdf.  It is also available on First American's website at

http://www.firstamne.com/printable/rates_filings/manual_pa.pdf

 (Zanic Dec. ¶ 14, Exh. 2) (Exh. 1).  First American also provides an online rate calculator at

http://titlefees.firstam.com (Zanic Dec. ¶ 14) (Exh.1).

At all relevant times, the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607 et.

seq. ("RESPA"), required lenders and mortgage brokers to provide customers with a HUD

brochure that informs them of the Reissue and Refinance rates.  24 C.F.R. § 3500.6.  These

regulations mandate that those who apply for a federally-related mortgage loan be given a

pamphlet that states: "[I]f you are buying a home which has changed hands within the last several years, ask your title company about a 'reissue rate,' which would be cheaper." (Exh. 3, p. 9).

Moreover, discounted title insurance rates are widely publicized in the general media. Articles have frequently appeared in Pennsylvania and national publications since 1998 informing the public of the availability of Reissue and Refinance rates. (<u>E.g.</u>, Schulz Aff., Exhs. 1-14) (Exh. 4). The Pittsburgh Post-Gazette published an article in October 1998 informing readers of "auxiliary" costs related to buying real estate. (Schulz Aff., Exh. 14) (Exh. 4). It states: "If the seller had obtained title insurance recently, [ ] insurers can offer a 'reissue rate' to the new owner. On a $100,000 house, for example, new title insurance would cost $829 while a reissue would cost only $746." <u>Id</u>. In October 2003, the Allentown Morning Call published an entire article on title insurance that informed readers:

> If you are refinancing within 10 years, you can ask for a reissue rate. The reissue rate is discounted. The amount of the discount varies by state…In Pennsylvania the reissue rate discount is 10 percent…Most companies give an additional 20 percent discount if the loan is being refinanced within three years…The reissue rate on a $100,000 loan is about $770. With the additional discount, it would be about $620. When you are refinancing, it's important to ask for reissue rates if you qualify, because some title companies don't volunteer them…

<u>Id</u>. In October 2005, the Pittsburgh Post-Gazette published another article that advises the public how to minimize refinancing costs: "If you've obtained title insurance recently, ask your lender for a lower-cost "reissue" title insurance policy." (Schulz Aff., Exh. 11) (Exh. 4). National publications like USA Today have also publicized the availability of discounted Reissue or Refinance rates. (Schulz Aff., Exh. 13) (Exh. 4). Public knowledge of the availability of the Reissue and Refinance rate discounts is so prevalent that some customers ask agents if they qualify for it. (Gusty Sunseri Deposition p. 40) (Exh. 5) (hereinafter,

"Sunseri Dep."). Certainly, lenders and mortgage brokers are very familiar with their discounts (See, Exh. 1, 11, 12).

## F.     Administrative Remedies Exist

The Pennsylvania Title Insurance Act at 40 P.S. § 910-44(b) provides a specific remedy for customers who believe they have been charged an incorrect rate for title insurance:

> Every rating organization and every title insurance company which makes its own rates shall provide, within this Commonwealth, reasonable means whereby any person aggrieved by the application of its rating system may be heard, in person or by his authorized representative, on his written request to review the manner in which such rating system has been applied in connection with the insurance afforded him. If the rating organization or title insurance company fails to grant or reject such request within thirty days after it is made, the applicant may proceed in the same manner as if his application had been rejected. Any party affected by the action of such rating organization or such title insurance company on such request may, within thirty days after written notice of such action, appeal to the commissioner, who, after a hearing held upon not less than ten days written notice to the appellant and to such rating organization or insurer, may affirm or reverse such action.

Section 910-44(b), therefore, creates a remedial system for an aggrieved person to request from a title insurer or TIRBOP a decision whether the customer is entitled to a refund of any title insurance premium that was allegedly overcharged and, if no such refund is forthcoming, the right to appeal to the Insurance Commissioner. 40 P.S. § 910-44(b). After a hearing on the issue, the Insurance Commissioner in turn has the power to "grant the relief appropriate" including a refund of an alleged overcharge. 40 P.S. § 910-46(d). Plaintiffs have failed to pursue this remedy.[3]

---

[3]     First American and Mezzo filed motions asserting that this Court lacks jurisdiction to hear Plaintiffs' claims because Plaintiffs failed to exhaust the administrative remedies provided in 40 P.S. § 910-44(b). Although the Court denied the motions, it invited First American and Mezzo to seek certification for interlocutory appeal. First American's and Mezzo's motion to certify this issue for immediate review by the Third Circuit pursuant to 28 U. S.C. § 1292(b) is currently pending before this Court (Doc. 102).

**G.     The Slapikases' Transaction**

Plaintiffs purchased a home at 626 Orchard Hill Drive in Pittsburgh in 1990, took out a mortgage and purchased title insurance (Alice Slapikas Dep., pp. 17-20) (Exh. 6).  They refinanced their mortgage five times between 1992 and 2003 (Alice Slapikas Dep. p. 11). Their 2003 refinance loan was provided by National City Mortgage Corporation ("National City") (Comp. ¶ 10).  Attendant to the 2003 refinancing, National City required Plaintiffs to pay the premium on a lender's policy of title insurance (Comp. ¶ 12).  Plaintiffs, or their mortgage broker, hired Mezzo to perform the settlement and closing services related to the 2003 refinancing (Comp. ¶ 11).  Mezzo prepared and signed the HUD-1 Settlement Statement outlining the fees paid from Plaintiffs' funds at settlement (Comp. ¶¶ 11, 13).  The premium charged for the lender's policy of title insurance was $1,198.75 (Alice Slapikas Dep. p. 20) (Exh. 6).  Plaintiffs maintain that Mezzo failed to inform them of the availability of the refinance rate before their transaction closed.  (Doc. 100, p. 6).

**H.     Slapikases' Knowledge of the Availability of the Discounts**

As required by HUD regulation (24 C.F.R. § 3500.6) in 1992 and after, Plaintiffs' lenders provided the disclosure pamphlets informing the Slapikases of the availability of Reissue and Refinance rates.  Plaintiffs produced federally-mandated Good Faith Estimates of Settlement Charges provided by their lenders in connection with their 1992, 1998, 2000, and 2001 refinancing transactions that certify Plaintiffs received the HUD disclosure pamphlet.  (Exh. 7).

**I.     First American's Relationship with Mezzo Land Services, LLC**

First American and Mezzo entered into an agency agreement on November 16, 2001 (Zanic Dec. ¶ 15, Exh. H) (**Exh. 1**) ("Agency Agreement").  It authorized Mezzo to "originate and solicit applications for title insurance, to examine and issue commitments to

insure, to conduct settlements in connection with applications for title insurance, and to issue and countersign policies of title insurance" in the Commonwealth of Pennsylvania (Zanic Dec. ¶ 15, Exh. H) (**Exh. 1**).  The Agency Agreement provides that Mezzo shall conduct its agency activities "in accordance with the rules, regulations and instructions of insurance laws, rules, and regulations of the Commonwealth of Pennsylvania. . . .  (Zanic Dec. ¶ 15, Exh. H, ¶ 2.I) (**Exh. 1**).  It also mandates that Mezzo "shall be liable to [First American] for all loss, cost or damage, including attorneys' fees and other costs, which [First American] may sustain, or become liable for on account of:

> **BREACH OF CONTRACT**
> A.    Failure of [Mezzo] to comply with the terms of this Agreement or with rules, regulations, and instructions given to [Mezzo] by [First American].
>
> **FRAUD, NEGLIGENCE, ETC.**
> B.    Any  dishonest, fraudulent, malicious, criminal or negligent act, whether by [Mezzo] or by [Mezzo's] employees or parties hired by [Mezzo], in connection with:
>
> > (1)    The issuance of an abstract of title, binder, commitment to insure, or policy of title insurance or other evidence of title of [First American]. . . .

(Zanic Dec. ¶ 15, Exh. H, ¶ 13) (**Exh. 1**).  Mezzo, not First American: dealt directly with Plaintiffs; received the application for the title work; processed the order for a title insurance policy; performed all services necessary as a pre-condition to issuing a title insurance policy; examined or caused the title evidence to be examined; obtained information from Plaintiffs' prior lender as necessary to pay off the prior loan as part of the refinancing; obtained information from Plaintiffs' new lender; issued a title insurance commitment; prepared the HUD-1 Settlement Statement; prepared other necessary closing documents; conducted the closing of the transaction; received funds from Plaintiffs or their new lender at closing for the title insurance premium as shown on the HUD-1 Settlement Statement line 1108; kept

$1036.90 as its share of the title insurance premium, and remitted the remainder of the premium to First American on or about July 15, 2003, which was the first notice to First American that Plaintiffs' new lender was among its insureds (Zanic Dec. ¶ 12) (Exh. 1).

**J.      There is No 'Typical' Reissue or Refinancing Closing Because Agents' Practices Vary Substantially**

Agents' practices related to providing the Reissue or Refinance rate to customers vary from agent to agent, and each of First American's 740 independent agents in Pennsylvania were free to adopt its own practices prior to the August 1, 2005, TIRBOP amendment.  Even First American's practices in its branch offices vary from one side of Pennsylvania to the other.

**1.      First American's Direct Operations**

Prior to the 2005 TIRBOP Manual, First American's direct operations would look for evidence that a prior title insurance policy was issued within the required number of years (Inkpen Dec. ¶ 5) (Exh. 8).  Actual evidence of prior title insurance policy was required to qualify for the Reissue or Refinance rate (Stinelli Dec. ¶ 4) (Exh. 9).  In eastern Pennsylvania, First American's direct operations would often find a stamp by a prior title company on some of the recorded instruments (Inkpen Dec. ¶ 5) (Exh. 8).  If they did not find such a stamp, the escrow officer would ask for proof of prior insurance by speaking to the real estate agent, mortgage broker, or borrower (Inkpen Dec. ¶ 5) (Exh. 8).

