## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY L. SLAPIKAS and ALICE B. SLAPIKAS, for themselves and all others similarly situated, | : : : : | No. 2:06-cv-00084-JFC |
| Plaintiffs, | : : | Hon. Joy Flowers Conti |
| vs. | : : | |
| FIRST AMERICAN TITLE INSURANCE COMPANY, | : : : | **ELECTRONICALLY FILED** |
| Defendant. | : : | |
| vs. | : : | |
| MEZZO LAND SERVICES, LLC | : : | |
| Third-Party Defendant. | : : | |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

Adrian N. Roe
Pa. Bar No. 61391
Watkins Dulac & Roe P.C.
Two Gateway Center, 17 East
603 Stanwix Street
Pittsburgh, PA  15222
(412) 434-5544
aroe@watkinsdulac.com

Mark R. Koberna
Sonkin & Koberna Co., LPA
3401 Enterprise Parkway, Suite 400
Cleveland, OH  44122
(216) 514-8300

David D. Yeagley
Ulmer & Berne LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, OH  44113
(216) 583-7194

Suzanne Lafleur Klok
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
(843) 216-9219

William H. Narwold
Ingrid Moll
Motley Rice LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1678

Mark A. Packman
Gilbert Randolph LLP
1100 New York Avenue, NW
Suite 700
Washington, DC  20005
(202) 772-2200

## TABLE OF CONTENTS

INTRODUCTION...............................................................................................................1

BACKGROUND................................................................................................................3

   A. The Typical First American Transaction in Pennsylvania.............................................4

   B. The Slapikases' Transaction.......................................................................................6

   C. Scope of the Overcharges...........................................................................................7

ARGUMENT....................................................................................................................8

   A. This Action Readily Satisfies All of the Criteria for Certification Set Forth in Federal Rule of Civil Procedure 23(a)........................................................................................8

      1. The Class Is "So Numerous that Joinder of All Members Is Impracticable".....8

      2. There Are "Questions of Law or Fact Common to the Class"...........................9

      3. The Claims of the Representative Parties Are "Typical of the Claims of the Class".................................................................................................................9

      4. The Representative Parties Will "Fairly and Adequately Protect the Interests of the Class"..........................................................................................................10

   B. This Action Readily Satisfies All of the Criteria for Certification Set Forth in Federal Rule of Civil Procedure 23(b)(3)..................................................................................10

      1. Common Questions of Fact and Law Predominate.........................................11

         a. Count I – Plaintiffs' Breach of Express Contract................................12

            i. Plaintiffs' Breach of Express Contract Claim Is Amenable to Class Treatment...................................................................12

            ii First American's Defenses to Plaintiffs' Breach of Express Contract Claim Are Amenable to Class Treatment...............13

         b. Count II – Breach of Implied Contract.................................................15

            i. Plaintiffs' Breach of Implied Contract Claim Is Amenable to Class Treatment...........................................................................15

　　　　　ii. First American's Defenses Are Amenable to Class
　　　　　　　Treatment............................................................................17

　　　c. Count III – Fraud.................................................................................20

　　　　　i. Plaintiffs' Fraud Claim Is Amenable to Class Treatment......20

　　　　　ii. First American's Defenses Are Amenable to Class
　　　　　　　Treatment............................................................................24

　　　d. Count IV – Unfair Trade Practices and Consumer Protection Law......25

　　　　　i. Plaintiffs' Claims Under the UTPCPL Are Amenable to Class
　　　　　　　Treatment............................................................................25

　　　　　ii. First American's Defenses Are Amenable to Class
　　　　　　　Treatment............................................................................26

　　　e. Count V – Unjust Enrichment...............................................................26

　　　　　i. Plaintiffs' Unjust Enrichment Claim Is Amenable to Class
　　　　　　　Treatment............................................................................26

　　　　　ii. First American's Defenses Are Amenable to Class
　　　　　　　Treatment............................................................................27

　　　f. First American's Affirmative Defenses of Waiver and Estoppel,
　　　　　Statute of Limitations and Standing......................................................28

　　2. A Class Action Is a Superior Method for Adjudicating the Overcharging
　　　Controversies Between First American and Consumers...................................30

CONCLUSION..........................................................................................................32

# TABLE OF AUTHORITIES

## CASES

*Acme Markets, Inc. v. Valley View Shopping Center, Inc.*, 493 A.2d 736, 737 (Pa. Super. Ct. 1985) ........................................................................................................................24

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................11, 26, 30

*Basille v. H & R Block, Inc.*, 729 A.2d 574 (Pa. Super. Ct. 1999) ................................23

*Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, No. 99-741, 2006 WL 3371690 (D.N.J. Nov. 17, 2006).................................................................................................31

*Beck v. Maximus, Inc.*, 457 F.3d 291 (3d Cir. 2006) ....................................................10

*Bunnion v. Conrail*, No. 97-4877, 1998 WL 372644 (E.D. Pa. May 14, 1998)............23

*Chesner v. Stewart Title Guaranty Co.*, No. 1:06-CV-476, 2006 WL 2252542 (N.D. Ohio Aug. 4, 2006) ......................................................................................................17, 19

*Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004) ..........................................................8

*In re Community Bank*, 418 F.3d 277 (3d Cir. 2005) ..............................................10, 30

*Commerce Bank/Pennsylvania v. First Union National Bank*, 911 A.2d 133 (Pa. Super. Ct. 2006) ....................................................................................................................27

*In re Coordinated Title Insurance Cases*, No. 010764/2002, 2004 WL 690380 (N.Y. Sup. Ct. Jan. 8, 2004) .............................................................................................. *passim*

*DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854 (2006).............................................28

*Dubin v. Security Union Title Insurance Co.*, 832 N.E.2d 815 (Ohio Ct. App. 2005).......... *passim*

*Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985).........................................................8

*Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 632 (3d Cir. 1996) .........................30

*Goodway Marketing, Inc. v. Faulkner Advertising Associates, Inc.*, 545 F. Supp. 263 (E.D. Pa. 1982)...........................................................................................................19

*Halstead v. Motorcycle Safety Foundation, Inc.*, 71 F. Supp. 2d 455 (E.D. Pa. 1999) ................16

*Himmelreich v. Adams Abstract Association*, 59 Pa. D & C 4th 283, 401 (Com. Pl. Ct. 2002) ...........................................................................................................................25

*Johnson v. Zerbst*, 304 U.S. 458 (1938) .................................................................28

*Johnston v. HBO Film Management*, 265 F.3d 178 (3d Cir. 2001)...........................9, 10

*Kepler v. Kepler*, 199 A. 198 (Pa. 1938) .................................................................19

*Lach v. Fleth*, 64 A.2d 821 (Pa. 1949)....................................................................16

*In re Loewen Group Securities Litigation*, 233 F.R.D. 154 (E.D. Pa. 2005)...................9

*McShane v. Recordex Acquisition Corp.*, No. 01117, 2003 WL 22805233 (Pa. Com. Pl. Nov. 14, 2003) ......................................................................................16

*Meyer v. CUNA Mutual Group*, No. 03-602, 2006 WL 197122 (W.D. Pa. Jan. 25, 2006)...........11

*Mitchell-Tracey v. United General Title Insurance Co.*, 237 F.R.D. 551 (D. Md. 2006) ..... *passim*

*Mitchell v. Chicago Title Insurance Co.*, No. CT 02-017299, 2003 WL 23786983 (Minn. Dist. Ct. Dec. 22, 2003) ...................................................................... 2-3

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001)...................8

*Omnicrom Systems, Inc. v. Weiner*, 860 A.2d 554 (Pa. Super. Ct. 2004)................................12, 16

*Paramount Aviation Corp. v. Agusta*, 178 F.3d 132 (3d Cir. 1999)........................................28, 29

*In re Pennsylvania Baycol Third-Party Payor Litigation*, No. 1874 SEPT. TERM 2001, 2005 WL 852135 (Pa. Com. Pl. Apr. 4, 2005) ........................................................................27

*Perry v. FleetBoston Finance Corp.*, 229 F.R.D. 105 (E.D. Pa. 2005) ........................................23

*Petruska v. Gannon University*, 462 F.3d 294 (3d Cir. 2006)........................................................28

*In re Prudential Insurance Co. of America Sales Practices Litigation*, 962 F. Supp. 450 (D.N.J. 1997)......................................................................................................11