In Pittsburgh, First American's direct operations would ask the person placing the order if there was any back title work available, particularly copies of a prior title insurance policy (Stinelli Dec. ¶ 5) (Exh. 9).  The practice in the Pittsburgh office was to ascertain from the title abstract whether there was a recent sale or first mortgage to an institutional lender that would have been insured (Stinelli Dec. ¶ 6) (Exh. 9).  First American would then call the customer and ask for a copy of the prior policy (Stinelli Dec. ¶ 6) (Exh. 9).  On a refinance

transaction, First American would typically contact the borrower directly and ask for evidence of the prior policy (Stinelli Dec. ¶ 6) (Exh. 9).  If the prior policy was a loan policy, the borrower might not have a copy, but First American would accept other evidence of the issuance of that policy, such as a HUD-1 settlement statement showing the premium the borrower paid for the prior loan policy (Stinelli Dec. ¶ 6) (Exh. 9).

Since the 2005 amendment to the TIRBOP Rate Manual, First American's direct operations provide the Reissue or Refinance rate discounts based on the presumption that a recorded deed for consideration or a recorded institutional mortgage was insured (Inkpen Dec. ¶ 2; Stinelli Dec. ¶ 3) (Exh. 9).  The information on these prior instruments is provided to First American's direct operations by their searchers or abstractors (Inkpen Dec. ¶ 2) (Exh. 8).  First American's direct operations also disclose to the buyers/owners that the property may qualify for a lower rate in their owner's affidavit (Inkpen Dec. ¶ 3) (Exh. 8).  This has been included in a notice to buyers/owners since the 2005 TIRBOP amendment (Inkpen Dec. ¶ 3) (Exh. 8).

### 2.    Independent Agents' Practices

Although First American provides its agents with bulletins and offers its agents training and support, it does not and could not supervise its agents on a transaction-by-transaction basis (Zanic Dep. 77-82) (Exh. 2).  Prior to the 2005 TIRBOP Manual, agents had the discretion to determine what evidence was sufficient to prove the existence of prior title insurance (Zanic Dep. 185-88) (Exh. 2).  For example, First American's Bulletin 2002-10 advised agents that they could accept a completed settlement sheet, verbal or written confirmation from the prior settlement agent, notations on a prior recorded document, or personal familiarity with local lender practice as evidence of prior insurance (Zanic Dec. ¶ 11, Exh. C) (Exh. 1).  Some of the forms of evidence, such as a

prior HUD-1 Settlement Statement, if provided in writing, would be in the agent's file. Others, such as familiarity with local lender practice, would involve a judgment call by the agent, which could not be second-guessed without individual testimony from the agent (Zanic Dep., pgs. 185-189) (Exh. 2).

On the other hand, the only evidence that some agents, such as Mezzo, the settlement agent in Plaintiffs' refinancing transaction, accepted before the 2005 amendment was "a final policy from the insured" (Sunseri Dep., p. 36) (Exh. 3). The agency's procedure was to ask customers if they had a prior policy (Sunseri Dep., p. 37) (Exh. 3). "If they had a prior policy within the requisite timeframes, then they would have an opportunity of having either of those, either the reissue or the substitution [refinance] rate" (Sunseri Dep., p. 37) (Exh. 3). Although First American's guidelines suggested that HUD-1 Settlement Statements might be sufficient evidence of prior insurance, Mezzo exercised its discretion and chose not accept them (Sunseri Dep., pp. 55-57) (Exh. 3). Because customers have a three-day statutory rescission period after closing in which to rescind a refinancing transaction (12 C.F.R. § 226.23(a)), a HUD-1 Settlement Statement alone does not unequivocally prove that the transaction closed and insurance was actually issued (Sunseri Dep., pp. 54-55) (Exh. 3). Nevertheless, since Mezzo's practice was to ask for a prior policy, the borrower had an opportunity to provide it. Other agents adopted differing procedures. For example, in the Philadelphia area, some agents looked for a stamp on the recorded deed or mortgage indicating the recorder was to return it to a particular title company. If the agents could not determine if prior insurance existed, they would contact the other title company (Strong Dec. ¶ 10) (Exh. 11). The common thread is that all of these agents asked orally for proof of a prior policy in what they considered appropriate circumstances.

Since the 2005 amendment, the TIRBOP Manual requires agents to provide the following notice or availability of the discounts:  "IF THIS CONVEYANCE OR REFINANCE OCCURS WITHIN TEN YEARS OF A PREVIOUS INSURANCE OF THE SAME PROPERTY, YOU MAY BE ENTITLED TO A REDUCED RATE" (Zanic Dec ¶ 13, Exh. F and G) (Exh. 1).

Nevertheless, most First American agents use a consistent but somewhat different disclosure.  The owner's affidavit used by most agents says:

> "NOTE:  If this transaction occurs within ten years of a previous title insurance transaction of the same property, or a portion thereof, it may be entitled to a reduced title insurance rate.
>
> To the best of our knowledge, title insurance was last obtained on _____."

Similarly, the purchaser's affidavit used by most agents includes the first sentence quoted above but not the second sentence (Strong Dec. ¶ 7) (Exh. 11).  Both an owner's affidavit and a purchaser's affidavit are required for any buy-sell transaction to which the Reissue Rate might apply.  An owner's affidavit (since there is no purchaser) is required for every refinance transaction.

**K.     First American Does Not Have Data to Identify Putative Class Members**

      **1.     First American's Direct Operations System (FAST)**

From the beginning of the putative class period to February 2003, First American computer systems only had an imaged repository of policies that cannot be electronically searched (Godec Aff. ¶ 6) (Exh. 10).  Since February 2003, First American has used the FAST system in its direct operations branches in Pennsylvania (Godec Aff. ¶ 5) (Exh. 10).  The FAST system is both a "production system" that has output (*e.g.*, title policies) and a database (Godec Aff. ¶ 5) (Exh. 10).  First American uses the FAST system to store the data on the policies First American has issued directly (Godec Aff. ¶ 5) (Exh. 10).  The FAST

system is used only by First American's direct operations that represent only XX%[4] of First American's current business in Pennsylvania (Godec Aff. ¶ 8) (Exh. 10). The FAST system contains data on the title policies issued by First American direct operations, the title abstract and examination, and the closing file if First American handled the closing as well as the issuance of the policy.

    **2.        Agent Computer Capabilities (WINGS)**

       First American uses the WINGS system to track information on title policies issued by independent agents in Pennsylvania (Godec Aff. ¶ 11) (Exh. 10). It is not a title policy production system; rather, it is only an agent remittance and tracking system that accounts for funds received (Godec Aff. ¶ 11) (Exh. 10). The agents issue policies and remit part of the premium and some limited information to First American only after a policy is issued (Godec Aff. ¶ 11; Zanic Dec. ¶ 6) (Exh. 10; Exh. 1). Obviously, the WINGS system receives and can issue reports only as to the information that the agents provide. Further, agents in Pennsylvania do not consistently report all of the data that WINGS could capture (Godec Aff. ¶ 11) (Exh. 10). In other words, different agents report different data, and even some agents do not consistently report the same data (Godec Aff. ¶ 11) (Exh. 10). Also, there are no automated links or interfaces between any agent in Pennsylvania and WINGS that would allow the transfer of data directly from an agent to First American (Godec Aff. ¶ 11) (Exh. 10).

       For First American policies issued by independent agents in Pennsylvania, the WINGS system can identify which policies were sold at the Basic Rate, Reissue Rate, and Refinance Rate <u>only</u> if that data was provided by the agent (Godec Aff. ¶ 13) (Exh. 10). The ability to distinguish among these rates is a special feature programmed into WINGS for

---

[4]      This information is confidential, trade secret information. The specific percentage is contained in Larry Godec's Affidavit which is being filed with this Court under seal.

Pennsylvania because of its unique requirement that First American report the number of policies sold at each rate in the state at the end of the year (Godec Aff. ¶ 13) (Exh. 10).

In addition to the field that distinguishes among the Basic, Reissue, and Refinance Rates, the WINGS system also has a series of fields to collect refinance information. These fields ask the person entering data in WINGS to check whether the transaction is a refinance and to give the face amount and date of the prior policy. Specifically, the fields are: Refinance Check Box, Previous Liability/Insurance, and Previous Policy Date (collectively the "Refinance Fields" in WINGS) (Godec Aff. ¶ 14) (Exh. 10). The Refinance Fields in WINGS could be used to identify persons who received the discount, but a report of a search of them would not identify anyone who did <u>not</u> receive the discount (Godec Aff. ¶ 15) (Exh. 10). Furthermore, WINGS does not have a data field to capture either the legal description or the property address for Pennsylvania (Godec Aff. ¶ 16) (Exh. 10). Nor does it have a data field to capture the mortgagor's (borrower's) name for a lender's policy because the lender (mortgagee) is the insured (Godec Aff. ¶ 17) (Exh. 10).

Although WINGS has fields that can identify policies sold at the Basic, Reissue, or Refinance rates, there is no report that can be run to determine whether a customer who was charged the Basic rate was entitled to receive a discounted Reissue or Refinance rate. Indeed, the WINGS system report for the policy the Slapikases purchased from Mezzo shows that it is a Basic Rate loan policy, but the Refinance Fields (*i.e.,* Refinance Check Box, Previous Liability/Insurance, and Previous Policy Date fields) do not contain any data and are therefore all blank (Godec Aff. ¶ 18) (Exh. 10). Mezzo did not report any such data to First American, and thus, First American could not enter it in WINGS (Godec Aff. ¶ 18; Zanic Dec. ¶ 6) (Exh. 10; Exh. 1).

Moreover, a WINGS report for all loan policies that were sold at the Basic Rate in Pennsylvania from February, 2003 to January, 2007, and that have data in any of the "Refinance Fields" (*i.e.*, the Refinance Check Box, Previous Liability/Insurance; Previous Policy Date fields) identifies just four policies that were keyed in error since it is inconsistent and incorrect to report a policy as being sold at the Basic Rate and completing one of the Refinance Fields (Godec Aff. ¶ 19) (Exh. 10).