*Randleman v. Fidelity National Title Insurance Co.*, Case No. 06-CV-07049, 2006 WL 3411529 (N.D. Ohio Nov. 17, 2006) ................................................................... *passim*

*In re Rent-Way Securities Litigation*, 218 F.R.D. 101 (W.D. Pa. 2003) ........................................9

*In re School Asbestos Litigation*, 789 F.2d 996 (3d Cir. 1986) ....................................................11

*Varacallo v. Massachusetts Mutual Life Insurance Co.*, 226 F.R.D. 207 (D.N.J. 2005) ..............11

*Wachtel v. Guardian Life Insurance Co.*, 453 F.3d 179 (3d Cir. 2006) ........................................12

*Youndt v. First National Bank*, 868 A.2d 539 (Pa. Super. 2005)....................................................21

*Zeno v. Ford Motor Co.*, 238 F.R.D. 173 (W.D. Pa. 2006)............................................8, 10, 15, 31

## STATUTES

13 Pa. Con. Stat. §§ 1206, 2201 .....................................................................................................18

13 Pa. Con. Stat. §§ 2201 ................................................................................................................18

13 Pa. Con. Stat. §§ 2319 ................................................................................................................18

33 Pa. Stat. Ann. §§ 1-6 ..................................................................................................................20

40 Pa. Stat. Ann. § 910-37 ................................................................................................................3

40 Pa. Stat. Ann. § 910-42 ................................................................................................................3

73 Pa. Stat. Ann. § 201-9.2(a)........................................................................................................25

68 Pa. Stat. Ann. §§ 250.201-250.203 ...........................................................................................18

Pa. SSJI (Civ) § 15.03.....................................................................................................................18

## OTHER AUTHORITIES

Fed. R. Civ. P. 23 ..................................................................................................................... *passim*

Fed. R. Evid. 1006 .............................................................................................................................7

1 *Newberg on Class Actions* § 4.25 ................................................................................................11

1 Pennsylvania Law Encyclopedia, "Contracts" § 6 .....................................................................16

RESTATEMENT (SECOND) OF CONTRACTS § 19                                                        16.

## INTRODUCTION

This case, brought by Plaintiffs Anthony and Alice Slapikas ("Plaintiffs") against

Defendant First American Title Insurance Company ("First American"), is one in a series of

actions brought in the Commonwealth of Pennsylvania (and across the country) against

particular title insurers for failing to give consumers mandatory discounts on the premiums

charged for title insurance. Class certification discovery has revealed that First American

systemically has overcharged tens of thousands of Pennsylvania consumers for title insurance

and, in the process, has collected a windfall of tens of millions of dollars in unlawful profits.[1] As

set forth below, this action readily satisfies all of the prerequisites under Rule 23 and should be

certified as a class action.[2]

This action is being brought on behalf of a class of consumers who have been

overcharged for title insurance in the Commonwealth of Pennsylvania.[3] The evidence before this

Court clearly demonstrates that:

---

[1]     First American has been sued for similar overcharging in at least 5 other states, and thus far has settled at least one of those overcharge cases. *See Mitchell-Tracey v. United Gen. Title Ins. Co. and First Am. Title Ins. Co.*, 237 F.R.D. 551 (D. Md. 2006); *Piazza v. First Am. Title Ins. Co.*, No. 06-765 (D. Conn. filed May 17, 2006); *Fiore v. First Am. Title Ins. Co.*, No. 05-00474 (S.D. Ill. filed July 6, 2005); *Barnes v. First Am. Title Ins. Co.*, No. 06-574 (N.D. Ohio filed Feb. 2, 2006); *In re Coordinated Title Ins. Cases*, No. 010764/2002, 2004 WL 690380 (N.Y. Sup. Ct. Jan. 8, 2004).

[2]     Plaintiffs' renewed motion for class certification is supported by the Appendix ("App."), which contains evidentiary material obtained during class certification discovery.

[3]     Plaintiffs seek certification of the following class (hereinafter referred to as the "Plaintiff Class"):

> All persons in the Commonwealth of Pennsylvania who, at any time after December 19, 1999: (a) paid premiums for the purchase of residential title insurance from Defendant First American; (b) qualified for the Reissue Rate or Refinance Rate discounts provided in the Title Insurance Rate

(Continued ...)

- First American has established uniform procedures for the underwriting and sale of title insurance in Pennsylvania.

- First American's agents and employees routinely overcharge consumers for title insurance by charging the higher Basic Rate rather than the statutorily mandated discounted Reissue or Refinance Rates, even though these consumers qualify for the discounted rates.

- Consumers receive no benefit whatsoever from paying the higher Basic Rate; it is "the exact same policy." App. at 116.

- In each and every transaction, First American knew or should have known from the title search it conducted that the consumer was entitled to the discount.

This case presents the exact situation the class action device was intended to address. As this Court noted, the instant case boils down to a basic proposition: "[W]hen you're dealing with overcharging, it means there was a price that should have been charged, [and] it wasn't charged." Tr. Mot. to Dismiss Hrg. 7 (May 8, 2006). The evidence developed to date shows that thousands of Pennsylvania consumers have been overcharged by First American, but because the amount of overcharge for each individual consumer is relatively small (typically a few hundred dollars), a class action is the only practical means by which these consumers can obtain redress.

Significantly, a number of courts in other jurisdictions have certified class actions based on similar allegations of overcharging for title insurance policies. *See, e.g., Mitchell-Tracey v. United Gen. Title Ins. Co. and First Am. Title Ins. Co.*, 237 F.R.D. 551 (D. Md. 2006) (certifying a class of homeowners overcharged for title insurance by First American); *Mitchell v. Chi. Title*

_____

(... Continued)

       Manual filed by the Title Insurance Rating Bureau of Pennsylvania; and
       (c) did not receive the discount specified in the Manual.

This definition has been modified slightly from the definition set forth in Plaintiffs' original motion for class certification, in order to clarify that the class is intended to include consumers who have been overcharged since the date the original complaint was filed and is limited to purchasers of residential title insurance.

*Ins. Co.*, No. CT 02-017299, 2003 WL 23786983 (Minn. Dist. Ct. Dec. 22, 2003); *In re*

*Coordinated Title Ins. Cases*, No. 010764/2002, 2004 WL 690380 (N.Y. Sup. Ct. Jan. 8, 2004);

*Dubin v. Sec. Union Title Ins. Co.*, 832 N.E.2d 815 (Ohio Ct. App. 2005). No court has denied

class certification in a title insurance overcharge case such as this one.

For these and the reasons set forth below, Plaintiffs' motion for class certification should

be granted.

## BACKGROUND

First American, along with other title insurers operating in Pennsylvania, is a member of

the Title Insurance Rating Bureau of Pennsylvania ("TIRBOP"). Pursuant to Pennsylvania law,

40 Pa. Stat. Ann. § 910-37(b), TIRBOP files its manual of rates ("Manual") with the

Pennsylvania Insurance Commissioner. App. at 117. That Manual, as approved by the

Commissioner, is binding on First American, and the premium rates for title insurance contained

therein are mandatory. 40 Pa. Stat. Ann. §§ 910-37(h), 910-42; App. at 94-95. Indeed, First

American has acknowledged, with respect to all transactions in Pennsylvania, that if a

transaction qualifies for a discounted rate, "then that is the rate that **MUST** be charged." App. at

127 (emphasis in original). Nevertheless, First American routinely has failed to charge

discounted rates mandated by the Manual, namely the "Reissue" and "Refinance" rate

discounts,[4] thereby overcharging Pennsylvania homeowners and pocketing the difference

between the Basic Rate and the discounted rates.

---

[4] Section 5.3 of the Manual provides that a homeowner is entitled to a 10 percent discount off of the "Basic Rate", known as the "Reissue Rate," if there is evidence of a prior title insurance policy on the same property within ten years preceding the transaction. Section 5.6 of the Manual provides for a 28 percent discount, known as the "Refinance Rate," if the prior purchase of title insurance with respect to the same property occurred within three years. *See* Manual §§ 5.3, 5.6; App. at 120, 122.