First American also has another system in operation in Pennsylvania called AgentNet (Godec Aff. ¶ 29) (Exh. 10).  The AgentNet system is a "back policy" system and it only contains prior First American policies issued by its agents in Pennsylvania.  Specifically, the AgentNet system stores scanned images of prior First American policies received from agents.  The AgentNet system in Pennsylvania dates back only to September, 2002; prior policies are not in AgentNet. AgentNet does not contain any images of title insurance policies issued in Pennsylvania by underwriters other than First American (Godec Aff. ¶ 29) (Exh. 10).

### 3.    Neither FAST Nor WINGS Can Identify the Class

It is not possible for First American to identify the Class using its systems or data. First American cannot identify the Class from FAST, WINGS, or any of its computer systems and databases.  Membership in the Class depends upon information that First American does not have (Godec Aff. ¶ 23) (Exh. 10).  To identify the Class, even just for policies issued by First American directly,  it would be absolutely necessary to review, individually, each imaged file in the FAST system for every policy issued by First American or an agent in Pennsylvania during the class period to try to determine whether: (1) the transaction was in fact a refinance; (2) there was any evidence of a prior policy; (3) the prior policy involved the same property; (4) there was no change in the fee simple ownership; and

(5) the prior policy was within three or ten years of the later policy. This review, while it could be done on a computer screen displaying imaged documents, would be tedious, labor-intensive and the same as reviewing paper documents (Godec Aff. ¶ 24; Zanic Dec. ¶ 14) (Exh. 10; Exh. 1).

The problem is even more acute for policies issued by agents. First American does not have the closing files for these policies – in either imaged or hard copy. The agents keep their own files, and they remit only limited information to First American. Recognizing this, Plaintiffs did not even attempt to identify class members from the WINGS remittance reports printed by First American. Instead, they issued a subpoena directly to Mezzo for the paper files. Mezzo provided Plaintiffs access to all its files but Plaintiffs' counsel reviewed only 898 files of over 2148 First American policies issued by Mezzo from 2000 to 2005. Plaintiffs would have to review the rest of the Mezzo files and then the similar files of the 739 other First American agents in Pennsylvania. (Even then, they would be unable to identify the class for policies issued before August 1, 2005.)

Moreover, no field in FAST or WINGS captures data as to whether there was a deed to a bona fide purchaser for value, or an unsatisfied mortgage to an institutional lender, or the date of either of those instruments (Godec Aff. ¶ 28) (Exh. 10). In addition to the information cited above, this is critical to a determination of class membership after the 2005 amendments to the TIRBOP Manual (Godec Aff. ¶ 24; Zanic Dec. ¶ 14) (Exh. 10; Exh. 1).

By way of example, for the purposes of this litigation, First American's Pennsylvania State Manager, Evan Zanic, reviewed 91 Mezzo files (10% of Plaintiffs' sample) to determine if those customers were overcharged for title insurance (Zanic Dec. ¶¶ 8-10) (Exh. 1). Even as the Pennsylvania State Manager for First American, Zanic could not possibly tell whether Mezzo charged the correct rate for those 91 files without personally reviewing each closing

file (Zanic Dec. ¶ 14) (Exh. 1).   He could not make this determination from the limited

information that First American keeps in its WINGS system on policies sold by agents in

Pennsylvania (Zanic Dec. ¶ 14) (Exh. 1).   The WINGS system could not tell him anything

about any <u>prior</u> transaction, such as whether it was within the required number of years,

whether it involved the same property or same mortgagors, or whether there was prior title

insurance and evidence of such insurance was provided (Zanic Dec. ¶ 14) (Exh. 1).  Even

with more than 20 years of experience in the title insurance field, Zanic's review of just 91

Mezzo files took approximately 15 hours for an average of 10 minutes per file (Zanic Dec. ¶

15) (Exh. 1).  Thus to review the 500,000 transactions suggested by Plaintiffs (Doc.100, p. 7)

would take an experienced reviewer(s) 83,333 hours.

If either the WINGS or FAST systems indicate that a policy was a Reissue or

Refinance policy, it is because those policies were charged one of those rates and the

purchaser of such a policy is clearly not a member of the Class. First American can not

possibly determine which borrowers' policies that were sold at the Basic Rate might have

qualified for the Refinance or Reissue Rates (Godec Aff. ¶ 26) (Exh. 10).

## L.     Plaintiffs' Statistical Review of Mezzo's Files is Inaccurate, Contains Glaring Miscalculations and Is Inadmissible

Plaintiffs' Motion for Class Certification is premised largely on a review of 898

closing files subpoenaed from Mezzo (Pl. App. 00130-31).  Plaintiffs maintain that 81%

(723/898) of the Mezzo files contained evidence of a prior title insurance policy that would

have qualified the borrower for the Reissue Rate or Refinance Rate.  <u>Id</u>.  This percentage is

grossly overstated.

First American reviewed a portion of the same 898 Mezzo files (Zanic Dec. ¶ 19)

(Exh. 1).  First American conducted a review of 91 of those files — slightly more than 10

percent — selected at random to re-examine the conclusions Plaintiffs drew as to whether

the borrowers were entitled to either the Reissue Rate or the Refinance Rate (Zanic Dec. ¶¶ 19-20) (Exh. 1). First American's review found the summary was consistently wrong about whether a borrower qualified for the Reissue Rate or Refinance Rate (Zanic Dec. ¶ 20) (Exh. 1). In fact, First American's review uncovered (1) only <u>four</u> borrowers who were overcharged (Zanic Dec. ¶ 22) (Exh. 1); (2) two (Zellars and Booth) received the Basic Rate but should have received the Refinance Rate; (3) two others (Amodeo and Brown) did receive the discounted Reissue Rate but should have received the further discounted Refinance Rate (Zanic Dec. ¶ 22) (Exh. 1). Further, three borrowers (Brida, Ostrich, and Salari-Lak) received the Reissue Rate but were not entitled to it and were <u>under</u>charged (Zanic Dec. ¶ 22) (Exh. 1). The 4 of 91 files that were overcharged correspond to a *de minimis* error rate of approximately 4.4% (Zanic Dec. ¶ 23) (Exh. 1).

It appears that Plaintiffs' summary grossly inflates the error rate by improperly applying the presumptions the 2005 TIRBOP Manual to all of the 898 Mezzo files (Zanic Dec. ¶ 27) (Exh. 1). However, <u>none</u> of the 898 Mezzo files reviewed were for transactions in 2005, and the 2005 TIRBOP Manual could not apply, retroactively, to them (Zanic Dec. ¶ 27) (Exh. 1). With the approval of the Pennsylvania Insurance Commissioner, TIRBOP amended the rate manual effective August 1, 2005, to create a presumption that there was prior title insurance if there was deed to a bona fide purchaser for value or an unsatisfied mortgage to an institutional lender (Zanic Dec. ¶ 28, Exh. F) (Exh. 1). The 2005 amendment to the TIRBOP Manual represented a significant change by adopting a presumption — sometimes contrary to fact — that a deed to a bona fide purchaser for value and an unsatisfied mortgage to an institutional lender are always insured (Zanic Dec. ¶ 30) (Exh. 1). Prior to the August 1, 2005, amendments to the TIRBOP Manual, actual prior title insurance was required. E.g. <u>Ricciardi v. Ameriquest Mortg. Co.</u>, 164 Fed. Appx. 221,

225-26 (3d Cir. 2006). Furthermore, the TIRBOP Manual required the presentation of some evidence of such prior title insurance to qualify for a Reissue or Refinance Rate (Zanic Dec. ¶ 31) (Exh. 1). It is inappropriate, illogical and unprecedented to apply the 2005 TIRBOP Manual to policies issued before August 1, 2005 (Zanic Dec. ¶ 32) (Exh. 1).

Finally, as a matter of law, Plaintiffs' summary is inadmissible evidence since it fails to comply with the requisites of the Federal Rules of Evidence as to both hearsay and summaries. Fed.R.Evid. 802 and 1006.

## III.   ARGUMENT

### A.   This Court Must Undertake a Rigorous Analysis

Certification of a class is a serious matter that requires "rigorous analysis." General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982). A lawsuit is not maintainable as a class action merely because a plaintiff makes class allegations. In re Am. Med Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996). Rather, the law places the burden of establishing each element necessary for a class action on the party seeking class certification. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14 (1997). As the issues raised by class certification are always "enmeshed in the factual and legal issues comprising the Plaintiff's causes of action," a court must probe behind the pleadings to determine whether the requirements for class certification are met. Falcon, 457 U.S. at 160. "[B]ecause the determination of a certification request invariably involves some examination of factual and legal issues underlying the plaintiffs' cause of action, a court may consider the substantive elements of the plaintiff's case…" Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 166 (3d Cir. 2001).

Here, Plaintiffs seek certification of a Rule 23(b)(3) class (Doc. 100, pp. 16-17). Before a court may certify a Rule 23(b)(3) class, Plaintiffs must prove the four requirements

of Rule 23(a) and two requirements of Rule 23(b)(3).  Fed.R.Civ.P. 23(a), 23(b)(3); <u>E.g.</u>,

<u>Newton</u>, 259 F.3d at 186; <u>see also</u>, <u>Szabo v. Bridgeport Machs., Inc.</u>, 249 F.3d 672, 676 (7th

Cir. 2001); <u>In re Initial Public Offering Sec. Litig.</u>, 471 F.3d 24, 32 (2d Cir. 2006).