## A.    The Typical First American Transaction in Pennsylvania

In all relevant respects, First American's procedures for selling title insurance are uniform throughout the state. First American sells its policies through an established network of hundreds of authorized agents to whom it issues "instructions and guidelines and standards."[5] App. at 45-46, 127, 181. Specifically, First American issues bulletins and instructions to its agents as to how to calculate title insurance premiums and how to fill out HUD-1 Settlement Statements ("HUD-1"). *Id.* at 134-38. Those agents receive orders for title insurance from customers, search the chain of title for prior deeds and mortgages, prepare title insurance commitments that identify and except prior mortgages unless satisfied, prepare HUD-1s, determine the premium charge for the title insurance, execute (along with the consumer) the HUD-1s, disburse the loan proceeds (including paying off prior mortgages), send "remittance reports" to First American informing First American of the rate charged, and issue the title insurance policies. *Id.* at 24-25, 54-93.

In the "vast majority" of real estate transactions in Pennsylvania, some form of title insurance is purchased. *Id.* at 55-57. This is because the Manual requires that an owner's title insurance policy be purchased (unless expressly waived by the parties) in all real estate sales transactions (Manual § 5.1(A)), and institutional lenders uniformly require the purchase of a loan policy as a condition precedent to issuing a loan to a homeowner. *Id.* at 96-101, 119.[6]

---

[5]    Although First American has some "direct" operations as well, First American concedes that in either situation First American is responsible. App. at 181-82.

[6]    For example, Federal National Mortgage Association ("Fannie Mae") guidelines require the purchase of a lender's policy of title insurance in all mortgage transactions. *See, e.g.*, "Title Insurance," *Fannie Mae Single Family Selling Guide* (Part V: Mortgage and Property Insurance, Chapter 2) (12/04/98), *available at*: http://www.allregs.com/efnma/ ("The lender must ensure (Continued ...)

Therefore, a deed or prior institutional mortgage in the chain of title constitutes clear evidence that a prior title insurance policy was issued. *Id.*; *see also id.* at 125. The title insurers in Pennsylvania have conceded this point by clarifying, in the current version of the Manual, that a deed or institutional mortgage constitutes evidence of prior title insurance. *Id.* at 183-86.[7] During the course of its title search (which it performs in every transaction), First American can determine whether a prior purchase or refinance transaction occurred within the ten- or three-year "look-back" periods specified in the Manual. *Id.* at 2, 63-65, 125. Accordingly, as a result of the title search it conducts in every transaction, First American has sufficient evidence to determine whether the purchaser is entitled to a discounted premium rate as provided in the Manual. Indeed, First American acknowledges that the discounted premium applies to most transactions because it would be a "rare case" where there would not have been a purchase or lender financing within the ten-year "look-back" period. *Id.* at 9-10, 96-97, 100-101.

First American further concedes that when a title search reveals the presence of a mortgage or deed in the chain of title during the "look-back" period, at a minimum its agents should disclose the availability of the discount or otherwise seek out further information. App. at 3-4, 105-06. First American has not, however, disclosed the existence of the discounted rates, but rather has used its superior knowledge to overcharge uninformed and unsuspecting consumers. Indeed, First American is well aware that, due to their relative lack of sophistication

---

(… Continued)
that title insurance that satisfies our requirements is in place before a mortgage is delivered to us for purchase or securitization.")

[7]     Although First American may contend that the clarifying language in the new Manual reflects a fundamental change, discovery will demonstrate that no such change occurred, and that a deed or prior institutional mortgage have been "evidence" of a prior policy over the entire class period. *See* App. at 127.

and knowledge about real estate generally and title insurance specifically, typical homeowners in Pennsylvania "rely upon the agent" to determine the applicable premium for title insurance. *Id.* at 47, 74-81, 84, 107-08. Nevertheless, First American admittedly takes no steps to monitor or ensure that the applicable premiums for title insurance are being charged, despite its recognition that it "ha[s] a right and duty to make sure that [its] agents are abiding by the rate manual . . . ." *Id.* at 5-8, 23, 26-28, 30, 48-50, 53, 101-13, 115. In fact, in the ordinary course of business, First American obtains remittance reports clearly indicating that First American is systemically charging the Basic Rate rather than the discounted rates. *Id.* at 130, 151-71.

**B.    The Slapikases' Transaction**

The Slapikases' transaction was typical of the transactions involving the Plaintiff Class. The Slapikases' transaction was handled by Mezzo Land Services, LLC ("Mezzo"), one of First American's agents. App. at 17, 32-33, 45-46. First American concedes that the Slapikases were charged the non-discounted Basic Rate, despite the fact that the title search revealed evidence of multiple prior title policies, including a prior institutional mortgage recorded less than three years before the Slapikases' refinancing. *Id.* at 33, 35, 83-84; *see also id.* at 36, 38-40. Nor were the Slapikases informed of the availability of the discount. *Id.* at 12, 14-15. Discovery proves that Pennsylvania consumers, like the Slapikases, have been overcharged by substantial amounts, often in the hundreds of dollars, without even being told of the existence or availability of the discount.[8]

---

[8]    Plaintiffs were charged the Basic Rate rather than the Refinance Rate for which they qualified, and thus were overcharged in the amount of $335.65. App. at 33 (line 1108); *see also id.* at 18-20, 29.

## C.    Scope of the Overcharges

First American's records show that the Plaintiff Class consists of at least tens of thousands of Pennsylvania homeowners.  First American sold over 500,000 policies during the class period.  First American has admitted that it would expect the "vast majority" of these policies to have qualified for discounted rates.  *Id.* at 9-10, 96-97, 100-101, 132.  Accordingly, First American's records should reflect that consumers were charged a discounted rate in the "vast majority" of transactions.  *Supra* at 5-6.  That is not the case.[9]  Instead, First American's records reflect that it actually charged a discounted rate less than half the time.  App. at 131-32.

Plaintiffs' limited (at this class certification stage) review of First American's closing files, remittances, and transaction summaries has uncovered evidence of rampant overcharging.[10] That review utilized information in First American's possession and the very same procedure (looking for a prior deed or institutional mortgage in the look-back period) that First American was required under the Manual to undertake at the time the title insurance premium was calculated.  First American's records and information show, based upon objective data, which consumers have been overcharged and, by reference to the Manual, the precise amount of such overcharges.  In the aggregate, First American's own records show, objectively, that First American has overcharged at least tens of thousands of Pennsylvania consumers tens of millions

---

[9]     Pursuant to Fed. R. Evid. 1006, the Appendix includes summaries regarding Plaintiffs' findings, based upon the review of the voluminous Mezzo closing files, First American remittances and statistical reports.  These summaries are being presented because the underlying closing files, remittances, and statistical reports are voluminous.  The underlying materials have been provided to the defendants, and are available to the Court if necessary.

[10]    The Appendix includes several examples of transactions in which consumers were overcharged.  App. at 32-36, 139-50.  First American knew that large numbers of consumers were routinely being charged the Basic Rate.  *Id.* at 132-151-71.

of dollars for title insurance by failing to pass along the mandatory premium discounts prescribed by the Manual.

## ARGUMENT

Although a court may "probe beyond the surface of plaintiffs' allegations" in assessing whether Rule 23's requirements are satisfied, only a "preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 168-69 (3d Cir. 2001). At this stage of the litigation, the substantive allegations of the complaint should be taken as true. *Chiang v. Veneman*, 385 F.3d 256, 262 (3d Cir. 2004); *Zeno v. Ford Motor Co.*, 238 F.R.D. 173, 183 (W.D. Pa. 2006). Any doubt regarding the propriety of certification should be resolved in favor of certifying the class. *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) (citations omitted).

### A.    This Action Readily Satisfies All of the Criteria for Certification Set Forth in Federal Rule of Civil Procedure 23(a)

As discussed below, this action clearly meets the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.[11]

#### 1.    *The Plaintiff Class Is "So Numerous that Joinder of All Members Is Impracticable"*

In this case, the evidence conclusively establishes that there are at least tens of thousands of potential class members. *See supra* at 7-8. Because the class has so many members that

---

[11]    Rule 23(a) requires that: (1) the class must be so numerous that joinder of all members is impracticable ("numerosity"); (2) questions of law or fact common to the class must exist ("commonality"); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class ("typicality"); and (4) the representative parties must fairly and adequately protect the interests of the class ("adequacy of representation"). Fed. R. Civ. P. 23(a).

joinder would be impracticable, Rule 23(a)(1)'s numerosity requirement is readily satisfied. *See Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 184 (3d Cir. 2001); *In re Rent-Way Secs. Litig.*, 218 F.R.D. 101, 112 (W.D. Pa. 2003).