     Rule 23 is to be treated as a threshold issue, similar to preliminary issues such as

personal or subject matter jurisdiction.  <u>Initial Public Offering</u>, 471 F.3d at 32.  The court,

when necessary, must resolve underlying factual disputes before certifying a class.  <u>Newton</u>,

259 F.3d at 166 (noting the Third Circuit follows this rule).  "There is no basis for thinking

that a specific Rule 23 requirement need not be fully established just because it concerns, or

even overlaps with, an aspect of the merits."  <u>Initial Public Offering</u>, 471 F.3d at 34.  The

burden is on Plaintiffs to prove each of the Rule 23 requirements by at least a preponderance

of the evidence.  <u>Id</u>. at 32, 41-42 (explicitly rejecting claim that plaintiffs need only make

"some showing" that Rule 23 requirements are satisfied to support class certification ); <u>see</u>

<u>also</u> <u>Newton</u>, 259 F.3d at 166.  <u>Szabo</u>, 249 F.3d at 676; <u>Gariety v. Grant Thornton, LLP</u>, 368

F.3d 356, 366 (4th Cir. 2004).

     A certification order is insufficient unless it includes:  "(1) a readily discernible, clear,

and precise statement of the parameters defining the class or classes to be certified, and (2) a

readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a

class basis."  <u>Wachtel v. Guardian Life Ins. Co. of America</u>, 453 F.3d 179, 187-88 (3d Cir.

2006).  Further, <u>Wachtel</u> also endorses the requirement that Plaintiffs submit a trial plan

describing the issues likely to be presented at trial and showing whether they are susceptible

to classwide proof.  <u>Id.</u> at 186 & nn.7-8.  Plaintiffs have not done so.

**B.     Individual Issues Predominate**

     The most serious flaw in Plaintiffs' proposed class action is that individual issues

clearly predominate over common ones.  The purpose of the predominance requirement is

to test "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., 521 U.S. at 623; see also Newton, 259 F.3d at 187. The predominance element is "far more demanding" than the commonality requirement of Rule 23(a), requiring more than a common claim. Amchem Prods., 521 U.S. at 623; Newton, 259 F.3d at 187. Predominance only exists "when there [is] generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." Lockwood Motors, Inc. v. General Motors Corp., 162 F.R.D. 569, 580 (D. Minn. 1995). "A question is not common … if its resolution turns on consideration of the individual circumstances of each class member." Thorn v. Jefferson-Pilot Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006).

1.    **Ricciardi Shows That the 2005 TIRBOP Manual Was a Change To (Not a Clarification of) the 1999 TIRBOP Manual**

Plaintiffs' premise certification on the assertion that the 2005 amendment to the Reissue and Refinance rates was merely a "clarification" of the 1999 version and did not constitute a fundamental change in the evidence required to be presented by a customer to receive these rates (Doc. 100). This notion, however, is irreconcilable with the Third Circuit's decision in Ricciardi v. Ameriquest Mortg. Co., 164 FedAppx. 221, 222-23 (3d Cir. 2006). In 2001, Ricciardi purchased a home and took out a mortgage with Cendant and then refinanced with Ameriquest. Id. At the time of the refinancing transaction, the prior mortgage with Cendant was unsatisfied. Id. Ricciardi sued Ameriquest alleging, among other things, various violations of the federal Truth in Lending Act. Id. at 222-23. Specifically, Ricciardi alleged that Ameriquest failed to provide him the Refinance rate in the 1999 TIRBOP Manual. The Third Circuit held that Ricciardi was not entitled to receive the Refinance rate. Id. at 225-26. The Court of Appeals reasoned that, under the 1999 TIRBOP Manual a borrower "is entitled to the refinance rate only if the previous mortgage

was insured.   "<u>As Ricciardi presented no evidence prior to or at the loan closing that his</u>

<u>previous mortgage was insured</u>, Ameriquest appropriately charged him the default title

insurance rates as published in the Rate Manual."  <u>Id</u>. at 226 (emphasis added).  The Court

held Ricciardi was not entitled to the Refinance rate although it confirmed that a prior

unsatisfied mortgage to an institutional lender existed at the time of the transaction.

Therefore, the Third Circuit has already determined an existing mortgage (and knowledge of

it) was insufficient to qualify for the discount rate and that the borrower must produce

"evidence."  This holding also forecloses any argument that the 2005 amendments merely

"clarified" the 1999 Manual..  Further, this holding is consistent with the plain language of

the TIRBOP Manual's term "provided" meaning given to the title agent; and not "exists" as

Plaintiffs urge.

> **2.    Individual Issues as to Who Was Allegedly Overcharged and,**
> **Therefore, Injured Overwhelm Each of Plaintiffs' Claims (All Counts)**

The Third Circuit has held that predominance is not satisfied when an individual

review of each class member's transaction is necessary to determine injury and, therefore,

liability.  <u>Newton</u>, 259 F.3d at 187.  This fatal flaw infects all of the counts of the first

amended complaint.  In <u>Newton</u>, investors brought a putative class action against their

brokers alleging that they failed to buy or sell class members' stock at the best available price.

<u>Id</u>. at 169-70.  The district court denied class certification holding, among other things, that

the predominance requirement of Rule 23(b)(3) was not satisfied because "individual

questions of whether each class member suffered economic injury presented insurmountable

obstacles to certification."  <u>Id</u>. at 187.   The Third Circuit upheld the district court's denial of

class certification, noting that assessing a broker's liability to a class member would first

require examining whether a particular trade (like the sale of a particular title policy)

provided an investor with the "best reasonably available price."  <u>Id</u>.  at 187, 190.

> Whether a class member suffered economic loss from a given
> securities transaction would require proof of the circumstances
> surrounding each trade, the availability of an alternative price, and the
> state of mind of each investor at the time the trade was requested.
> This Herculean task, involving hundreds of millions of transactions,
> counsels against finding predominance.

Id. The Third Circuit reasoned that "[p]roof of injury (whether or not an injury occurred at

all) must be distinguished from calculation of damages (which determines the actual value of

the injury)." Id. at 188. Because liability could not be presumed, the process of ascertaining

which class members sustained injury defeated the predominance requirement. Newton, 259

F.3d at 190. Similarly, in Sanneman v. Chrysler, 191 F.R.D. 441, 449-450 (E.D. Pa. 2000)

(Van Antwerpen, J.), the court denied class certification in an alleged vehicle defect case,

holding that predominance was not met because each class member was required to prove

the fact and extent of injury:

> The need to establish injury and causation with respect to each class
> member will necessarily require a detailed factual inquiry including
> physical examination of each vehicle, a mind-boggling concept that is
> preclusively costly in both time and money. We will not certify a
> class that will result in an administrative process lasting untold years,
> where threshold questions will overshadow common issues regarding
> Defendant's alleged conduct.

Just as in Newton and Sanneman, Plaintiffs here cannot adjudicate their claims on a

classwide basis. Unquestionably, the determination whether any particular class member

since 1999 was entitled to receive a discounted title insurance premium requires individual

testimony and documentary proof, first, that he or she produced evidence of a prior policy

(and what that evidence was) at or before closing. Second, even if the Court were prepared

to excuse class members from the presentation requirement (and disregard Ricciardi), each

class member would have to prove, at a minimum, that he or she in fact had a prior policy.

Third, even with respect to policies issued after the 2005 TIRBOP Manual, the Court would

still need to hear individual evidence whether the title records showed that there was a

qualifying prior deed or mortgage within the required number of years and the property and the fee owners were the same. No common evidence exists that can prove any of these requirements of the 2005 TIRBOP Manual.

Plaintiffs summarize their grossly oversimplified view of how this case could possibly be tried on a classwide basis at pages 4-5 of their brief. They say that <u>most</u> home buyers purchase an owner's policy, that <u>most</u> institutional lenders require loan policies, that the Court should thus assume that all deeds and mortgages were insured even when the 1999 TIRBOP Manual did not provide for any such presumptions, and that one could find the evidence of prior deeds and mortgages in the title records. This theory does not correspond to reality or the law and "most" is simply not good enough (if even correct) to support the certification mandate.

First, Plaintiffs fail to recognize that the 1999 TIRBOP Manual expressly put the burden on the borrower or other applicant for the policy to produce evidence of a prior title insurance policy to qualify for the discount: "A purchaser of title insurance shall be entitled to purchase this coverage at the reissue rate … when evidence of the prior policy is <u>produced</u>…." (emphasis added) This requirement is not optional and the plain meaning of "produce" is clear- it is not synonymous with "exists" as Plaintiffs argue. Instead, it requires action by the borrower. The Third Circuit has already spoken on this issue. "As <u>Ricciardi</u> <u>presented no evidence prior to or at the loan closing that his previous mortgage was insured,</u> Ameriquest appropriately charged him the default title insurance rates as published in the Rate Manual." <u>Ricciardi</u>, 164 Fed. Appx. at 226 (emphasis added). "Unless the conditions for a reduced rate are satisfied, a lender may reasonably charge the basic rate for title insurance." <u>In re Fields</u>, 2006 WL 2191342, *4 (E.D. Pa. July 31, 2006)(Bartle, C.J.).

Curiously, Plaintiffs' brief never mentioned that the Slapikases may have possessed the needed evidence to comply with this requirement.  In discovery they provided a copy of the HUD-1 Settlement Statement from their 2001 refinance to the mortgage broker who helped them with their 2003 refinance, and the mortgage broker provided it to the title agent, Mezzo.  (Doc. 100, at App. – 1 – 00036 to 36)  The HUD-1 shows the premium they paid in 2001 for the loan policy insuring their prior lender, and it is one of the forms of evidence of prior insurance mentioned in First American's 2002 Bulletin (Zanic Dec. ¶ 11, Exh. D) (Exh. 1).  However, the agents were not required to follow this bulletin (Zanic Dep., pp. 185-188) (Exh. 2), and Sunseri, the principal of Mezzo, testified that only a copy of the prior policy was sufficient but that his staff would have asked for it (Sunseri Dep., pp. 55-57) (Exh. 5).  Clearly, this is a dispute of fact to be tried not only in the Slapikases' individual case but, if necessary, if many thousands more.