>    2.    *There Are "Questions of Law or Fact Common to the Class"*

The commonality requirement of Rule 23(a)(2) is also satisfied here. Commonality "will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston*, 265 F.3d at 184. Here, Plaintiffs' claims mirror the claims of the proposed class members, all of which concern whether Plaintiffs "[were] eligible for and entitled to the [discounted rate] under the Defendants' filed rates, and whether they failed to receive that rate as a result of Defendants' wrongdoing." *Mitchell-Tracey*, 237 F.R.D at 557. As the *Mitchell-Tracey* court explained, in certifying a similar class action of consumers overcharged for title insurance:

> Although variations exist as to the actual amount of the premium paid by each potential class member, these variations do not alter the fundamental nature of the claims, as it is the nature of the transactions, the rate charged, and the reasons therefor, that are in fact at issue in this case. . . . [T]he Defendants' alleged procedures, protocols, written guidelines and lack of oversight of their . . . agents – all of which allegedly precluded the members of the proposed class from receiving the appropriate reissue rate – do not vary in any material manner. Defendants allegedly utilized standardized forms, processes and practices. The existence of routine and standardized practices giving rise to numerous claims weigh in favor of finding commonality, as well as typicality.

*Id.*; *see also In re Coordinated Title Ins. Cases*, 2004 WL 690380, at *9.

>    3.    *The Claims of the Representative Parties Are "Typical of the Claims of the Class"*

The threshold for satisfying the typicality requirement is low. *In re Loewen Group Sec. Litig.*, 233 F.R.D. 154, 162-63 (E.D. Pa. 2005). If the named plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of the class members,

and if it is based on the same legal theory," typicality is satisfied even if some factual differences exist. *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006) (citations omitted); *accord In re Cmty. Bank*, 418 F.3d 277, 303 (3d Cir. 2005). Here, Plaintiffs' claims present "virtually identical fact patterns and legal theories" as those advanced by the class members, and are based upon the same conduct by Defendant. *Mitchell-Tracey*, 237 F.R.D. at 558. Accordingly, this case satisfies the typicality requirement of Rule 23(a)(3).

> 4.    *The Representative Parties Will "Fairly and Adequately Protect the Interests of the Class"*

To determine adequacy of representation, courts evaluate first, "whether the named plaintiffs' interests are sufficiently aligned with the [absent class members]" and second, "the qualifications of the counsel to represent the class." *In re Cmty. Bank*, 418 F.3d at 303. Both criteria are satisfied in this case. As demonstrated above, Plaintiffs' interests are directly aligned with those of the proposed class members; there are no foreseeable conflicts between the named Plaintiffs and the Plaintiff Class members. *Johnston*, 265 F.3d at 185; *Mitchell-Tracey*, 237 F.R.D. at 558. Moreover, the Plaintiffs' agreement to bear the responsibilities of serving as representative plaintiffs for the class and their retention of experienced, competent counsel demonstrate their serious commitment to achieving the best litigation results possible for all class members.[12]

**B.    This Action Readily Satisfies All of the Criteria for Certification Set Forth in Federal Rule of Civil Procedure 23(b)(3)**

---

[12]    Plaintiffs' counsel in this case bring to bear their extensive collective experience in class action and complex litigation, including their extensive experience in similar title insurance overcharge litigation in cases pending in Pennsylvania, Ohio, New Jersey and Connecticut. The competency and adequacy of counsel for the Plaintiffs is generally presumed, barring contrary evidence presented before the court. *Zeno v. Ford Motor Co.*, 238 F.R.D. at 188.

The Plaintiff Class also satisfies Rule 23(b)(3), which requires that questions of law or fact common to the members of the class predominate over questions affecting only individual members ("predominance"), and that a class action be superior to other available methods for the fair and efficient adjudication of the controversy ("superiority").

### 1.    *Common Questions of Fact and Law Predominate*

"To evaluate predominance, the Court must determine whether the efficiencies gained by class resolution of the common issues are outweighed by individual issues presented for adjudication." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 511 (D.N.J. 1997) (citing 1 *Newberg on Class Actions* § 4.25, at 4-81 to 4-86). Courts consistently have held that even a few common issues can satisfy this requirement where their resolution will significantly advance the litigation. *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (citations omitted). Similarly, "[i]n cases where it is alleged that the defendant . . . engaged in a common course of conduct, courts have found that conduct to satisfy the commonality and predominance requirements." *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 231 (D.N.J. 2005); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (acknowledging the relative ease with which predominance is met in consumer fraud cases).

In this case, the relevant facts and applicable law are common to all members of the Plaintiff Class. It is undisputed that the rates set forth in the Manual are mandatory, and First American's interpretation and application of those rates is central to each and every class members' claim. *See Meyer v. CUNA Mut. Group*, No. 03-602, 2006 WL 197122, at *22 (W.D. Pa. Jan. 25, 2006) (holding that where the interpretation of "identical language" is central to the claims of all class members, "then on the question of interpreting the language, the court finds that common questions of law and fact predominate over individual ones"). Moreover, class

certification discovery has disclosed that, as to all proposed class members, First American's procedures, protocols, written guidelines, and (apparently conscious) lack of oversight of its Pennsylvania employees and agents do not vary in any material manner. *See supra* pp. 5-6. The relevant forms and insurance coverage are identical, and the transactions occur in the same general manner for all members of the proposed class.

In accordance with the Third Circuit's ruling in *Wachtel v. Guardian Life Insurance Co.*, 453 F.3d 179 (3d Cir. 2006), and the directives of this Court, Plaintiffs have set forth below a particularized analysis as to why each and every element of Plaintiffs' claims and Defendant's defenses are amenable to class treatment. The Amended Complaint contains five counts: (1) breach of express contract; (2) breach of implied contract; (3) fraud; (4) violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; and (5) unjust enrichment. For the ease and convenience of the Court, a chart detailing each element of the Plaintiffs' claims, and the Defendant's relevant defenses, and summarizing how each is amenable to class treatment, is annexed hereto as Exhibit A. Each defense discussed below is discussed in reference to the count of the Amended Complaint to which it most directly pertains.

### a.    Count I – Plaintiffs' Breach of Express Contract

i.    Plaintiffs' Breach of Express Contract Claim Is Amenable to Class Treatment

Count I of Plaintiffs' Amended Complaint asserts a claim for breach of express contract. The necessary elements of claim for breach of contract are: (1) mutual assent to the same terms; (2) exchanged consideration; and (3) breach. *See, e.g., Omnicrom Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004); Restatement (2d) of Contracts, §17(1). Plaintiffs allege that the express contract between the Plaintiff Class and First American is evidenced by the standardized HUD-1 settlement statements, an essential term of which is First American's promise that the

rate charge is the "actual" rate for title insurance. *See* Am. Compl. ¶¶ 75-82. By systematically

charging the higher Basic Rate, rather than the "actual" (discounted) rate prescribed by the

Manual, First American breached the express contract, resulting in damages equal to the amount

of the overcharge calculated by reference to the Manual's standardized rates.

Each of these elements is amenable to class adjudication, because Plaintiffs' contract

claim turns on evidence cutting across the entire Plaintiff Class. The HUD-1 settlement

statements, evidencing an express contract between Pennsylvania consumers and First American,

whereby consumers agreed to pay First American the "actual" charge for title insurance and First

American agreed in return to issue a title insurance policy, are uniform forms that do not differ in

any material respects from transaction to transaction. Because the transactions are standardized,

the testimony from the Slapikases (as class representatives) and from First American will

establish the elements of a breach of express (or implied) contract claim on a class-wide basis:

(i) the Slapikases, like others, paid the premium that was set by First American in exchange for a

title insurance policy issued by First American; (ii) First American is required by law to adhere

to the rates set forth in the Manual; (iii) the Slapikases, like others, paid the premium established

by First American based on the express or implied term that the premium was the applicable or

actual premium prescribed by the rate schedule; (iv) the Slapikases, like others, would not

knowingly have paid more than the applicable or actual rate for title insurance; and (v) the

Slapikases, like others, were damaged as a result of being charged the undiscounted Basic Rate,

rather than the discounted rate to which they were entitled.