Why, then, the silence about what may be the compelling evidence Plaintiffs could have, but failed to, produce at their closing?  They know that trying the issue of whether the Slapikases presented sufficient evidence of prior insurance to Mezzo before closing will not prove whether any other member of the class did likewise.  It is an individual issue that they want the Court to ignore or to trivialize.  Instead, they say that the presumptions adopted for the first time in the August 1, 2005 manual should apply, retroactively, to 1999.  The law does not permit this Court to indulge any such assumption.  If the 2005 TIRBOP Manual applied retroactively to policies issued before its enactment, the Third Circuit would have had to reach the exact opposite result in Ricciardi as would the Eastern District in In re Fields.

Plaintiffs cite Randleman v. Fidelity Nat'l Title Ins. Co., 2006 WL 3411529 (N. D. Ohio Nov. 17, 2006), for the proposition that a title agent could waive the presentation

requirement by not inquiring about the prior title insurance policy.  But this Court should follow <u>Ricciardi</u> and <u>In re Fields</u> rather than a readily-distinguishable district court decision from another circuit interpreting another state's requirements.  Moreover, whether the First American branch office or independent title agent asked the borrower or other applicant about any prior title insurance policies is a highly individualized issue of fact, as discussed <u>infra</u>.

Plaintiffs also cite the intermediate Ohio appellate court decision in <u>Dubin v. Security Union Title Ins. Co.</u>, 832 N.E.2d 815 (Ohio Ct. App. 2005), suggesting that whether a plaintiff must present evidence of a prior title insurance policy is an issue of fact that a court should not address on a motion for class certification.  <u>Dubin</u> interpreted different rules of procedure and jurisprudence and is distinguishable.  The U.S. Supreme Court requires this Court to probe behind the pleadings because the class certification decision is always enmeshed with the substantive factual and legal issues.  <u>Falcon</u>, 457 U.S. at 160.  The Third Circuit will require this Court to specify the factual issues to be tried on a classwide basis and will expect the plaintiffs to have a trial plan for their classwide evidence.  <u>Wachtel</u>, 453 F.3d 186-88.  Moreover, whether presentation of the prior policy is required is not an open issue after <u>Ricciardi</u> and <u>In re Fields</u>.

However, even if Plaintiffs could convince this Court to disregard <u>Ricciardi, In re Fields</u>, and the express presentation requirement of the TIRBOP manual, they still would not have classwide proof of injury that would satisfy Rule 23 or <u>Newton</u>.  Evidence of a prior title insurance is still required; waiver of the presentation requirement could benefit only putative class members who in fact had a qualifying prior policy.  Only due to discovery in this case and not from anything in the ordinary course of their dealings with Mezzo, is it known that the Slapikases had a prior loan policy issued.  Plaintiffs do not have evidence

that any other member of the proposed class had a prior policy within the required number of years insuring the same property and involving the same fee owners, and they failed to submit a trial plan demonstrating that such evidence exists or how to present it to the Court at trial that does not require thousands of individual, "mini-trials." Instead, Plaintiffs again want the Court to ignore or trivialize this issue. They want the Court to adopt an irrebuttable presumption from 1999 to the present and, contrary to fact, that every prior deed or institutional mortgage was insured. TIRBOP did not adopt this presumption until 2005.

First American and the agents have testified that this was a significant change in how the Refinance and Reissue rates were to be applied (Zanic Dec. ¶ 30; Strong Dec. ¶ 5)(Exhs. 1, 11). Plaintiffs say they can show that the presumption applies throughout the class period, but they cite only a single page of a First American Bulletin (Doc. 100, pg. 5 n. 7 citing App. 127) that does not say that agents can presume the existence of prior insurance.[5] Proving whether an agent received any of the types of acceptable evidence is just as highly individualized an inquiry as looking for prior policies, and trying to present classwide evidence of verbal confirmations or personal understandings is utterly useless.

It is recognized, of course, that the proposed class period extends to the present, and the presumptions adopted by TIRBOP in 2005 would apply to policies issued after August 1 of that year. Plaintiffs say that First American can determine whether a policy qualifies for a discount because the title search will reveal whether there was a deed to a bona fide purchaser for value or an unsatisfied mortgage to an institutional lender. This is not entirely

---

[5]     Instead, it tells agents that they need actual evidence of prior insurance, but it tells them that they can accept forms of evidence besides the prior policy itself, such as a completed settlement sheet, verbal or written confirmation from the prior title agent, notations on prior recorded instruments by a prior title company, or personal familiarity with local lender practice. If the agent did not receive such evidence, then the applicant was not entitled to a discount. (Zanic Dec. ¶ 5, Exh. D) (Exh. 1).

true, and Plaintiffs have not explained to the Court how they would try this case on a classwide basis even if it were so.  Thus, the Court cannot certify a class even as to policies issued after August 1, 2005.

A good title search will show the prior deeds and mortgages, but First American does not perform or get the results of the title search for the 60% of policies issued in Pennsylvania by independent agents.  The agents or the abstracters they hire perform the search, and the agents keep the abstract or other results in their own files.  First American never gets the agent's file (Godec Aff. ¶¶ 11, 26) (Exh. 10) .  That is why Plaintiffs' counsel went to Mezzo's warehouse of closed files and spent days poring through old files even though they were looking for nothing more than a prior deed or unsatisfied mortgage (E.g., Zanic Dec. ¶ 26) (Exh. 1).  Notably, they managed to review only 898 of over 2000 Mezzo files within the proposed class period, and Mezzo is only one of 740 independent agents in Pennsylvania.  Again, Plaintiffs have offered no trial plan explaining how the Court could possibly hear evidence and make findings of fact as to which class members had qualifying prior deeds or institutional mortgages.

Even as to First American's direct operations, the title evidence would be available since 2002 in imaged form in First American's FAST system, but scrolling through thousands of scanned abstracts would be only slightly less tedious than reviewing paper files (Godec Aff. ¶  24) (Exh. 10).  First American has no automated means to identify the class either before or after August 1, 2005.  None of the computer systems used by First American or its agents include data fields that record sufficient information to permit First American to search electronically for putative class members (Godec Aff. ¶¶ 18, 23, 24) (Exh. 10).

First American does not maintain any electronic data that makes it possible to determine whether a customer was overcharged without the individual file-by-file review of each transaction outlined above. Since 2003, First American's direct operations have electronically stored information related to the policies they issue on the FAST system (Godec Aff. ¶ 5) (Exh. 10). As to the amount of premium paid for any title policy in Pennsylvania, the FAST system captures only the total premium paid for a policy (Godec Aff. ¶ 10) (Exh. 10). Before 2003, First American's direct operation's systems did not maintain any searchable information related to policies issued (Godec Aff. ¶ 6) (Exh. 10).

First American uses the WINGS system to maintain information related to policies issued by its independent agents (Godec Aff. ¶ 11) (Exh. 10). While the WINGS system can identify which policies were reported as sold at the Basic, Reissue, and Refinance rates (and only if such information is reported by the agents to First American), there is no report that can be run to determine whether a customer who was charged the Basic rate was entitled to receive a discounted Reissue or Refinance rate (Godec Aff. ¶ 18) (Exh. 10). For instance, the WINGS system report for the Slapikases' policy only shows it was a Basic rate loan policy and there is no information in the Refinance fields (Godec Aff. ¶ 18) (Exh. 10). Moreover, a WINGS report for all loan policies that were sold at the Basic rate in Pennsylvania from February 2003 to January 2007, and that have data in the Refinance Fields, identifies just four policies that were keyed in error since it is inconsistent and incorrect to both report a policy as being sold at the Basic rate and complete one of the Refinance fields (Godec Aff. ¶ 19) (Exh. 10).

Other information critical to determining whether a customer was entitled to receive a discounted rate under the terms of the TIRBOP Manual (both pre and post 2005 amendment) is not maintained electronically. Neither the FAST or WINGS systems have a

data file to capture either the legal description or the property address for Pennsylvania (Godec Aff. ¶ 16) (Exh. 10). Nor do they have a data field to capture the mortgagor's (borrower's) name because the lender (mortgagee) is the insured (Godec Aff. ¶ 17) (Exh. 10).

Membership in the class simply depends upon information that First American does not have at all, much less electronically (Godec Aff. ¶ 23) (Exh. 10). Simply put, if either the FAST or WINGS systems indicate that a policy was a Reissue or Refinance policy, it is because those policies were charged one of the respective rates and the purchaser of such policy is not a member of the class. First American can not possibly determine which customers' policies that were sold at the Basic Rate might have qualified for the Refinance or Reissue rates (Godec Aff. ¶ 26) (Exh. 10). Because Plaintiffs cannot demonstrate that the essential elements of their claims can be proved on a classwide basis, common issues do not predominate and class certification is inappropriate.

**3.    Individual Issues Pervade Plaintiffs' Breach of Contract Claims (Counts I and II)**

Plaintiffs assert that First American breached an express or implied contract by systematically charging customers the Basic rate when they were entitled to the discounted Reissue or Refinance rates pursuant to the terms of the TIRBOP Manual (Doc. 100, pp. 13, 15-16). To establish breach of express or implied contract, Plaintiffs must prove: (1) mutual assent to the same terms; (2) exchanged consideration; and (3) breach. Omicron Sys., Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. Ct. 2004). As Plaintiffs recognize, the conduct of the parties and the surrounding circumstances are critical to the determination of whether an implied contract exists. E.g., Halstead v. Motorcycle Safety Found., Inc., 71 F. Supp. 2d 455, 459 (E.D. Pa. 1999).

Plaintiffs' unprecedented theory is that the breach of contract claims can be tried on a classwide basis because all class members should have received a HUD-1 Settlement Statement that allegedly promised to charge the "actual" rate for title insurance.  First American disagrees, of course, since there is an express contract—the lender's title insurance policy—to which the Slapikases and any others similarly situated were not a party.  See, e.g., Dass v. Epplen, 162 Colo. 60, 424 P.2d 779 (Colo. 1967) ("settlement sheet in this transaction creates no contractual rights but is merely an arithmetical calculation"); see also Hampden Real Estate, Inc. v. Metropolitan Management Group, 2003 WL 23206072 (E.D. Pa. 2003), rev'd on other grounds, 142 Fed.Appx. 600 (3d Cir. 2005).   That issue, however, is one for the forth-coming summary judgment.  Nevertheless, several insurmountable individual factual issues preclude class certification on the breach of contract counts.