> ii.     First American's Defenses to Plaintiffs' Breach of Express
>         Contract Claim Are Amenable to Class Treatment

First American's defenses to Count I target the underlying *theory* of Plaintiffs' express contract claim – *i.e.*, that the settlement statement cannot constitute evidence of an express contract, and that, even if it could, First American is not a party to the contract. *See* Tr. Mot. to Dismiss Hrg. 26 (May 8, 2006) (counsel asserting that "[if] the HUD-1 isn't a contract, then the plaintiffs don't have a claim"); *see also* Mot. to Dismiss (Doc. No. 7), at 3-4. These defenses, reflecting the standardized nature of the title insurance transactions at issue, are directed across-the-board to all consumers within the Plaintiff Class. First American is not arguing that the HUD-1 is not evidence of a contract in *Plaintiffs'* case, but rather that the HUD-1 settlement statement, as a matter of law, can *never* under any circumstances constitute evidence of a contract. *See* Defendant's Mem. in Support of Mot. to Dismiss Plaintiffs' Am. Compl. at 3. Likewise, First American's assertion that it is not a party to the HUD-1 settlement statement is not based on any facts particular to Plaintiffs' transaction, but rather is based on the assertions that, as a non-signatory, First American cannot be a party to the contract, and that First American's agents, who are signatories, are not acting in their capacities as First American's agents when they fill out the HUD-1s. *See id.* at 4. Because these defenses are based on common facts and legal theories, adjudicating First American's defenses in connection with Plaintiffs' claim will simultaneously resolve those defenses for all Class members.

First American also contends that consumers within the Plaintiff Class may not have qualified for the discounted rate under the Manual, and that First American therefore could not have breached any contract with respect to these consumers. *See* Tr. Mot. to Dismiss Hrg. 31 (May 8, 2006) (arguing that there are "conditions precedent to entitlement" to the discounted rate). This defense attacks the fundamental underlying premise of Plaintiffs' claim – that First American obtains sufficient information during the title search it conducts in each transaction to

14

determine whether the consumer qualifies for the discounted rates. *See supra at* 4-5. Thus, the issue of qualifying for the discounted rate presents questions as to the application or interpretation of the Manual that apply across-the-board to the Plaintiff Class. *See Dubin*, 823 N.E.2d at 819-20 (holding that whether language in a title insurance rate manual was "clear and unambiguous . . . should rightfully be determined by a trier of fact and not by the trial court in ruling on a motion for class certification."). Moreover, class certification should not be decided based on a premature "construction" of the Manual, particularly where any ambiguities in the application of the Manual ultimately must be decided – on a class-wide basis – by the trier of fact. *Id.*[13]

It is clear, therefore, that Count I and the related defenses involve *common issues that predominate over individual issues*, making class adjudication the most efficient means of resolving the claim for all members of the Plaintiff Class. *Zeno v. Ford Motor Co.*, 238 F.R.D. at 189 (certifying a class where "the evidence adduced thus far confirms that the contracts at issue are standardized and that defendant is liable for the same breach for each member of the class").

### b.    Count II – Breach of Implied Contract

i.    Plaintiffs' Breach of Implied Contract Claim Is Amenable to Class Treatment.

---

[13]    In *Randleman v. Fidelity National Title Insurance Company*, Case No. 06-CV-07049, 2006 WL 3411529 (N.D. Ohio Nov. 17, 2006), United States District Chief Judge James Carr reasoned that a purported condition precedent to the discounted rate would not necessarily apply "where the insurer, presumptively well informed about all applicable regulations, declines to inquire of the lender or borrower, or otherwise ascertain whether a prior policy was issued within the ten-year period." *Id.* at *5. Indeed, reasoned the court, such a precondition solely benefits the insurer, and therefore the failure to invoke its provisions at the time the policy is issued precludes the insurer from later seeking to use it to justify an overcharge of an unknowing consumer. *Id.* at *4-5.

Count II of the Amended Complaint sets forth a claim for breach of implied contract. The elements of a claim for breach of an implied contract are the same as those for breach of an express contract: (1) mutual assent to the same terms; (2) exchanged consideration; and (3) breach. *Omnicrom Sys., Inc. v. Weiner*, 860 A.2d at 564; *Lach v. Fleth*, 64 A.2d 821, 826 (Pa. 1949). The existence of an implied-in-fact contract is determined based on the conduct of the parties in light of the surrounding circumstances. *See, e.g.,* Restatement (2d) of Contracts § 19; 1 Pennsylvania Law Encyclopedia, "Contracts" § 6; *Halstead v. Motorcycle Safety Found., Inc.*, 71 F. Supp. 2d 455, 459 (E.D. Pa. 1999).

Each of the Plaintiff Class members' claims arise out of standardized transactions whereby the Class members agreed to pay for title insurance policies issued by First American and First American agreed to issue such policies in return for the premium. An *implied term* of these contracts was that First American would charge consumers the legal premium rate prescribed by the Manual. *See McShane v. Recordex Acquisition Corp.*, No. 01117, 2003 WL 22805233 (Pa. Com. Pl. Nov. 14, 2003) ("the laws in force when a contract is entered into become part of the obligation of contract with the same effect as if expressly incorporated in [the contract's] terms") (citing *DePaul v. Kauffman*, 272 A.2d 500, 507 (Pa. 1971)); Restatement (2d) of Contracts, § 4 (Illustration 1) ("A telephones to his grocer, 'Send me a ten-pound bag of flour.' The grocer sends it. A has thereby promised to pay the grocer's current price therefor."). First American breached the implied contract when it charged consumers the Basic Rate, rather than the discounted rate mandated by the Manual. Importantly, First American acknowledges that it was required to charge the applicable rate prescribed by the Manual, which is an implied term or requirement in *every* such contract between First American and the consumer. *See McShane*, 2003 WL 22805233.

16

In *Randleman*, a case involving similar claims of title insurance overcharging, Chief

Judge Carr reasoned:

> the implied-in-fact contract alleged by plaintiffs requires that
> defendant issue a title insurance policy [per the appropriate form
> on file with the ODI] to plaintiffs' lender, and that it do so in
> accordance with applicable law, including ODI regulations.
>
> . . .
>
> Under the implied-in-fact contract, as alleged here, plaintiffs
> promised to provide the funds for the title insurance premium, and
> defendant promised, in anticipation of receipt of those funds, to
> issue a title insurance policy to plaintiffs' lender.

2006 WL 3411529 at *5-6 (brackets in original; "ODI" refers to Ohio Department of Insurance).

Similarly, in *Chesner v. Stewart Title Guaranty Company*, No. 1:06-CV-476, 2006 WL 2252542

(N.D. Ohio Aug. 4, 2006), Judge Boyko reasoned that the implied contract claim

> is akin to three players on three teams involved in a three-way
> deal. Each transaction is contingent on all three teams fulfilling
> their contractual obligations. Each gives consideration. Plaintiffs
> paid monies for the title insurance policy in exchange for mortgage
> refinancing. The mortgage company provides the mortgage
> refinancing in exchange for payment and title insurance protection.
> The title insurer receives premiums in exchange for title insurance.

*Id.* at *5.

Thus, the implied-in-fact contract claim turns on the standardized nature of the title

insurance transaction, not on facts and circumstances unique or peculiar to any particular

consumer. Accordingly, the implied contract claim is amenable to class treatment. *See*

*Randleman,* 2006 WL 3411529; *Chesner,* 2006 WL 2252542.

<div style="margin-left:2em">

ii.     First American's Defenses Are Amenable to Class
Treatment

</div>

17

As with the express contract claim, First American's defenses to the implied contract claim go to Plaintiffs' underlying *legal theory*, not any individualized facts. *See* May 8, 2006 Transcript, pp. 34-38. First, First American argues that the title insurance policy comprises the "express" contract, thus precluding any implied contract. Mot. to Dismiss, p. 5. That argument ignores the fact that there are two contracts in every transaction, "each involving a different set of parties: an express contract between defendant and plaintiffs' lender to provide lenders title insurance to the lender; another, implied-in-fact, between defendant and plaintiffs for the defendant to issue such policy to the lender, so that the refinancing proceeds forward." *Randleman*, 2006 WL 3411529 at *5. At this class certification juncture, however, it is unnecessary and even inappropriate to determine whether an implied-in-fact contract exists. *See* Tr. Mot. to Dismiss Hrg. 36-38 (May 8, 2006) (noting that such a determination can only be made after full development of the factual record). Rather, the Court need only determine whether the defense involves common or individual issues. The evidence adduced to date demonstrates that the transactions at issue are standardized, with each involving the same basic structure. *See, e.g.,* App. at 134-39. Accordingly, First American's defense ultimately will turn on a legal determination, applicable to the entire class, of whether that standardized transaction gives rise to an implied-in-fact contract between the Plaintiff Class members and First American.