First, evidence of a breach is, obviously, a key element of any breach of contract claim.  Nothing on the Slapikases' HUD-1 Settlement Statement proves that they were overcharged (i.e., charged something other than the "actual" rate).  Plaintiffs will have to prove breach (overcharging) through evidence other than the HUD-1, and they cannot do that on any common basis for all the reasons set forth supra.

Second, the HUD-1 is not common evidence in any event.  Although the HUD-1 Settlement Statement is a standardized form, there is a separate form individually prepared for each unique closing.  They often go through several drafts as the expected loan amount changes, and the final HUD-1 should be signed by the borrowers and the settlement agent.  Thousands of individual HUD-1 statements are not common evidence. [6]

---

[6]    Courts routinely deny certification of Rule 23(b)(3) class actions in cases where adjudication of the class claims would require a review of each and every class member's transaction on an individual basis.  See, e.g., Gardner v. First Am. Title Ins. Co., 2003 WL 221844, * 7-8 (D. Minn. Jan. 27, 2003)(certification denied where court was required to adjudicate each putative class member's claim to demonstrate RESPA violation); Rogers v. Coburn Fin. Corp., 53 F.R.D. 182,

Third, First American does not prepare the HUD-1 for transactions closed by the independent agents including attorneys.  Thus, it is not a party to any contract "evidenced" by the HUD-1.  Apart from that legal defect in Plaintiffs' theory, however, the practical problem is that only the 740 independent agents (plus 200 terminated agents active during the class period who no longer have any relationship with First American) have the HUD-1s. Plaintiffs have not offered a manageable trial plan demonstrating that the Court can review the final, signed HUD-1s,  from all these sources for many thousands of transactions.

### 4.     Individual Issues of Misrepresentation, Reliance and Injury Preclude Plaintiffs' Fraud and UTPCPL Claims (Counts III and IV)

It is widely-recognized that "fraud and misrepresentation claims are not readily susceptible to class action treatment."  <u>Gariety v. Grant Thornton, LLP</u>, 386 F.3d 356, 362 (4th Cir. 2004).  "Proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those misrepresentations" are issues that need to proven on an individual basis for each class member.  <u>Moore v. PaineWebber, Inc.</u>, 306 F.3d 1247, 1253 (2d Cir. 2002)(affirming denial of class certification in fraudulent misrepresentation case).

A cause of action for fraud in Pennsylvania requires that a plaintiff prove: (1) a representation; (2) which is material to the transaction; (3) made falsely, with knowledge of its falsity or recklessness as to its veracity; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance.  <u>Wilson v. Donegal Mut. Ins. Co.</u>, 410 Pa. Super. 312,

---

183 (N.D. Ga. 1971)(denied certification because court would have to physically examine several thousand TILA statements furnished to borrowers); <u>Nicodemus v. Union Pac. Corp.</u>, 204 F.R.D. 479, 488 (D. Wyo. 2001)(certification not appropriate because it was necessary to review thousands of deeds of individual class members); <u>Trecker v. Manning Implement, Inc.</u>, 73 F.R.D. 554, 560-64 (N.D. Iowa 1976)(class certification denied where class membership would require examination of thousands of invoices); <u>Lawson v. Brown</u>, 349 F. Supp. 203, 209 (W.D. Va. 1972)(same).

40-41, 598 A.2d 1310, 1315 (1991).  Similar elements must be shown for the UTPCPL claim.

In order to prove a violation of any provision of the UTPCPL, a plaintiff must prove both

reliance and causation.  E.g., Santana Prods., Inc. v. Bobrick Washroom Equip., Inc., 401

F.3d 123, 136 (3d Cir. 2005).   If UTPCPL claims are premised upon fraud allegations, a

plaintiff must prove the elements of common law fraud including a material

misrepresentation of fact, knowledge, justifiable reliance, and damages.  Baker v. Family

Credit Counseling Corp., 440 F. Supp.2d 392, 412 (E.D. Pa. 2006).

 The impropriety of certifying Plaintiffs' fraud and UTPCPL claims is clear.  Plaintiffs

allege that First American made misrepresentations "on the HUD-1 Settlement Statement of

an illegal, inflated premium for title insurance" (Doc. 100, p. 21).  First, individual facts are

necessary just to determine whether a misrepresentation occurred.  As detailed above, the

question whether a borrower was entitled to a discounted Reissue or Refinance rate but was

instead charged a Basic rate cannot be determined by computer analysis.  As Plaintiffs

acknowledge, the mere fact a borrower was charged the Basic rate as indicated on a HUD-1

Settlement Statement does not prove an overcharge.  Moreover, there is no common proof

of any non-disclosure.  Practices related to disclosing the existence of Reissue and Refinance

rates to borrowers varied from agent to agent and transaction to transaction. (Inkpen Aff. ¶

5; Stinelli Aff. ¶ 6; Strong Dec. ¶ 10)(Exhs. 8, 9, 11).  What any particular borrower was told

(or not told) is inherently an individual issue that cannot be proved on a classwide basis.

 Furthermore, whether any class member justifiably relied upon First American's

alleged misrepresentations necessarily depends on a fact-intensive inquiry into the

background of each plaintiff and what information each plaintiff actually had and when.  It is

not permissible to presume reliance in fraud or UTPCPL actions.  Similarly, the issue of

injury unequivocally varies from class member to class member.  Plaintiffs' only "evidence"

of a common fraudulent scheme is based on an inaccurate and misleading summary of one agent's files.

### (a)   There is No Common Evidence of a Fraudulent Scheme

The crux of Plaintiffs' fraud and UTPCPL claims is that First American has participated in a "statewide scheme to overcharge customers [ ] for title insurance" (Doc. 100, p. 20).  Plaintiffs represent to this Court that their review of Mezzo's records reveals that "First American has overcharged at least tens of thousands of Pennsylvania customers tens of millions of dollars for title insurance by failing to pass along the mandatory premium discounts…" (Doc. 100, pps. 7-8).  Plaintiffs' assertions are nothing more than conjecture premised on improper assumption yielding an inaccurate analysis of one agent's files that must be disregarded by this Court.   There is no <u>evidence</u> of any uniform scheme.

After individually reviewing 898 of Mezzo's files (a process that took several days), Plaintiffs maintain that 81 percent (723/898) contained evidence of a prior title policy that would have qualified the borrower for the Reissue or Refinance rate (Pl. App. 130-31).  This percentage is grossly overstated (Zanic Dec. ¶¶ 18-24) (Exh. 1).  Plaintiffs were almost always wrong about whether a borrower qualified for the Reissue or Refinance rate (Zanic Dec. ¶¶ 27-32) (Exh. 1).  In fact, only 4.4% of the files indicate any overcharge at all (Zanic Dec. ¶ 23) (Exh. 1).

Plaintiffs exponentially increased the "error rate" by improperly applying the presumptions from the 2005 TIRBOP Manual in their review of the 898 Mezzo files despite the fact none of the files Plaintiffs reviewed was from 2005, and the 2005 amendments did not apply to those files (Zanic Dec. ¶ 32) (Exh. 1).  As the Third Circuit recognized in

<u>Ricciardi</u>, it is not appropriate to apply the presumptions of the 2005 Manual to policies previously issued.  164 Fed.Appx. at 222-23.

       **(b)**       **<u>Proof of Misrepresentation is Individualized</u>**

Even if it were proper to apply the 2005 TIRBOP Manual to transactions occurring before the amendment (which it is not), Plaintiffs cannot prove First American made any misrepresentations absent a file-by-file review of each class member's transaction.  The issues that preclude class certification of Plaintiffs' breach of contract claims also prevent certification of their fraud and UTPCPL claims.  The Slapikases' evidence does not prove these elements for any other transaction, and First American does not electronically maintain this information. Whether First American misrepresented the 'actual' cost of title insurance to any particular class member on a HUD-1 Settlement Statement can only be determined from a detailed review of the documents for and participants in each transaction.  Such an individual file-by-file review and testimony is inherently inconsistent with the notion of classwide adjudication.

       **(c)**       **<u>Failure to Disclose the Existence of the Reissue or Refinance Rate Is an Individual Issue</u>**

Plaintiffs ignore another critical impediment to class certification:  the extent to which First American or its agents <u>disclosed</u> the existence of the Reissue or Refinance rates to class members cannot be tried on a classwide basis.  Even if Plaintiffs could prove each class member was overcharged without a file-by-file review and testimony (which they unequivocally cannot) that alone does not prove a misrepresentation.  Rather, before any class member can prove First American made an actionable misrepresentation to them, the trier of fact must determine: (1) whether there was a disclosure regarding the availability of the refinance rate; (2) who received the disclosure; (3) if someone besides the borrowers received the disclosure, what did that person tell them; and (4) what did the closing agent say

(if anything) to the class member regarding the title insurance rate?  These inquiries are critical in this case.

The Slapikases maintain that they did not have knowledge of the reissue or refinance rates, and that no one from Mezzo asked them for evidence of prior insurance before their transaction closed (Doc. 100, p. 6).  Mezzo's principal refuted this allegation:

> "Q.    Did you make any effort to tell consumers dealing with Mezzo that they might qualified [sic] for the reissue or refinancing discount?
>
> A.    My policy at my company was to ask if they had a prior policy.  If they had a prior policy within the requisite timeframes, then they would have an opportunity of having either of those, either the reissue or the substitution rate.
>
> Q.    So was it your instruction to your employees to specifically ask the consumers if they had a prior policy?
>
> A.    That was my policy."