First American is also apparently asserting a statute of frauds defense to Plaintiffs' implied contract claim. The statute of frauds requires the following types of contracts be in writing in order to be enforceable: (1) contracts for the sale of land; (2) contracts for the sale of goods over $500; (3) contracts to answer for the debt of another; and (4) promises of an executor to pay the debts of an estate. See 33 Pa. Stat. Ann. §§ 1-6; 68 Pa. Stat. Ann. §§ 250.201-250.203; 13 Pa. Con. Stat. §§ 1206, 2201, and 2319. *See also* Pa. SSJI (Civ) § 15.03. Here, the

implied contract alleged by Plaintiffs does not fall into any of the aforementioned categories and thus would not be subject to the statute of frauds. In any event, the applicability of the statute of frauds is a common issue which would apply equally to all members of the Plaintiff Class.

The same analysis applies to First American's "ratification" and "accord and satisfaction" defenses. In a nutshell, neither of those defenses raise any individualized issues; rather, the defenses apply across-the-board to every one of the standardized title insurance overcharge claims. Ratification, for example, requires that the plaintiff have knowledge of the fraud at the time the contract is affirmed. *See, e.g., Kepler v. Kepler*, 199 A. 198, 204 (Pa. 1938). This argument apparently relies on First American's "filed rate" doctrine defense – one that has been rejected by every court in the title insurance overcharge context. *See, e.g., Randleman*, 2006 WL3411529; *Chesner*, 2006 WL2252542; Tr. Mot. to Dismiss Hrg. 94, (December 21, 2006) ("Nobody is challenging the terms of the rates. The plaintiffs have not challenged that. [The filed rate doctrine] does not bar the plaintiffs from attempting to enforce the filed rates."). Regardless of its lack of merit, the important point is that whether such a doctrine applies can be determined on a class-wide basis. Similarly, an accord and satisfaction requires the following "essential elements": "a disputed debt, a clear and unequivocal offer of payment in full satisfaction of the debt and acceptance and retention of payment by the offeree." *Goodway Mktg, Inc. v. Faulkner Adver. Assocs., Inc.*, 545 F. Supp. 263, 266 (E.D. Pa. 1982). In this case, there is simply no evidence that any class member accepted and retained payment from First American in satisfaction of the overcharge. As explained above, the Plaintiff Class had no awareness of the overcharge. *Supra* at 6.

In the end, the implied contract claims, as well as the asserted defenses to those claims, present an especially compelling case for class certification, since neither the claims nor any

defenses turn on individualized issues that could impact the predominance of common (and uniform) questions in this action, but instead involve broad issues of law in a collective "thumbs-up-or-thumbs-down" manner that applies across the board to the entire class. *Cf.* Fed. R. Civ. P. 23(c)(1)(B). Accordingly, this entire case boils down to a simple proposition that will be resolved at trial on the basis of objective class-wide proof:

> it deals with alleged overcharging for title insurance.... The insurance rates are essentially set and it's not something where there's discretion by the title insurance company when they're charging a rate.

Tr. Mot. to Dismiss Hrg. 2 (May 8, 2006).

### c.    Count III – Fraud

#### i.    Plaintiffs' Fraud Claim Is Amenable to Class Treatment

Plaintiffs' common-law fraud claim is also well-suited to class treatment, as Plaintiffs allege a statewide scheme to overcharge consumers in exactly the same way: by charging the incorrect, inflated premium for title insurance in residential real estate transactions. Class discovery confirms that First American: (a) requires its agents to follow uniform procedures when preparing HUD-1 settlement statements; (b) is responsible for the calculation of the title insurance charges set forth on the HUD-1 in every case; and (c) is aware, or has recklessly disregarded clear evidence, that its agents have been overcharging vast numbers of Pennsylvania homeowners. *Supra* at 4-7.

These facts, which are central to Plaintiffs' fraud claim, establish that common issues predominate over individual ones as to every element of the fraud count. As noted by this Court, the elements of fraud are:

> one, a representation; [t]wo, which is material to the transaction at hand; three, made falsely, with knowledge of its falsity or

> recklessness as to whether it is true or false; four, with the intent of
> misleading another into relying on it; five, justifiable reliance on
> the misrepresentation; and six, the resulting injury was proximately
> caused by the reliance.

Tr. Mot. to Dismiss Hrg. 75 (Dec. 21, 2006) (citing *Youndt v. First Nat'l Bank*, 868 A.2d 539

(Pa. Super. 2005)).

As to the first and second elements, Plaintiffs are alleging the same "representation" with

regard to every single transaction:  First American's representation on the HUD-1 settlement

statement of an illegal, inflated premium for title insurance.  Am. Compl. ¶¶ 24-25.  The

premium required to obtain title insurance clearly is a material term in every title insurance

transaction.  *See* Tr. Mot. to Dismiss Hrg. 77 (Dec. 21, 2006) ("[A]ssume this could be material

because it was paid.  It was shown and it was paid.").  Thus, the first two elements involve facts

and legal issues common to the class.

As to knowledge of the misstatements by First American, First American conducts a title

search from which it gains actual knowledge as to whether there is evidence of prior title

insurance during the look-back period, and so would have actual knowledge of the misstatement

as to every overcharged consumer.  *Supra* at 4-5.  Furthermore, on a state-wide basis, First

American has conceded that the majority of consumers over the class period should have

qualified for a Reissue or Refinance Discount.  *Id.*  Discovery revealed, however, that First

American has been receiving periodic remittance reports informing it that comparatively and

disproportionately few homeowners have been receiving the Refinance and Reissue discounts

over the class period.  *See* App. at 23, 112, 115.  Thus, First American had actual knowledge, or

reckless disregarded the fact, that consumers were being overcharged for title insurance.

Plaintiffs will also prove intent through evidence common to the class, the massive profits reaped

by First American as a result of its overcharging, First American's failure to take steps to correct

21

the overcharging problem, and First American's almost certain knowledge, as a leading title insurance company, that the failure to give the proper discounts is a widespread and common problem in the industry. Am. Compl. ¶ 71. (referencing admissions by the title insurance industry's trade association that failing to disclose the discounts is a "very bad practice" and that overcharging is a problem in the industry).

Reliance also can be established class-wide in this case. First American has admitted in deposition testimony that, in every transaction, the homeowner relies on First American or its agent to calculate the rate, and that First American would expect the homeowner to rely on that calculation. *Supra* at 5; *see* Am. Compl. ¶¶ 27, 53, 101. As to each and every member of the Plaintiff Class, there is evidence of actual reliance in the form of the consumer's signature on the HUD-1 and the payment of the inflated amount by the class member. As courts certifying similar title insurance overcharge cases have recognized, there is simply no logical reason that any consumer would voluntarily pay more for what is admittedly the "exact same policy". App at 87; *accord Mitchell-Tracey*, 237 F.R.D. at 557-58 (certifying a class of homeowners overcharged for title insurance and holding that "there is no evidence in the record, and it is difficult to comprehend, that a borrower who is made aware of the opportunity to save money knowingly would elect to pay a higher rate and for[e]go significant savings."); *Dubin,* 832 N.E.2d at 821 ("[i]n logical terms, it is not plausible to think that a consumer, made aware of the opportunity to save hundreds of dollars, would choose to pay the higher rate and forego a savings mandated by law."); *In re Coordinated Title Ins. Cases*, 2004 WL 690380, at *8 ("weighing against the defendants' argument that individual issues of reliance predominate is the difficulty of imagining a scenario where a consumer would agree to pay more for a product than the law allows.").

Similarly, causation will not require individualized proof, because the misrepresentation as to the applicable premium clearly caused the damages (the overpayment) in every single case.