(Sunseri Dep. p. 37, lns. 4-15) (Exh. 5).  The final determination whether Mezzo disclosed the discounted rates or asked for the prior policy is a fact issue that remains for trial both as to the Slapikases and the putative class.  None of the "common" evidence Plaintiffs presented to this Court in their motion for class certification answers these questions for the Slapikases let alone any other class members, and they cannot be determined without actual testimony from individual class members.  The Court cannot assume a non-disclosure and the burden is on Plaintiffs to prove it by clear and convincing evidence for each class member.  E.g., TransPenn Wax Corp. v. McCandless, 50 F.3d 217, 232 (3d Cir. 1995) (plaintiffs must prove all elements of fraud by clear and convincing evidence).

While Plaintiffs assert that First American has a policy of not disclosing the existence of the discounted rates, this is wrong (Doc. 100, p. 5).  Plaintiffs cite to no evidence in support of the proposition, and the evidence submitted by First American directly refutes it.  First American's direct operations in Pittsburgh routinely asked refinancing borrowers

directly for copies of their prior title policies or other evidence of prior insurance, such as a HUD-1 (Stinelli Dec. ¶ 6) (Exh. 9). First American's direct operations in eastern Pennsylvania would ask the mortgage broker, real estate agent, or borrower for proof of prior insurance (Inkpen Dec. ¶ 5) (Exh. 8). Similarly, Mezzo is just one of many agents that asked for copies of prior policies (Sunseri Dep., pgs 55-58) (Exh. 5). These are merely examples. Plaintiffs would need individual proof as to the practices of each of the 740 current and 200 terminated agents as to what their practice was and whether it was followed in each individual case.

Unlike some other states, neither Pennsylvania law or the 1999 TIRBOP Manual required any particular form of disclosure. Compare In re Coordinated Title Ins. Cases, 2004 WL 690380, at * 3 (N.Y. Sup. Jan. 8, 2004). The lack of a specific required disclosure means that each of First American's 740 agents and its direct branches had the discretion to set its own disclosure procedure, a far cry from a "uniform" case of non-disclosure.

Furthermore, since the 2005 amendment, there is a specific disclosure of the discounts, and First American and the agents routinely give the disclosure (E.g., Strong Dec. ¶ 7) (Exh. 11) that would defeat the fraud claims, though the issue of compliance (i.e., whether a particular class member received notice of the discounted rates), would still require individual determination for each class member. These are individual issues that cannot be ignored and must be tried separately for each member of the putative class.

        **(d)**      **Proof of Reliance Depends on a Fact-Intensive Inquiry into What Information Each Class Member Had**

Courts have routinely held that "the reliance element of fraud and negligent misrepresentation claims is not readily susceptible to class wide proof; rather, proof of reasonable reliance depends on a fact-intensive inquiry into what information each plaintiff actually had." Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 435 (4th Cir. 2003)(citing

Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 341 (4th Cir. 1998)); see also Gavron v. Blinder Robinson & Co., Inc., 115 F.R.D. 318, 325 (E.D. Pa. 1987)(holding common law fraud claims, as opposed to Rule 10b-5 claims, were not suitable for class treatment because plaintiff had to demonstrate his individual reliance upon the defendants' misstatements)(citing Rosenberg v. Digilog, Inc., 648 F. Supp. 40, 43-44 (E.D. Pa. 1985)). The same is true for UTPCPL claims as they also require proof of reliance. Baker v. Family Credit Counseling Corp., 440 F. Supp.2d 392, 412 (E.D. Pa. 2006).

This case is no different. Plaintiffs cannot prove reliance without establishing what information they had regarding the discounted rates at the time of their closing. A borrower's awareness of the discounted rates could come from her agent's disclosure, a mortgage broker, her lender, prior experience, or the media. As discussed above, agent practices relating to disclosing the discounted premiums varied from agent to agent, and transaction to transaction. There was no uniform practice among First American direct operations or its agents.

Regardless of whether a class member received information about the discounted rates from her title agent, she very well may have received a disclosure from her lender. Throughout the class period, RESPA required mortgage brokers to provide borrowers with a disclosure pamphlet that informs them of the potential availability of Reissue and Refinance rates. 24 C.F.R. § 3500.6. It provides: "[I]f you are buying a home which has changed hands within the last several years, ask your title company about a 'reissue rate,' which would be cheaper" (Exh. 3, p. 9). The Slapikases received this (or similar) disclosures from their lenders in connection with their four prior refinancing transactions (Exh. 9).

Furthermore, lenders, mortgage brokers, and real estate agents, who often order the title work on their customer's behalf, are usually quite familiar with the discounted rates

(Inkpen Dec. ¶ 6) (Exh. 8).  First American's experience in direct operations is, for example, that mortgage brokers handling refinances, more often than not, ask about the availability of a discount when ordering the title insurance (Inkpen Dec. ¶ 5) (Exh. 8).  Other agents get questions from mortgage brokers or real estate agents (Strong Dec. ¶ 9).  These examples show that plaintiffs cannot presume ignorance of the discounts but must prove it on an individual basis.

Moreover, the availability of discounted title insurance rates has been, and continues to be, widely publicized in the mainstream media.  Throughout the class period, articles have appeared in Pennsylvania and national publications informing the public of the availability of discounted Reissue and Refinance rates.  (Schulz Aff., Exhs. 1 - 14 ) (Exh. 4).  Obviously some borrowers knew of the availability of the discounted rates.  Regardless of the source, what each class member knew and whether she justifiably relied on an alleged misrepresentation on a HUD-1 Settlement Statement cannot be made on a classwide basis.

Finally, there is no support under Pennsylvania law for Plaintiffs' assertion that reliance can be presumed in either fraud or UTPCPL actions.  E.g., Baker, 440 F. Supp.2d at 412 (holding justifiable reliance must be proved in every UTPCPL action premised on fraud).  Depending upon the level of knowledge, a borrower's reliance on an alleged misrepresentation on a HUD-1 Settlement Statement may not have been justifiable.  Plaintiffs cannot seek certification and ask this Court to turn a blind eye or a deaf ear to disclosures made by agents, lenders, brokers or others, and to ignore their burden to present evidence of their prior title policies (for whatever reason), and later complain that they did not receive a discounted rate.  Whether reliance is justified is something the trier of fact cannot determine without a look into each class member's state of mind – a process that is not conducive to class adjudication.  E.g., Thorn v. Jefferson-Pilot Ins. Co., 445 F.3d 311,

321 (4th Cir. 2006)(holding individual hearings are required if claim implicates the plaintiff's knowledge).

**(e)**      **There is No Common Evidence of Injury**

It is settled law that a plaintiff must suffer an ascertainable injury in order to prove fraud and UTPCPL claims.  Wilson v. Donegal Mut. Ins. Co., 410 Pa. Super. 312, 40-41, 598 A.2d 1310, 1315 (1991)(injury is element of fraud claim); Baker, 440 F. Supp.2d at 412 (injury element of every UTPCPL claim).  Here, the viability of Plaintiffs' claims (and, therefore, the claims of the class they purport to represent) rests, among other factors, on whether they were entitled to, but did not receive, a discounted rate.  As discussed above, this requires an individual determination of each putative class member's transaction(s) with First American.  Id.  Where, as here, liability cannot be presumed, the process of ascertaining which class members sustained injury defeats the predominance requirement.  Newton, 259 F.3d at 190; Sanneman, 191 F.R.D. at 449-50.

**5.      Plaintiffs' Unjust Enrichment Claim Is Also Fraught with Individual Issues (Count V)**

In order to prove unjust enrichment, Plaintiffs must prove that First American received the alleged premium overcharge and retained it.  Commerce Bank/Pennsylvania v. First Union Nat'l Bank, 911 A.2d 133, 143-44 (Pa. Super. Ct. 2006).  In Pennsylvania, First American agents retain up to XX% of the premium charged for title insurance (Zanic Dec. ¶ 5) (Exh. 1).  The specific premium split varies from agent to agent, from time period to time period, and is specified in agreements with First American (Zanic Dec. ¶ 5) (Exh. 1).  Even if Plaintiffs can prove that it is inequitable for First American to retain the overcharge (which cannot be proved absent an individual file by file review to determine if each class member was in fact overcharged), Plaintiffs could only recover from First American the percentage of the policy premium it received.  This calculation would, in turn, require a separate

file-by-file review to determine the agent involved and applicable premium split.  Again, none of these determinations is suitable for class adjudication.

## C.     Plaintiffs' Claim for Punitive Damages Cannot be Certified for Classwide Adjudication

Plaintiffs' request for punitive damages produces even more difficulties, rendering this case unsuitable for certification.  Punitive damages are intended to punish wrongdoers and deter future conduct.   Feingold v. Southeastern Penn. Transp. Auth., 512 Pa. 567, 579, 517 A.2d 1270, 1276 (1986); see also Kirkbride v. Lisbon Contractors, 521 Pa. 97, 102, 555 A.2d 800, 802 (1989).  Of course, deterring future conduct is a moot point since TIRBOP amended the rate manual in 2005.  Outrageous conduct is a legal and factual prerequisite to awarding punitive damages.  See Tunis Brothers v. Ford Motor Co., 952 F.2d 715, 740 (3d Cir. 1991).  In this case, Plaintiffs must show that the agent or First American branch involved in each transaction maliciously defrauded the borrower.  Whether First American or its independent agents acted in such a manner to justify punitive damages necessarily involves analyzing the conduct of every agent involved in every transaction.  In Pennsylvania, a significant percent of transactions are conducted by the 740 independent agents (Zanic Dec. ¶¶ 5, 8) (Exh. 1).  In the vast majority of cases, First American did not deal directly with borrowers in any transactions.  Instead, the independent agents speak with the customers, perform the rate calculations, and provide notice of the reissue rate (Zanic Dec. ¶ 11) (Exh. 1).  The evidence the Slapikases may present against Mezzo in their transaction would not necessarily apply to other transactions Mezzo conducted and certainly would not apply to other agents or First American's direct operations.