Accordingly, as to each and every element of the Plaintiffs' fraud claim, common issues involving First American's uniform procedures predominate over individualized ones. *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 113 (E.D. Pa. 2005) (certifying a class action and holding that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud . . . [i]ndeed, predominance is normally satisfied when plaintiffs have alleged a common course of conduct on the part of the defendant."); *see also Bunnion v. Conrail*, No. 97-4877, 1998 WL372644, at *16 (E.D. Pa. May 14, 1998) (certifying Pennsylvania common-law fraud claims as a class action and holding that "reliance alone is not enough to preclude certification . . . . [w]hile individual issues are present, especially in the context of reliance, they do not predominate. Rather, the central issues revolve around whether the defendants negligently or intentionally misrepresented information.").

Plaintiffs' fraud claim also is predicated on the existence of a fiduciary relationship between First American and each member of the Plaintiff Class. Am. Compl. ¶¶ 102-04. The existence of such a relationship turns on the class-wide issue of whether, in connection with the standardized transactions at issue, First American exercised "overmastering influence." Tr. Mot. to Dismiss Hrg. 83:14-15 (Dec. 21, 2006). The existence of such influence can be addressed on a class-wide basis by reference to First American's uniform closing procedures, including, for example, the standard operating procedure of having the agent prepare the HUD-1 specifying the amount to be charged for title insurance. If a fiduciary relationship is found to exist between First American and the members of the Plaintiff Class, reliance and materiality should be presumed on a class-wide basis. *Basille v. H & R Block, Inc.*, 729 A.2d 574, 584 (Pa. Super. Ct.

23

1999) ("we find no need for a demonstration of reliance by any member of the class due to the nature of the parties' relationship. Because Block . . . was bound to conform to the duty of a fiduciary, reliance by the class plaintiffs is implicit and is established by operation of law . . . ."), *rev'd and remanded on other grounds*, 761 A.2d 1115 (Pa. 2000).

<div align="center">

ii.    First American's Defenses Are Amenable to Class Treatment

</div>

Similarly, since all of the transactions are virtually identical, common issues predominate over individual issues with respect to First American's defenses. Just as with the contract claims, the defenses raised by First American go to the underlying theory of Plaintiffs' fraud claim, rather than to individualized issues. Certain defenses raised by First American's Answer have already been addressed by the Court in the argument on the prior motions to dismiss (i.e., Filed Rate Doctrine and "Gist of the Action" Doctrine), but in any event these defenses will all stand or fall on a common set of facts and legal principles. As noted above, the Filed Rate Doctrine does not preclude Plaintiffs' claims, but in any event the Manual which sets forth the mandatory filed rates applies across the board to every Class member. *Supra* at 19. Therefore the Filed Rate Doctrine would apply or not apply equally to every Class member. Similarly, while the "Gist of the Action" doctrine does not bar Plaintiffs claims, the doctrine would either apply to every transaction in the Class or none at all, as there are no legally relevant differences in the nature of these transactions.

The doctrine of "voluntary payment" is simply inapposite, as it only governs when a party "voluntarily and without fraud or duress pays money to another with full knowledge of the facts." *Acme Mkts., Inc. v. Valley View Shopping Ctr., Inc.*, 493 A.2d 736, 737 (Pa. Super. Ct. 1985). Since Plaintiffs allege a fraud, there can be no voluntary payment. Even were First American to prevail on the fraud claim, it strains logic to conclude that any consumer that had

<div align="center">

24

</div>

full knowledge would willingly pay more than the law allows.  *See In re Coordinated Title Ins. Cases*, 2004 WL 690380 at *8; supra at 22.  In any event, this can be resolved on a class-wide basis as there are no significant differences between the transactions.

<div align="center">

**d.     Count IV – Unfair Trade Practices and Consumer Protection Law**

</div>

<div align="center">

i.      Plaintiffs' Claims Under the UTPCPL Are Amenable to Class Treatment

</div>

Just as with their fraud claim, Plaintiffs' claims under the Unfair Trade Practices and Consumer Protection Law ("UTPCPL") turn on common issues of fact and law.  To prevail on their UTPCPL claim, Plaintiffs must establish three elements:  (1) Plaintiffs purchased "goods or services primarily for personal, family or household purposes," 73 Pa. Stat. Ann. § 201-9.2(a); (2) Defendant engaged in "fraudulent or deceptive conduct which creat[ed] a likelihood of confusion or of misunderstanding," *id.* § 201-2(4)(xxi)[14]; and (3) Plaintiffs suffered an ascertainable loss of money as a result of Defendant's fraudulent or deceptive conduct, *id.* § 201-9.2(a).

With respect to the first element, the Plaintiff Class by definition is limited to purchasers of *residential* title insurance, Am. Compl. at 29, and the purchase of title insurance in connection with the purchase of a residence qualifies as the purchase of a service "primarily for personal, family or household purposes."  *Himmelreich v. Adams Abstract Assoc.*, 59 Pa. D & C 4th 283, 401 (Com. Pl. Ct. 2002).  With regard to the second element, fraudulent or deceptive conduct, all

---

[14]     The UTPCPL provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 2 of this act and regulations promulgated under section 3.1 of this act are hereby declared unlawful."  73 Pa. Stat. Ann. § 201-9.2(a).  Plaintiffs' claim is predicated on section 2(4)(xxi), which is commonly referred to as the "catch all" provision.  Am. Compl. ¶ 109.

of the elements of common law fraud, including reliance and causation, involve common issues

of law and can be proven based on common proof. *Supra.* at 20-23. The third element,

ascertainable loss, is also amenable to class treatment, because the loss suffered by Plaintiffs and

each Plaintiff Class member is the same in every transaction – the amount of the overcharge.

While the exact dollar amount will differ for each class member, it can be objectively ascertained

by reference to the Manual.

> ii.    First American's Defenses Are Amenable to Class
>        Treatment

According to First American, Plaintiffs' must prove all of the elements of common law

fraud to prevail on their UTPCPL claim. *See* Defendant's Mem. in Support of Mot. to Dismiss

Counts III and IV of Am. Compl. at 13. Accordingly, First American's principal defense is

simply to reassert all of its defenses to Count III. For the reasons discussed above, those

defenses are amenable to class treatment.

The only UTPCPL-specific defense asserted by First American is its apparent argument

that the "purchasers" in the transactions at issue are the lenders who are insured under the

policies, rather than the homeowners who actually pay for the policies. *See id* at 12-13. That

argument, however, raises an issue of law that is common to every Plaintiff Class member and is

most efficiently resolved on a class-wide basis.

> e.    **Count V – Unjust Enrichment**
>
> > i.    Plaintiffs' Unjust Enrichment Claim Is Amenable to Class
> >        Treatment

Plaintiffs' unjust enrichment claims are not only suitable for class treatment but constitute

precisely the sort of claim that class actions were designed to address. *Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. at 617. In Pennsylvania, the elements of unjust enrichment are "[1] benefits

26

conferred on defendant by plaintiff, [2] appreciation of such benefits by defendant, and [3] acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Commerce Bank/Pennsylvania v. First Union Nat'l Bank*, 911 A.2d 133, 143-44 (Pa. Super. Ct. 2006) (citation omitted). The intention of the parties is not the point of focus; rather, "[t]he most significant element of the doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited . . . ." *Id.*

Plaintiffs conferred benefits on First American in the form of excessive title insurance premiums, which First American retained. Such acceptance and retention, absent payment of value, is patently inequitable inasmuch as Defendant was not entitled to the overcharge. These facts remain the same from case to case without regard to the identity or circumstances of particular class members. *See supra* at 4-6 (describing uniform procedures for selling title insurance employed by First American across the state). Indeed, "[f]ailure to certify the claims for unjust enrichment would or could result in class members having to file virtually thousands of individual suits wherein the discovery and factual issues would be nearly identical." *In re Pennsylvania Baycol Third-Party Payor Litig.*, No. 1874 SEPT. TERM 2001, 2005 WL 852135, at *7 (Pa. Com. Pl. Apr. 4, 2005) (citation omitted); *see also supra* at 8 (estimating that there are tens of thousands of potential class members in this case). Accordingly, class treatment is clearly the most suitable way to address plaintiffs' unjust enrichment claim.

        ii.     First American's Defenses Are Amenable to Class Treatment.