## D.     A Class Action Is Not the Superior Method of Adjudicating Plaintiffs' Claims

Under Rule 23(b)(3), a class must not be certified unless certification is superior to all other methods for the fair and efficient adjudication of the controversy.  Id.  Superiority is

not satisfied if resolution of the class action "breaks down into an unmanageable variety of individual legal and factual issues." Andrews v. AT&T, 95 F.3d 1014, 1023 (11th Cir. 1996). As explained above, resolution of Plaintiffs' claims will require a substantial amount of individualized evidence and a plethora of mini-trials regarding numerous issues.  Under these circumstances, class treatment of Plaintiffs' claims would neither be "fair" or "efficient."

Moreover, class members have other superior methods of dispute resolution available to them.  The Pennsylvania legislature has enacted a comprehensive statutory scheme that governs title insurance known as the Pennsylvania Title Insurance Act.  40 P.S. § 910-1 et seq.  The Act provides a specific statutory remedy for customers who believe they have been charged an incorrect rate for title insurance.  40 P.S. § 910-44(b).  Section 910-44(b) creates a remedial system for an aggrieved person to request from a title insurer or its rating bureau a decision as to whether the customer is entitled to a refund of any title insurance premium that was allegedly overcharged and, if no such refund is forthcoming, a right to appeal to the Insurance Commissioner.  Id.  After a hearing on the issue, the Insurance Commissioner in turn has the power to "grant the appropriate relief" including a refund of an alleged overcharge.  40 P.S. § 910-46(d).  This administrative process is much simpler and more effective than litigation, and provides Plaintiffs with the same remedies as they seek through this litigation.

Further, when the law provides for the recovery of attorneys' fees, "individual suits are feasible" and "the most compelling rationale for finding superiority in a class action – the existence of a negative value suit – is missing …" Castano v. American Tobacco Co., 84 F.3d 734, 748 (5th Cir. 1996); In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360, 375 (E.D. La. 1997); Jones v. CBE Group, Inc., 215 F.R.D. 558, 570 (D. Minn. 2003); Gardner v. First Am. Title Ins. Co., 2003 WL 221844, at *8 (D. Minn. Jan. 27, 2003).  Thus,

since the UTPCPL provides for both attorneys' fees and treble damages, 73 P.S. § 201-9.2(a),

the alleged damages to each class member are not *de minimis*, and individual suits are

economically viable and more important for each individual class member.  See Fisher v.

Bristol-Myers Squibb Co., 181 F.R.D. 365, 373 (N.D. Ill. 1998).

**E.      If Certified, This Case Would Be Unmanageable**

Under Rule 23, the Court is also required to examine "the difficulties likely to be

encountered in the management of a class action," which encompass "the whole range of

practical problems that may render the class action format inappropriate for a particular

suit." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974); see also Sanneman v. Chrysler,

191 F.R.D. 441, 449-450 (E.D. Pa. 2000).  Prosecution of this case creates a morass of legal

and factual issues ill-suited for certification.

As outlined above, the 740 independent agents that issue most of First American

policies in Pennsylvania are critical to prosecuting and defending against Plaintiffs' class

claims.  These agents alone have possession of the customer's closing files (which may or

may not have evidence of any prior title policies).  These agents also are the only ones with

knowledge of their practices regarding disclosure of the existence of the discounted rates.

Just as the Slapikases required information from Mezzo to attempt to prove their claims,

each class member will need similar information from her settlement agent.

In order to prosecute this action, Plaintiffs will need discovery from over 740 agents,

many of which are lawyers or law firms.  Finding the files of the 200 terminated agents will

be even more difficult.  Tens of thousands of transactions will need to be reviewed (Doc.

100, pps. 6-8).  The process will take years and years.  It is hard to imagine a case that is less

manageable as a class action than one involving tens of thousands of transactions requiring

individual review and hundreds of indispensable third parties.

**F.     Plaintiffs Are Inadequate Class Representatives**

Plaintiffs must show that they will fairly and adequately represent the class. Fed.R.Civ.P. 23(a).  Because of the res judicata effect of the class judgment on absent class members and other constitutional due process considerations, this prerequisite for class certification is strictly enforced.  Broussard, 155 F.3d at 338.  Here, Plaintiffs are not adequate class representatives because they failed to exhaust the administrative remedy provided in the Pennsylvania Title Insurance Act.  E.g., International Union v. Clark, 2006 WL 2687005 (D. D.C. 2006).  In Clark, the plaintiffs filed a putative class action lawsuit against the United States Marshals Service.  Id. at 1.  The Court held that the plaintiffs were inadequate representatives because they had failed to exhaust their administrative remedies prior to filing suit, and that failure had the effect of depriving the court of jurisdiction over the claims they sought to maintain as a class action.  Id. at 6.[7]  Because Plaintiffs did not pursue the remedies provided in § 910-44(b), their claims are premature and, as in Clark, they cannot adequately protect the interests of the class.

**G.     Plaintiffs' Proposed Class Definition Is Defective**

The only persons included in the proposed class are those who qualified for the Reissue or Refinance discounts and did not receive them (Doc. 95, 97).  Thus, class membership is impermissibly based on an assumed determination of liability and only binds class members if they are successful on their claims (i.e., a "fail safe" class).  While this Court has not had occasion to address the problems inherent in a "fail-safe" class, others have uniformly criticized and rejected them.  E.g., Adashunas v. Negley, 626 F.2d 600, 604 (7th

---

[7]     As First American has asserted in its Motion to Amend this Court's December 21, 2006 Order to Include Certification for Interlocutory Appeal pursuant to 28 USC § 1292(b), Section 910-44(b) of the Pennsylvania Title Insurance Act provides a mandatory administrative remedy that must be exhausted before a plaintiff can maintain a lawsuit alleging they were charged the incorrect rate for title insurance (Doc. 104).

Cir. 1980); <u>Nicodemus v. Union Pacific Corp.</u>, 204 F.R.D. 479, 489 (D. Wyo. 2001)(reversed

on other grounds); <u>Intratex Gas Co. v. Beeson</u>, 22 S.W. 3d 398, 405 (Tex. 2000).  A

"fail-safe" class deprives the court and defendants of any certainty about the scope of the

preclusive effect of a judgment.  <u>E.g.</u>, <u>Intratex</u>, 22 S.W. 3d at 405 ("Certifying a fail-safe class

inevitably creates one-sided results.  If the defendant is found liable, class membership is

then ascertainable and the litigation comes to an end.  A determination that the defendant is

not liable, however, obviates the class, thereby precluding the proposed class members from

being bound by the judgment.").

 Under the class Plaintiffs seek to certify, if a class member fails to prove he was

overcharged, she is not a member of the class and not bound by any judgment.  Conversely,

if a class member shows that she was charged more than she should have been, she is a

member of the class and entitled to relief.  This is a classic "heads I win, tails you lose"

situation that courts abhor and in which they have denied class certification.  <u>See</u> <u>Forman v.

Data Transfer, Inc.</u>, 164 F.R.D. 400, 403 (E.D. Pa. 1995); <u>see also</u> <u>Adashunas</u>, 626 F.2d at

604 (proposed class of children with learning disabilities who are not receiving special

education); <u>Hagen v. City of Winnemucca</u>, 108 F.R.D. 61, 63 (D. Nev. 1985)(inappropriate

for class to be defined as all persons whose constitutional rights were violated); <u>Dunn v.

Midwest Buslines, Inc.</u>, 94 F.R.D. 170, 172 (E.D. Ark. 1982)(denying certification of class of

"those who have been actually discriminated against"); <u>Sperberg v. Firestone Tire & Rubber

Co.</u>, 61 F.R.D. 70, 75 (N.D. Ohio 1973)(refusing to certify class of alleged patent infringers).

The class Plaintiffs seek to have certified – which include only those persons overcharged –

suffer from the same genetic flaw as those rejected in these cases.  It is also required that

class membership is readily ascertainable at the time of certification.  Here putative class

members cannot be identified or given notice because the trial court has no way of

ascertaining whether a given person is a member of the class until a trial on liability to that one individual is held.  <u>Clay v. American Tobacco Co.</u>, 188 F.R.D. 483, 490 (S.D. Ill. 1999).

## IV.    CONCLUSION

Defendant First American Title Insurance Company requests that this Court receive into evidence Exhibits 1 to 11 submitted herewith and deny Plaintiffs' Renewed Motion for Class Certification.

February 15, 2007

Respectfully submitted,

BRYAN CAVE LLP

Charles A. Newman (admitted *pro hac vice*)
Douglas W. King (admitted *pro hac vice*)
Elizabeth T. Ferrick (admitted *pro hac vice*)
James W. Weiss (admitted *pro hac vice*)
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Telephone: 314.259.2000
Facsimile: 314.259.2020

COHEN & GRIGSBY, P.C.

By:    /s/ David F. Russey
Larry Elliott (PA35261)
Email: leliott@cohenlaw.com
David F. Russey (PA84184)
Email:  drussey@cohenlaw.com
Cohen & Grigsby, P.C.
11 Stanwix Street
15th Floor
Pittsburgh, Pennsylvania 15222
Telephone: 412.297.4925
Facsimile: 412.209.0672

Counsel for First American
Title Insurance Company

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was filed electronically on this 15th day of February, 2007, to be served by operation of this Court's electronic filing system on the following counsel of record:

Adrian N. Roe
Watkins Dulac & Roe P.C.
Two Gateway Center, 17 East
603 Stanwix Street
Pittsburgh, Pennsylvania 15222

Mark R. Koberna
Sonkin & Koberna Co., LPA
55 Public Square, Suite 1660
Cleveland, Ohio 44113

David D. Yeagley
Ulmer & Berne LLP
1660 West 2nd Street
Cleveland, Ohio 44112

Attorneys for Plaintiffs Alice and Anthony Slapikas

Samuel H. Foreman
Weber, Gallagher, Simpson, Stapleton, Fires & Newby
603 Stanwix Street
Suite 1450, 14th Floor
Two Gateway Center
Pittsburgh, Pennsylvania 15222

Attorney for Third-Party Defendant Mezzo Land Services, LLC

    /s/  David F. Russey