First American pleads an affirmative defense of unjust enrichment, arguing that plaintiffs' claims are barred "on the basis that plaintiffs and members of the proposed class

would be unjustly enriched if they were allowed to recover damages sought in Plaintiff's complaint." Answer at 6.

Presumably, this is a variation on First American's claim that Plaintiffs did not qualify for the discounted premium in the first instance. *Supra at* 14. If Plaintiffs qualified for the discount and were not given it, how can First American claim that it would be unjust to return the overcharged amount to them? The uniformity of the title insurance transactions at issue mandates class action treatment of First American's unjust enrichment affirmative defense for all of the reasons advanced in support of class treatment of Plaintiffs' unjust enrichment claims. *See supra* at 21-22.

### f.    First American's Affirmative Defenses of Waiver and Estoppel, Statutes of Limitations and Standing

First American's affirmative defenses of waiver and estoppel, statutes of limitations and standing should be dealt with on a class-wide basis as well. Plaintiffs all stand on common ground with respect to their posture at the inception of the case: their claims all fall within the class period, making any statute of limitations analysis applicable to all. Similarly, their standing is uniformly grounded on the injuries they sustained when First American overcharged them for title insurance. *See DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1861 (2006) (reciting the elements of standing as "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."). As to waiver and estoppel, "[a] waiver is 'an intentional relinquishment or abandonment of a known right or privilege.'" *Petruska v. Gannon Univ.*, 462 F.3d 294, 309 (3d Cir. 2006) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *see also Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 148 (3d Cir. 1999) ("Under Pennsylvania law, waiver of legal rights can arise by clear

unequivocal, and decisive action by a party with knowledge of such rights and evidence purpose to surrender them."). It is unclear what First American believes Plaintiffs have waived; they are not aware of waiving any rights whatsoever. While it is true that "[w]aiver can be express or implied from conduct in situations that would support equitable estoppel," it is also true that to prevail on an implied waiver defense in Pennsylvania, First American "must show that it was misled and prejudiced by [Plaintiffs'] conduct." *Paramount*, 178 F.3d at 148. No such prejudice is presented here. Moreover, if First American's waiver defense is predicated on some argument that Plaintiffs made no attempt to demand payment or return of the overcharge before they sued, Pennsylvania law is clear: "failure to demand payment is simply not a clear, unequivocal, and decisive action" that would give rise to waiver. *Id.* More to the point, the uniformity of First American's conduct in selling title insurance across the state, and of the common circumstances in which Plaintiffs found themselves as a result, mandates class treatment of these affirmative defenses as well as the claims discussed above. In the end, First American's defenses, among them waiver and estoppel, raise an important point on class certification. The mere assertion of a long list of affirmative defenses, where the application of any of them in the context of the particular case does not raise problematic individualized issues, is not sufficient to deny class certification.

Courts in other jurisdictions faced with virtually identical allegations of overcharging have repeatedly held that the predominance requirement is satisfied and that class certification is appropriate. *See, e.g.*, *Mitchell-Tracey*, 237 F.R.D. at 557 ("The pertinent facts and applicable law at issue in this case are common to all the members of the proposed classes."); *Dubin*, 832 N.E.2d at 820 ("[T]he collective issues of [the title insurer's] practice involving the distribution of its mandated discounted refinance rates predominated over any transaction-by-transaction

29

differences of individual consumers."); *In re Coordinated Title Ins. Cases*, 2004 WL 690380, at

*9-18 (rejecting defendant insurers' argument that the presence of intermediaries in transactions,

the possibility of a change in the premises, the requirement of reliance as an element of a claim,

or any combination of these and other factors raised individual issues sufficient to defeat class

certification). The predominance requirement is likewise satisfied here with regard to each and

every claim and defense presented to the Court.

<div style="text-align:center">

2.    *A Class Action Is a Superior Method for Adjudicating the Overcharging
Controversies Between First American and Consumers*

</div>

The Plaintiff Class also satisfies Rule 23(b)(3)'s superiority requirement, which "asks a

district court to balance, in terms of fairness and efficiency, the merits of a class action against

those of alternative methods of adjudication." *In re Cmty. Bank*, 418 F.3d at 277 (quoting

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996)) (internal quotation marks

deleted). In this case, all of the nonexclusive factors set forth in Rule 23(b)(3) that are to be

considered by the Court clearly weigh in favor of class certification.

First and foremost, individual members of the class have no realistic ability to litigate

their claims against First American in separate lawsuits. Because individual damages are

unlikely to exceed a few hundred dollars, individual class members could not afford to bear the

disproportionate costs of litigation. Thus, this case must proceed as a class action or not at all,

which is precisely the situation that the class action procedure was designed to address.

*Amchem*, 521 U.S. at 617 (the fundamental purpose of the class action device is to vindicate "the

rights of groups of people who individually would be without effective strength to bring their

opponents into court at all"); *Mitchell-Tracey*, 237 F.R.D. at 560 (characterizing a similar title

<div style="text-align:center">

30

</div>

insurance overcharge case as "precisely the kind of case that class actions were designed for")
(citation omitted).

Second, the absence of parallel actions or attempts to intervene in this case evidences the
Plaintiffs' interest in proceeding as a class. *See Bayshore Ford Truck Sales, Inc. v. Ford Motor
Co.*, No. 99-741, 2006 WL 3371690, at *10 (D.N.J. Nov. 17, 2006) (plaintiffs' "strong interest"
in proceeding as a class "is evidenced by the very few individual actions brought thus far").

Third, concentrating the litigation in this forum would serve the interests of judicial
economy and conserve the class members' and Defendant's resources. Moreover, the proposed
class consists only of residents of the Commonwealth of Pennsylvania, and there is no basis to
conclude that this forum is any less desirable than any other available forum. *See Zeno*, 238
F.R.D. at 197-98.

With respect to the fourth factor, manageability, while First American likely will argue
that the class is unmanageable because of the perceived burden associated with calculating
individual damages and identifying members of the class, other courts have rejected those
arguments in title insurance cases. In fact, individual calculation of damages will not present a
significant obstacle in this case because that calculation would be based on a simple
mathematical formula. *See Mitchell-Tracey*, 237 F.R.D. at 557 (rejecting defendant title
insurer's argument that variable damage awards rendered overcharge case improper for class
certification). Identifying class members would require some inquiry, but the data necessary to
conduct that inquiry is in the possession or control of First American, some of it in electronic
form. *Supra* at 4-6. Indeed, the United States District Court for Maryland already has held that
First American has the requisite data "readily available" to it and "reasonable methods are
available to collect the data." *Mitchell-Tracey*, 237 F.R.D. at 560 ("It strains credulity to

31

suggest, as [First American and United General] do, that the Defendants (and their agents) lack the ability to compile information on insurance policies that they have issued"); *see also In re Coordinated Title Ins. Cases*, 2004 WL 690380, at *17-18 (rejecting the argument by First American and other insurers that class action would not be manageable because identifying members of the class would be a "gargantuan task").

## CONCLUSION

Accordingly, for all of the reasons set forth above, Plaintiffs respectfully urge this Court to certify the Plaintiff Class.

Respectfully submitted,

Dated:  July 16, 2007

s/Adrian N. Roe
Adrian N. Roe
  Pa. Bar No. 61391
Charles B. Watkins
  Pa. Bar No. 01082
Kenneth J. Witzel
  Pa. Bar No. 82814
Watkins Dulac & Roe P.C.
Two Gateway Center, 17 East
603 Stanwix Street
Pittsburgh, PA 15222
(412) 434-5544
aroe@watkinsdulac.com

Mark R. Koberna
Sonkin & Koberna Co., LPA
3401 Enterprise Parkway, Suite 400
Cleveland, OH 44122
(216) 514-8300

David D. Yeagley
Shannan L. Katz
Ulmer & Berne LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, OH 44113-1448
(216) 583-7194

Suzanne Lafleur Klok
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant SC 29464
(843) 216-9219

William H. Narwold
Ingrid L. Moll
Motley Rice LLC
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1678

Mark A. Packman
Gilbert Randolph LLP
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
(202) 772-2200

Counsel for Plaintiffs Anthony and Alice
Slapikas on behalf of themselves and all
others similarly situated