**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANTHONY L. SLAPIKAS | ) |
| and ALICE B. SLAPIKAS, | ) |
| | ) |
|       Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 2:06-CV-00084JFC |
| FIRST AMERICAN TITLE | ) |
| INSURANCE COMPANY, | ) |
| | ) JUDGE JOY FLOWERS CONTI |
|       Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| MEZZO LAND SERVICES, LLC, | ) |
| | ) |
|       Third-Party Defendant. | ) |

**DEFENDANT'S MEMORANDUM IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................................................iii

I.  INTRODUCTION ...........................................................................................................1

II. STATEMENT OF FACTS...............................................................................................2

    A.  First American Title and Its Independent Agents..........................................................2

    B.  The TIRBOP Manuals...................................................................................................3

        1.  1999 TIRBOP Rate Manual...................................................................................3

        2.  2005 TIRBOP Manual ...........................................................................................4

    C.  Public Knowledge of the Reissue and Refinance Rates.................................................5

    D.  Administrative Remedies Exist .....................................................................................6

    E.  The Slapikas' Transaction..............................................................................................6

    F.  Slapikases' Knowledge of the Availability of the Discounts.........................................7

    G.  There Is No 'Typical' Reissue or Refinancing Closing..................................................7

        1.  First American's Direct Operations........................................................................7

        2.  Independent Agents' Practices ...............................................................................8

    H.  First American Does Not Have Data to Identify Putative Class Members ...............10

        1.  First American's Direct Operations System (FAST)...............................................10

        2.  Agent Computer Capabilities (WINGS) ..............................................................10

        3.  Neither FAST Nor WINGS Can Identify the Class .............................................12

    I.  Plaintiffs' Statistical Review of Mezzo's Files Is Inaccurate, Contains Glaring
        Miscalculations and Is Inadmissible.................................................................................14

III. ARGUMENT .................................................................................................................15

    A.  This Court Must Undertake a Rigorous Analysis .......................................................15

    B.  Individual Issues Predominate......................................................................................15

**Page**

1.  <u>Ricciardi</u> Shows That the 2005 TIRBOP Manual Was a Change To
    (Not a Clarification of) the 1999 TIRBOP Manual (All Counts) .......................... 16

2.  Individual Issues as to Who Was Allegedly Overcharged and,
    Therefore, Injured Overwhelm Each of Plaintiffs' Claims (All Counts) .............. 17

3.  Individual Issues Pervade Plaintiffs' Breach of Contract Claims
    (Counts I and II) ............................................................................................. 23

4.  Individual Issues of Misrepresentation, Reliance and Injury Preclude
    Plaintiffs' Fraud and UTPCPL Claims (Counts III and IV) ................................. 25
    (a)  Proof of Misrepresentation Is Individualized ............................................ 26
    (b)  Failure to Disclose the Existence of the Reissue or Refinance
         Rate Is an Individual Issue ....................................................................... 27
    (c)  Proof of Reliance Depends on a Fact-Intensive Inquiry into
         What Information Each Class Member Had ............................................... 29
    (d)  There Is No Common Evidence of Injury ................................................. 30

5.  Plaintiffs' Unjust Enrichment Claim Is Also Fraught with Individual
    Issues (Count V) .............................................................................................. 31

C.  A Class Action Is Not the Superior Method of Adjudicating Plaintiffs' Claims ........ 31

D.  If Certified, This Case Would Be Unmanageable ............................................................. 32

E.  Plaintiffs Are Inadequate Class Representatives .............................................................. 33

F.  Plaintiffs' Proposed Class Definition Is Defective .......................................................... 33

IV. CONCLUSION ..................................................................................................................... 34

CERTIFICATE OF SERVICE .................................................................................................. 36

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### CASES

Adashunas v. Negley, 626 F.2d 600 (7th Cir. 1980) ........................................................34

Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997) ..................................................15

Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392 (E.D. Pa. 2006) ............25, 29, 30

Castano v. American Tobacco Co., 84 F.3d 734 (5th Cir. 1996) ....................................32

Commerce Bank/Pennsylvania v. First Union Nat'l Bank, 911 A.2d 133
    (Pa. Super. Ct. 2006) ................................................................................................31

Dass v. Epplen, 162 Colo. 60, 424 P.2d 779 (Colo. 1967) ...........................................24

Dubin v. Security Union Title Ins. Co., 832 N.E.2d 815 (Ohio Ct. App. 2005) ............20

Dunn v. Midwest Buslines, Inc., 94 F.R.D. 170 (E.D. Ark. 1982) ................................34

Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974) ......................................................32

Feingold v. Southeastern Penn. Transp. Auth., 512 Pa. 567, 517 A.2d 1270
    (1986) ........................................................................................................................31

Fisher v. Bristol-Myers Squibb Co., 181 F.R.D. 365 (N.D. Ill. 1998) ..........................32

Forman v. Data Transfer, Inc., 164 F.R.D. 400 (E.D. Pa. 1995) ...................................34

Gardner v. First Am. Title Ins. Co., 2003 WL 221844 (D. Minn. Jan. 27, 2003) .................24, 32

Gariety v. Grant Thornton, LLP, 386 F.3d 356 (4th Cir. 2004) .....................................25

Gavron v. Blinder Robinson & Co., Inc., 115 F.R.D. 318 (E.D. Pa. 1987)....................29

General Tel. Co. of Southwest v. Falcon, 457 U.S. 147 (1982) ..............................15, 20

Gunnells v. Healthplan Services, Inc., 348 F.3d 417 (4th Cir. 2003)............................29

Hagen v. City of Winnemucca, 108 F.R.D. 61 (D. Nev. 1985)......................................34

Halstead v. Motorcycle Safety Found., Inc., 71 F. Supp. 2d 455 (E.D. Pa. 1999) ........24

Hampden Real Estate, Inc. v. Metropolitan Management Group, 2003 WL.
    23206072 (E.D. Pa. 2003) .......................................................................................24

**Page**

In re Coordinated Title Ins. Cases, 2004 WL. 690380 (N.Y. Sup. Jan. 8, 2004) .........................28

In re Fields, 2006 WL. 2191342 (E.D. Pa. July 31, 2006) .....................................................19, 20

In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360 (E.D. La.
   1997) ...................................................................................................................................32

In re Initial Public Offering Sec. Litig., 471 F.3d 24 (2d Cir. 2006) ............................................15

International Union v. Clark, 2006 WL. 2687005 (D. D.C. 2006)................................................33

Intratex Gas Co. v. Beeson, 22 S.W.3d 398 (Tex. 2000)..............................................................34

Jones v. CBE Group, Inc., 215 F.R.D. 558 (D. Minn. 2003)........................................................32

Kirkbride v. Lisbon Contractors, 521 Pa. 97, 555 A.2d 800 (1989)............................................31

Lawson v. Brown, 349 F. Supp. 203 (W.D. Va. 1972)..................................................................24

Lockwood Motors, Inc. v. General Motors Corp., 162 F.R.D. 569 (D. Minn.
   1995) ...................................................................................................................................16

Moore v. PaineWebber, Inc., 306 F.3d 1247 (2d Cir. 2002) ........................................................25

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154
   (3d Cir. 2001).................................................................................................15, 17, 18, 20, 31

Nicodemus v. Union Pac. Corp., 204 F.R.D. 479 (D. Wyo. 2001) .........................................24, 34

Omicron Sys., Inc. v. Weiner, 860 A.2d 554 (Pa. Super. Ct. 2004).............................................23

Randleman v. Fidelity Nat'l Title Ins. Co., 2006 WL. 3411529
   (N. D. Ohio Nov. 17, 2006) ................................................................................................20

Ricciardi v. Ameriquest Mortg. Co., 164 Fed. Appx. 221, 225-26 (3d Cir. 2006)............... *passim*

Rogers v. Coburn Fin. Corp., 53 F.R.D. 182 (N.D. Ga. 1971).....................................................24

Sanneman v. Chrysler, 191 F.R.D. 441 (E.D. Pa. 2000) .............................................17, 18, 31, 32

Santana Prods., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123 (3d Cir.
   2005) ...................................................................................................................................25

Sperberg v. Firestone Tire & Rubber Co., 61 F.R.D. 70 (N.D. Ohio 1973).................................34

iv

**Page**

Thorn v. Jefferson-Pilot Ins. Co., 445 F.3d 311 (4th Cir. 2006)..............................................16, 30

TransPenn Wax Corp. v. McCandless, 50 F.3d 217 (3d Cir. 1995) ...............................................28

Trecker v. Manning Implement, Inc., 73 F.R.D. 554 (N.D. Iowa 1976) .......................................24

Wachtel v. Guardian Life Ins. Co. of America, 453 F.3d 179 (3d Cir. 2006) ..................20, 22, 25

Wilson v. Donegal Mut. Ins. Co., 410 Pa. Super. 312, 598 A.2d 1310 (1991) .......................25, 30

## STATUTES

12 U.S.C. § 2607 et. seq.............................................................................................................5

40 P.S. § 910-41..................................................................................................................3, 6, 32

40 P.S. § 910-44(b) .................................................................................................................6, 32

12 C.F.R. § 226.23(a).....................................................................................................................9

24 C.F.R. § 3500.6 ...................................................................................................................5, 29

73 P.S. § 201-9.2(a) .....................................................................................................................32

## OTHER AUTHORITIES

HUD Brochure ................................................................................................................................5

1999 TIRBOP Rate Manual...........................................................................................................3

2005 TIRBOP Manual ...................................................................................................................4

## I.      __INTRODUCTION__

Plaintiffs' Motion for Class Certification is based on several false premises.  First, the

TIRBOP Rate Manual that FA allegedly violated was not uniform throughout the class

period.  Rather, it was substantially amended in August 2005.  The Third Circuit's Ricciardi

decision makes clear that, prior to August 2005, a customer did not qualify for a discounted

rate unless he presented evidence of a prior policy before closing and there was *no*

presumption that an unsatisfied mortgage or a deed to a bona fide purchaser was proof of a

prior policy.  Contrary to Plaintiffs' linchpin assumption, every customer who may have

been entitled to a discounted rate after August 2005 did not necessarily qualify for the

discount prior to the amendment.  When the proper standard is employed, a review of FA's

agent files indicates that only a *de minimis* 4.4% of customers were overcharged - not the

staggering 81% alleged by Plaintiffs.  There is no credible evidence for their contention that

FA's agents and employees routinely overcharge customers.  Indeed, the facts reveal a very

different picture.  The methods by which FA and its agents informed customers of, and

provided customers with, the discounted rates varied greatly from agent to agent, branch to

branch, and time to time.  The fact that customers were required to present evidence of the

prior policy during much of the class period raises a host of individual issues that cannot be

tried on a classwide basis.

Critically, the evidence of the Slapikases to prove they were overcharged will not

prove that anyone else was overcharged.  Obviously the Slapikases' HUD-1 – the only

"common" evidence Plaintiffs point to – can not prove anything for any other class

member.  Nor does FA maintain any data or system to determine whether a customer was

overcharged.  This can be found, if at all, only by an individual file-by-file review of each

transaction – a tedious process that would take an untold number of years.  This case is simply not amenable to class certification.

## II.        STATEMENT OF FACTS

### A.        First American Title and Its Independent Agents

FA is a national title insurance underwriter (Ex. 1 ¶ 1).  It issues title insurance policies throughout Pennsylvania directly and through a network of independent agents (Ex. 1 ¶ 7).  FA has 16 direct operation branch offices in Pennsylvania and 740 independent agents (Ex. 1 ¶ 7, Exs. A, B).  Former and present FA agents include recognized and well-respected lawyers, law firms, judges and public office holders (Ex. 1 ¶ 9, Ex. C).  Approximately 40% of FA's residential title business is conducted by direct operations (Ex. 1 ¶ 8).  The remaining 60% is from hundreds of independent agents (Ex. 1 ¶ 8).

In Pennsylvania, agents are licensed and are required to take continuing education classes (Ex. 1 ¶ 10).  FA provides additional training through seminars, bulletins and other training materials, visits from agency representatives, and on-call assistance  (Ex. 1 ¶ 10).  Although the agents have an agreement with FA to sell and to issue title policies, they are independent businesses and deal directly with customers (Ex. 1 ¶ 12).  The independent agents: (1) receive the applications for title work, (2) process the orders for title policies, (3) perform all services necessary to issue title policies, (4) examine the title evidence, (5) obtain information from customers' prior lender(s) to pay off any prior loan (in a refinancing), (6) issue title insurance commitments, (7) prepare HUD-1s and other necessary closing documents, (8) conduct the closing of the transactions, and (9) receive the premium for the title insurance as shown on the HUD-1s (Ex. 1 ¶ 12).  Critically, the agents also calculate the premium to be charged for title insurance (Ex. 1 ¶ 12).  FA is not informed

about any particular policy an agent sells until it is issued and it receives its portion of the premium (Ex. 1 ¶ 12).

**B.     The TIRBOP Manuals**

FA's title insurance premium rates, including the basic rate and all discounted rates, are published in the TIRBOP Manual. 40 P.S. § 910-41.  TIRBOP amends its manual from time to time (Ex. 1 ¶ 13, Exs. E-G).

**1.     1999 TIRBOP Rate Manual**

In 1999, when the proposed class period starts, TIRBOP published a rate manual that provided two discounted title insurance premium rates, the "Reissue" and the "Refinance" rates ("'99 Manual") (Ex. 1 ¶ 13, Ex. E  ¶¶ 5.3, 5.6).  Under the '99 Manual, a customer was entitled to purchase title insurance at the discounted Reissue rate "if the real property to be insured is identical to or is part of real property insured 10 years immediately prior to the date the insured transaction closes when evidence of the earlier policy is produced notwithstanding the amount of coverage provided by the prior policy" (Ex. 1 ¶ 13, Ex. E ¶ 5.3).  Similarly, the Refinance rate was available "[w]hen a refinance or substitution loan is made within 3 years from the date of closing of a previously insured mortgage or fee interest and the premises to be insured are identical to or part of the real property previously insured and there has been no change in the fee simple ownership" (Ex. 1 ¶ 13, Ex. E ¶ 5.6). Under the '99 Manual, actual evidence of prior insurance was required to be produced before a customer could receive the Reissue or Refinance rates.  E.g., Ricciardi v. Ameriquest Mortg. Co., 164 Fed. Appx. 221, 225-26 (3d Cir. 2006).  Indeed, the Department of Insurance cited agents that provided customers the Reissue or Refinance rate without first obtaining evidence of prior insurance (Ex. 2 193) (hereinafter "Zanic Dep.").  The 1999 Manual did not specify what "evidence" must be produced to prove the issuance of prior

3

insurance (Ex. 2 185-88).  Although FA issued non-binding bulletins suggesting what
constituted sufficient proof of prior insurance, the agents had discretion whether to follow
those guidelines (Ex. 2 77-82).  Under the FA guidelines, evidence of a prior deed or
mortgage was <u>not</u> sufficient to presume the existence of prior insurance (Ex. 2 185-86).  The
TIRBOP Manual was amended in 2000, 2002, 2003, and January 2005.  The Reissue and
Refinance rate provisions remained unchanged in those versions of the Manual (Ex. 1 ¶ 13).

      **2.**      **2005 TIRBOP Manual**

      In August 2005, the Reissue and Refinance rate provisions of the TIRBOP Manual
were amended (the "'05 Manual") (Ex. 1 ¶ 13, Ex. F ¶ 2.8).  The 2005 amendment lessened
the "evidentiary" requirements customers must satisfy to be entitled to Reissue or Refinance
discounts.  <u>Id.</u>  It still provides that the Reissue and Refinance rates "are applicable when
evidence of previous insurance" is provided, but as evidence of previous insurance, an
Insurer shall rely upon:

      (a)      the recording (within the period of time specified within the applicable
            Section of the Manual) of either:
            (1)      a deed to a bona fide purchaser for value, or
            (2)      an unsatisfied mortgage to an institutional lender; or in the
                  alternative,
      (b)      any of the following documents produced by or on behalf of the purchaser
            of the title insurance policy:
            (1)      a copy of the prior policy;
            (2)      a copy of the marked-up commitment;
            (3)      a settlement sheet showing payment of a title insurance premium;
                  or
            (4)      other written evidence acceptable to the Insurer that title insurance
                  coverage was purchased for the property.

<u>Id</u>.  Although the '05 Manual still nominally requires customers to provide evidence of a
prior mortgage, it actually creates the presumption that prior insurance exists if a deed a
bona fide purchases for value or unsatisfied mortgage to an institutional lender was recorded

during the applicable time period.  Id.  The 2005 amendment represented a significant

change from the prior requirements (Zanic Dec. ¶ 30) (Exh. 1). [1]

## C.      Public Knowledge of the Reissue and Refinance Rates

The TIRBOP Manual is a public record and readily available to consumers (Ex. 1 ¶

14). [2]  Also, the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607 et. seq. ("RESPA"),

requires lenders and mortgage brokers to provide customers with a HUD brochure that

informs them of the Reissue and Refinance rates.  24 C.F.R. § 3500.6.  These  regulations

mandate that those who apply for a federally related mortgage loan be given a pamphlet that

states:  "[I]f you are buying a home which has changed hands within the last several years,

ask your title company about a 'reissue rate,' which would be cheaper" (Ex. 3, 9).

Moreover, discounted title premiums have been widely publicized in the media in

Pennsylvania and national publications since 1998 (Ex. 4 Exs. 1-14).  The Pittsburgh

Post-Gazette in October 1998 informed readers of "auxiliary" costs related to buying real

estate (Ex. 4 Ex. 14).  It states:  "If the seller had obtained title insurance recently, [ ] insurers

can offer a 'reissue rate' to the new owner.  On a $100,000 house, for example, new title

insurance would cost $829 while a reissue would cost only $746."  Id.  Similarly, in October

2005, the Post-Gazette wrote:  "If you've obtained title insurance recently, ask your lender

for a lower-cost "reissue" title insurance policy" (Ex. 4, Ex. 11). [3]  National publications like

---

[1]      To further complicate matters, TIRBOP amended the manual again effective May 1, 2006.  The 2006 amendment did not change the presumptions regarding proof of prior insurance, but it did change the time periods within which the Refinance rate is available.  Instead of one 80% reduced rate available within three years of a prior policy, the 2006 manual provides a 70% rate within two years and a 80% rate within four years (Ex. 1 ¶ 13, Ex. G).

[2]      The current version of the manual is available online at FA's website (Ex. 1 ¶ 14, Ex. 1).

[3]      In October 2003, the Allentown Morning Call published an entire article on title insurance that informed readers to "ask for a reissue rate."  Id.  It provides:  "If you are refinancing within 10 years, you can ask for a reissue rate.  The reissue rate is discounted.  The amount of the discount varies by state…In Pennsylvania the reissue rate discount is 10 (Cont'd)

USA Today have also publicized the discounted Reissue or Refinance rates (Ex. 4, Ex. 13). Public knowledge of the availability of the Reissue and Refinance rate discounts is common enough that some customers ask if they qualify for it (Ex. 5 40) (hereinafter, "Sunseri Dep."). Certainly, lenders and mortgage brokers are very familiar with their discounts (See, Ex. 1, 11, 12).

**D.      Administrative Remedies Exist**

The Pennsylvania Title Insurance Act at 40 P.S. § 910-44(b) provides a remedial system for an aggrieved person to seek from TIRBOP a refund of any premium overcharged and, if a refund is not made, the further right to appeal to the Insurance Commissioner.  40 P.S. § 910-44(b).   After a hearing, the Insurance Commissioner may "grant the relief appropriate" including a refund of an alleged overcharge.  40 P.S. § 910-46(d).  Plaintiffs have failed to pursue this remedy.

**E.      The Slapikas' Transaction**

Plaintiffs purchased a home in Pittsburgh in 1990, took out a mortgage and purchased title insurance (Ex. 6 17-20).  They refinanced five times between 1992 and 2003 (Ex. 6 11).  Their 2003 refinance loan was provided by National City Mortgage Corporation ("National City") (Comp. ¶ 10).  Attendant to the 2003 refinancing, National City required Plaintiffs to pay the premium on a lender's title policy (Comp. ¶ 12).  Plaintiffs, or their mortgage broker, hired Mezzo Land Services LLC ("Mezzo") to perform the settlement and closing services related to the 2003 refinancing (Comp. ¶ 11).  Mezzo prepared and signed

---

percent…Most companies give an additional 20 percent discount if the loan is being refinanced within three years…The reissue rate on a $100,000 loan is about $770.  With the additional discount, it would be about $620.  When you are refinancing, it's important to ask for reissue rates if you qualify, because some title companies don't volunteer them…" Id.

the HUD-1 Statement outlining the fees paid at settlement (Comp. ¶¶ 11, 13).  The premium

for the lender's policy was $1,198.75 (Ex. 6 p. 20).  Plaintiffs claim Mezzo failed to inform

them of the refinance rate before their transaction closed (Doc. 100, p. 6).  Mezzo, not FA

dealt directly with Plaintiffs' new lender, issued a title insurance commitment, prepared the

HUD-1 and other necessary closing documents, conducted the closing of the transaction,

kept $1036.90 as its share of the title premium, and remitted the remaining premium to FA

on July 15, 2003, which was the first notice to FA that Plaintiffs' new lender was among its

insureds (Ex. 1 ¶ 12).

**F.    Slapikases' Knowledge of the Availability of the Discounts**

As required by HUD, Plaintiffs' lenders provided the disclosure pamphlets

informing the Slapikases of the Reissue and Refinance rates.  Plaintiffs produced federally

mandated Good Faith Estimates of Settlement Charges provided by their lenders in 1992,

1998, 2000, and 2001 that certify Plaintiffs received the HUD disclosure pamphlet (Ex. 7).

**G.    There Is No 'Typical' Reissue or Refinancing Closing**

Practices related to providing the Reissue or Refinance rate to customers vary, and

each of FA's 740 independent agents in Pennsylvania was free to adopt its own practices

prior to the August 1, 2005, TIRBOP amendment.  Even FA's practices in its branch offices

vary.

**1.    First American's Direct Operations**

Prior to the '05 Manual, FA's direct operations sought evidence that a prior title

policy was issued within the required number of years (Ex. 8 ¶ 5).  Actual evidence of a prior

title policy was required for the Reissue or Refinance rate (Ex. 9 ¶ 4).  In eastern

Pennsylvania, FA's offices would often find a stamp by a prior title company on some of the

recorded instruments (Ex. 8 ¶ 5).  If they did not, the escrow officer would ask for proof of

prior insurance from the real estate agent, mortgage broker, or borrower (Ex. 8 ¶ 5).

     In Pittsburgh, FA would ask the person placing the order if there was any back title

work available, like a prior title policy (Ex. 9 ¶ 5).  The practice in the Pittsburgh office was

to ascertain from the title abstract whether there was a recent sale or first mortgage to an

institutional lender that could have been insured (Ex. 9 ¶ 6).  FA would then call the

customer and ask for the prior policy (Ex. 9 ¶ 6).  On a refinance transaction, FA would

typically contact the borrower and ask for evidence of the prior policy (Ex. 9 ¶ 6).  If the

prior policy was a loan policy, the borrower might not have a copy, but FA would accept

other evidence of the issuance of that policy, such as a HUD-1 showing the premium paid

for the prior loan policy (Ex. 9 ¶ 6).

     Since the 2005 amendment to the TIRBOP Rate Manual, FA's direct operations

provide the Reissue or Refinance rate discounts based on the presumption that a recorded

deed for consideration or a recorded institutional mortgage was insured (Ex. 8 ¶ 2; Ex. 9

¶ 3).  FA's direct operations also disclose to the buyers/owners that the property may qualify

for a lower rate in the owner's affidavit since the 2005 TIRBOP amendment (Ex. 8 ¶ 3).

    **2.**    **Independent Agents' Practices**

     Prior to the '05 Manual, agents had the discretion to determine what evidence was

sufficient to prove the existence of prior title insurance (Ex. 2 185-88).  For example,

Bulletin 2002-10 advised agents that they could accept a completed settlement sheet, verbal

or written confirmation from the prior settlement agent, notations on a recorded document,

or rely on personal familiarity with local lender practice (Ex. 1 ¶ 11, Ex. C).  Some of the

evidence, like a HUD-1, if provided in writing, would be in the agent's file.  Others, such as

familiarity with local lender practice, would involve a judgment call by the agent, that could not be "second-guessed" without testimony from the agent (Ex. 2 185-189).

On the other hand, the only evidence that some agents, like Mezzo, accepted before the 2005 amendment was "a final policy from the insured" (Ex. 3 36). The agency's procedure was to ask customers if they had a prior policy (Ex. 3 37). "If they had a prior policy within the requisite timeframes, then they would have an opportunity of having either of those, either the reissue or the substitution [refinance] rate" (Ex. 3 37). Although FA's guidelines suggested that a HUD-1s might be sufficient evidence of prior insurance, Mezzo exercised its discretion and chose not accept it (Ex. 3 55-57) because customers have a three-day statutory rescission period to rescind a refinancing transaction (12 C.F.R. § 226.23(a)), a HUD-1 alone does not unequivocally prove that the transaction closed and insurance was actually issued (Ex. 3 54-55). Nevertheless, since Mezzo's practice was to ask for a prior policy, the borrower had an opportunity to obtain and provide it. Other agents were different. For example, in Philadelphia, some looked for a stamp on the recorded deed or mortgage indicating the recorder was to return it to a particular title company. If the agents could not determine if prior insurance existed, they would contact the other title company (Ex. 11 ¶ 10). The common thread is that all of these agents asked orally for proof of a prior policy in what they considered appropriate circumstances.

The '05 Manual requires agents to provide the following notice of the discounts: "IF THIS CONVEYANCE OR REFINANCE OCCURS WITHIN TEN YEARS OF A PREVIOUS INSURANCE OF THE SAME PROPERTY, YOU MAY BE ENTITLED TO A REDUCED RATE" (Ex. 1 ¶ 13, Ex. F and G). Most FA agents use a consistent but somewhat different disclosure; the owner's affidavit that says:

9

> NOTE:  If this transaction occurs within ten years of a previous title
> insurance transaction of the same property, or a portion thereof, it may be
> entitled to a reduced title insurance rate.

> To the best of our knowledge, title insurance was last obtained on
> _____.

Similarly, the purchaser's affidavit used by most agents includes the first sentence quoted above but not the second (Ex. 11 ¶ 7).  Both an owner's and a purchaser's affidavit are required for any buy-sell transaction to which the Reissue Rate might apply.  An owner's affidavit (since there is no purchaser) is required for every refinance transaction.

**H.     First American Does Not Have Data to Identify Putative Class Members**

**1.     First American's Direct Operations System (FAST)**

From the beginning of the putative class period to February 2003, FA computer systems only had images of policies issued by its direct operations that cannot be electronically searched (Ex. 10 ¶ 6).  Since February 2003, FA has used the FAST system in its branches in Pennsylvania to store data on the policies FA has issued directly (Ex. 10 ¶ 5).  The FAST system is used only by FA's direct operations, and they represent only 40% of FA's current business in Pennsylvania (Ex. 10 ¶ 8).  FAST contains data on the title policies issued by direct operations, the title abstract and examination, and the closing.

**2.     Agent Computer Capabilities (WINGS)**

FA uses the WINGS system to track information on title policies issued by independent agents in Pennsylvania (Ex. 10 ¶ 11).  The agents issue policies and remit part of the premium and some limited information to FA only after a policy is issued (Ex. 10 ¶ 11; Ex. 1 ¶ 6).  Obviously, WINGS can issue reports only for the data that the agents provide.  Further, agents in Pennsylvania do not consistently report all of the data that WINGS could capture (Ex. 10 ¶ 11).  Different agents report different data, and even some agents do not consistently report the same data (Ex. 10 ¶ 11).  Also, there are no automated

links or interfaces between any agent in Pennsylvania and WINGS that would allow the transfer of data directly from an agent to FA (Ex. 10 ¶ 11).

The WINGS system can identify which policies were sold at the Basic Rate, Reissue Rate, and Refinance Rate but <u>only</u> if that data was provided by the agent (Ex. 10 ¶ 13).  The ability to distinguish among these rates is a special feature in WINGS for Pennsylvania because of its requirement that FA report the number of policies sold at each rate in the state at the end of the year (Ex. 10 ¶ 13).

In addition to the field that distinguishes among the Basic, Reissue, and Refinance Rates, the WINGS system also has fields to collect refinance information.  These fields ask the person entering data in WINGS to check whether the transaction is a refinance and to give the face amount and date of the prior policy.  Specifically, the fields are:  Refinance Check Box, Previous Liability/Insurance, and Previous Policy Date (collectively the "Refinance Fields" in WINGS) (Ex. 10 ¶ 14).  The Refinance Fields in WINGS could be used to identify persons who received the discount, but such a report would not identify anyone who did <u>not</u> receive the discount (Ex. 10 ¶ 15).  Furthermore, WINGS does not have a data field to capture either the legal description or the property address for Pennsylvania (Ex. 10 ¶ 16).  Nor does it have a data field to capture the mortgagor's (borrower's) name for a lender's policy because the lender (mortgagee) is the insured (Ex. 10 ¶ 17).

Although WINGS has fields that can identify policies sold at the Basic, Reissue, or Refinance rates, there is no report that can show whether a customer who was charged the Basic rate was entitled to receive a discounted rate.  Indeed, the WINGS system report for the policy the Slapikases purchased from Mezzo shows that it is a Basic Rate loan policy, but the Refinance Fields do not contain any data and are all blank (Ex. 10 ¶ 18).  Mezzo did not

report any such data to FA, and thus, FA could not enter it in WINGS (Ex. 10 ¶ 18; Ex. 1 ¶ 6).

Moreover, a WINGS report for all loan policies that were (a) sold at the Basic Rate in Pennsylvania from February 2003 to January 2007, and (b) have data in any of the "Refinance Fields" identifies just four policies (that were keyed in error since it is inconsistent to report a policy as being sold at the Basic Rate and complete one of the Refinance Fields) (Ex. 10 ¶ 19).

FA also has another system in operation in Pennsylvania called AgentNet (Ex. 10 ¶ 29). The AgentNet system is a "back policy" system, and it only contains prior FA policies issued in Pennsylvania. Specifically, the AgentNet system stores scanned images of prior FA policies. The AgentNet system in Pennsylvania dates back only to September 2002; prior policies are not in AgentNet. AgentNet does not contain any images of title insurance policies issued by underwriters other than FA (Ex. 10 ¶ 29).

### 3.    Neither FAST Nor WINGS Can Identify the Class

It is not possible for FA to identify the Class using its systems or data. FA cannot identify the Class from FAST, WINGS, or any of its computer systems and databases. Membership in the Class depends upon information that FA does not have (Ex. 10 ¶ 23). To identify the Class, even just for policies issued by FA directly,  it would be necessary to review each imaged file in the FAST system for every policy issued by FA in Pennsylvania during the class period to try to determine whether: (1) the transaction was in fact a refinance; (2) there was any evidence of a prior policy; (3) the prior policy involved the same property; (4) there was no change in the fee simple ownership; and (5) the prior policy was within three or ten years of the later policy. This review, while it could be done on a

computer screen displaying imaged documents, would be tedious, labor-intensive and the same as reviewing paper documents (Ex. 10 ¶ 24; Ex. 1 ¶ 14).

The problem is even more acute for policies issued by agents.  FA does not have the closing files for these policies – in either imaged or hard copy.  The agents keep their own files, and they remit only limited information to FA.  Recognizing this, Plaintiffs did not even attempt to identify class members from the WINGS remittance reports printed by FA.  Instead, they issued a subpoena directly to Mezzo for the paper files.  Mezzo provided access to all its files, but Plaintiffs' counsel reviewed only 898 files of over 2148 FA policies issued by Mezzo from 2000 to 2005.  Plaintiffs would have to review the rest of the Mezzo files and then the similar files of the 739 other FA agents in Pennsylvania.  (Even then, they would be unable to identify the class for policies issued before August 1, 2005.)

Moreover, no field in FAST or WINGS captures data as to whether there was a deed to a bona fide purchaser for value, or an unsatisfied mortgage to an institutional lender, or the date of either of those instruments (Ex. 10 ¶ 28).  This is critical to a determination of class membership after the 2005 amendments to the TIRBOP Manual (Ex. 10 ¶ 24; Ex. 1 ¶ 14).

For example, FA's Pennsylvania State Manager, Evan Zanic, reviewed 91 Mezzo files (10% of Plaintiffs' sample) to determine if those customers were overcharged (Ex. 1 ¶¶ 8-10).  Even he could not tell whether Mezzo charged the correct rate without personally reviewing each closing file (Ex. 1 ¶ 14).  He could not make this determination from the limited information that FA keeps in its WINGS system (Ex. 1 ¶ 14).  It could not tell him anything about any prior transaction, such as whether it was within the required number of years, whether it involved the same property or same mortgagors, or whether there was prior title insurance and evidence of such insurance was provided (Ex. 1 ¶ 14).  Even with more

13

than 20 years of experience in the title insurance field, Zanic's review of just 91 Mezzo files took approximately 15 hours for an average of 10 minutes per file (Ex. 1 ¶ 15).  Thus, to review the 500,000 transactions suggested by Plaintiffs (Doc.100, p. 7) would take experienced reviewers 83,333 hours.

I.     **Plaintiffs' Statistical Review of Mezzo's Files Is Inaccurate, Contains Glaring Miscalculations, and Is Inadmissible**

Plaintiffs' Motion for Class Certification is premised largely on a review of the 898 closing files subpoenaed from Mezzo (Pl. App. 130-31).  Plaintiffs maintain that 81% (723/898) of the Mezzo files contained evidence of a prior title policy that would have qualified the borrower for the Reissue Rate or Refinance Rate.  Id.  This percentage is grossly overstated.

FA reviewed 10% of the same files to re-examine the conclusions Plaintiffs drew as to whether the borrowers were entitled to either discount (Ex. 1 ¶¶ 19-20).  FA found Plaintiffs were consistently wrong about whether a borrower qualified for the Reissue Rate or Refinance Rate (Ex. 1 ¶ 20).  In fact, FA's review uncovered only <u>four</u> borrowers who were overcharged (Ex. 1 ¶ 22).[4]  Further, three borrowers received the Reissue Rate but were not entitled to it and were <u>under</u>charged (Ex. 1 ¶ 22).  The 4 of 91 files that were overcharged correspond to a *de minimis* error rate of approximately 4.4% (Ex. 1 ¶ 23).

It appears that Plaintiffs' summary grossly inflates the error rate by improperly applying the presumptions the '05 Manual to all of the 898 Mezzo files (Ex. 1 ¶ 27).  However, <u>none</u> of the 898 Mezzo files reviewed were for transactions in 2005, and the '05 Manual could not apply, retroactively, to them (Ex. 1 ¶ 27).

---

[4]     Two (Zellars and Booth) received the Basic Rate but should have received the Refinance Rate.  Two others (Amodeo and Brown) did receive the discounted Reissue Rate but should have received the further discounted Refinance Rate (Ex. 1 ¶ 22).

### III.   ARGUMENT

#### A.   This Court Must Undertake a Rigorous Analysis

The law places the burden of establishing each element necessary for a class action on the party seeking class certification.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14 (1997).  As the issues raised by class certification are always "enmeshed in the factual and legal issues comprising the Plaintiff's causes of action," a court must probe behind the pleadings to determine whether the requirements for class certification are met.  General Tel. Co. of Southwest v. Falcon, 457 U.S. (1982) at 160.  "[B]ecause the determination of a certification request invariably involves some examination of factual and legal issues underlying the plaintiffs' cause of action, a court may consider the substantive elements of the plaintiff's case…"  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 166 (3d Cir. 2001).  The court, when necessary, must resolve underlying factual disputes before certifying a class.  Newton, 259 F.3d at 166.  "There is no basis for thinking that a specific Rule 23 requirement need not be fully established just because it concerns, or even overlaps with, an aspect of the merits."  In re Initial Public Offering Sec. Litig., 471 F.3d 24, 32 (2d Cir. 2006).

#### B.   Individual Issues Predominate

The most serious flaw in Plaintiffs' proposed class action is that individual issues clearly predominate over common ones.  The purpose of the predominance requirement is to test "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem Prods., 521 U.S. at 623; see also Newton, 259 F.3d at 187.  The predominance element is "far more demanding" than the commonality requirement of Rule 23(a), requiring more than a common claim.  Amchem Prods., 521 U.S. at 623; Newton, 259 F.3d at 187.  Predominance only exists "when there [is] generalized evidence which proves

or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." Lockwood Motors, Inc. v. General Motors Corp., 162 F.R.D. 569, 580 (D. Minn. 1995). "A question is not common … if its resolution turns on consideration of the individual circumstances of each class member." Thorn v. Jefferson-Pilot Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006).

> ### 1.   Ricciardi Shows That the 2005 TIRBOP Manual Was a Change To (Not a Clarification of) the 1999 TIRBOP Manual  (All Counts)

Plaintiffs premise certification on the assertion that the 2005 amendment to the Reissue and Refinance rates was merely a "clarification" of the 1999 version and did not constitute a fundamental change in the evidence required to be presented by a customer to receive these rates (Doc. 100).  This notion, however, is irreconcilable with the Third Circuit's decision in Ricciardi v. Ameriquest Mortg. Co., 164 FedAppx. 221, 222-23 (3d Cir. 2006).   In 2001, Ricciardi purchased a home and took out a mortgage with Cendant and then refinanced with Ameriquest.  Id.  At the time of the refinancing transaction, the prior mortgage with Cendant was unsatisfied.  Id.   Ricciardi sued Ameriquest alleging violations of the Truth in Lending Act.  Id. at 222-23.  Specifically, Ricciardi alleged that Ameriquest failed to provide him the Refinance rate in the '99 Manual.  The Third Circuit held that Ricciardi was not entitled to receive the Refinance rate even though a prior unsatisfied mortgage to an institutional lender clearly existed at the time of the transaction.  Id. at 225-26.  The Court of Appeals reasoned that, under the '99 Manual a borrower "is entitled to the refinance rate only if the previous mortgage was insured.  As Ricciardi presented no evidence prior to or at the loan closing that his previous mortgage was insured, Ameriquest appropriately charged him the default title insurance rates as published in the Rate Manual." Id. at 226 (emphasis added).  Therefore, the Third Circuit has already determined an existing mortgage (and knowledge of it) was insufficient to qualify for the discount rate and that the

borrower must produce "evidence." This holding also forecloses any argument that the 2005 amendments merely "clarified" the 1999 Manual.

> **2.** **Individual Issues as to Who Was Allegedly Overcharged and, Therefore, Injured Overwhelm Plaintiffs' Claims (All Counts)**

The Third Circuit has held that predominance is not satisfied when an individual review of each class member's transaction is necessary to determine injury and, therefore, liability. Newton, 259 F.3d at 187. This fatal flaw infects all of the counts of the first amended complaint. In Newton, investors brought a putative class action against their brokers alleging that they failed to buy or sell class members' stock at the best available price. Id. at 169-70. The district court denied class certification holding, among other things, that the predominance requirement of Rule 23(b)(3) was not satisfied because "individual questions of whether each class member suffered economic injury presented insurmountable obstacles to certification." Id. at 187. The Third Circuit affirmed because assessing a broker's liability to a class member would first require examining whether a particular trade provided an investor with the "best reasonably available price." Id. at 187, 190.

> Whether a class member suffered economic loss from a given securities transaction would require proof of the circumstances surrounding each trade, the availability of an alternative price, and the state of mind of each investor at the time the trade was requested. This Herculean task, involving hundreds of millions of transactions, counsels against finding predominance.

Id. The Third Circuit explained that "[p]roof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)." Id. at 188. Because liability could not be presumed, the process of ascertaining which class members sustained injury defeated the predominance requirement. Id. at 190. Similarly, in Sanneman v. Chrysler, 191 F.R.D. 441, 449-450 (E.D. Pa. 2000), the court denied class certification in an alleged vehicle defect case, holding:

> The need to establish injury and causation with respect to each class member will necessarily require a detailed factual inquiry including physical examination of each vehicle, a mind-boggling concept that is preclusively costly in both time and money. We will not certify a class that will result in an administrative process lasting untold years, where threshold questions will overshadow common issues regarding Defendant's alleged conduct.

As in Newton and Sanneman, Plaintiffs here cannot adjudicate their claims on a classwide basis. Whether any particular class member since 1999 was entitled to receive a discounted title insurance premium requires individual testimony and documentary proof, first, that he or she produced evidence of a prior policy (and what that evidence was) at or before closing. Second, even if the Court were prepared to excuse class members from the presentation requirement (and disregard Ricciardi), each class member would have to prove, at a minimum, that he or she in fact had a prior policy. Third, even with respect to policies issued after the '05 Manual, the Court would still need to hear individual evidence whether the title records showed that there was a qualifying prior deed or mortgage within the required number of years and the property and the fee owners were the same.

Plaintiffs summarize their grossly oversimplified view of how this case could be tried on a classwide basis at pages 4-5 of their brief. They say that most home buyers purchase an owner's policy, that most institutional lenders require loan policies, that the Court should thus assume that all deeds and mortgages were insured even when the '99 Manual did not provide for any such presumptions, and that one could find the evidence of prior deeds and mortgages in the title records. This theory does not correspond to reality or the law, and "most" is simply not good enough (if even correct) to support certification.

Plaintiffs fail to recognize that the '99 Manual expressly put the burden on the applicant for the policy to produce evidence of a prior title policy to qualify for the discount: "A purchaser of title insurance shall be entitled to purchase this coverage at the reissue rate

… when evidence of the prior policy is <u>produced</u>….” This requirement is not optional, and the plain meaning of “produce” is clear; it is not synonymous with “exists” as Plaintiffs argue. Instead, it requires action by the borrower. The Third Circuit has already spoken on this issue. “As Ricciardi presented no evidence prior to or at the loan closing that his previous mortgage was insured, Ameriquest appropriately charged him the default title insurance rates as published in the Rate Manual.” <u>Ricciardi</u>, 164 Fed. Appx. at 226. “Unless the conditions for a reduced rate are satisfied, a lender may reasonably charge the basic rate for title insurance.” <u>In re Fields</u>, 2006 WL 2191342, *4 (E.D. Pa. July 31, 2006).

Curiously, Plaintiffs never mention that the Slapikases may have possessed the evidence needed to comply with this requirement. They provided a copy of the HUD-1 from their 2001 refinance to the mortgage broker who helped them with their 2003 refinance, and the mortgage broker provided it to the title agent, Mezzo. The HUD-1 shows the premium they paid in 2001 for the loan policy insuring their prior lender, and it is one of the forms of evidence of prior insurance mentioned in FA’s 2002 Bulletin (Ex. 1 ¶ 11, Ex. D). However, the agents were not required to follow this bulletin (Ex. 2 185-188), and Sunseri, the principal of Mezzo, testified that only a copy of the prior policy was sufficient but that his staff would have asked for it (Ex. 5 55-57). Clearly, this is a dispute of fact to be tried in the Slapikases’ individual case.

Why, then, the silence about what may be the most compelling evidence Plaintiffs have? They know that trying the issue of whether the Slapikases presented sufficient evidence of prior insurance to Mezzo before closing will not prove whether any other member of the class did likewise. It is an individual issue that they want the Court to ignore. Instead, they say that the presumptions adopted for the first time in the August 1, 2005 manual should apply, retroactively, to 1999. The law does not permit this Court to indulge

19

any such assumption.  If the '05 Manual applied retroactively to policies issued before its enactment, the Third Circuit would have had to reach the exact opposite result in <u>Ricciardi</u> as would the Eastern District in <u>In re Fields</u>.

 Plaintiffs cite <u>Randleman v. Fidelity Nat'l Title Ins. Co.</u>, 2006 WL 3411529 (N. D. Ohio Nov. 17, 2006), for the proposition that a title agent could waive the presentation requirement by not inquiring about the prior policy.  This Court should follow <u>Ricciardi</u> and <u>In re Fields</u> rather than a readily distinguishable district court decision from another circuit interpreting another state's requirements.  Moreover, whether the FA branch office or independent title agent asked the borrower about any prior title insurance policies is itself a highly individualized issue of fact.

 Plaintiffs also cite the Ohio appellate court decision in <u>Dubin v. Security Union Title Ins. Co.</u>, 832 N.E.2d 815 (Ohio Ct. App. 2005), suggesting that whether a plaintiff must present evidence of a prior title policy is an issue of fact that a court should not address on a motion for class certification.  <u>Dubin</u> applied Ohio State rules of procedure and is easily distinguishable.  The U.S. Supreme Court requires this Court to probe behind the pleadings because the class certification decision is always enmeshed with the substantive factual and legal issues.  <u>Falcon</u>, 457 U.S. at 160.  The Third Circuit will require this Court to specify the factual issues to be tried on a classwide basis and will expect Plaintiffs to have a trial plan for their classwide evidence.  <u>Wachtel v. Guardian Life Ins. Co. of America</u>, 453 F.3d (3d Cir. 2006) at 186-88.  Moreover, whether presentation of the prior policy is required is not an open issue after <u>Ricciardi</u> and <u>In re Fields</u>.

 However, even if Plaintiffs could convince this Court to disregard <u>Ricciardi</u>, <u>In re Fields</u>, and the express presentation requirement of the TIRBOP manual, they still would not have classwide proof of injury that would satisfy Rule 23 or <u>Newton</u>.  Evidence of a

prior title insurance is still required; waiver of the presentation requirement could benefit only putative class members who in fact had a qualifying prior policy.  Plaintiffs do not have evidence that any other member of the proposed class had a prior policy within the required number of years insuring the same property and involving the same fee owners.  They failed to submit a trial plan demonstrating that such evidence exists or how to present it to the Court at trial without requiring thousands of individual "mini-trials."  Instead, Plaintiffs again want the Court to ignore or trivialize this issue.  They want the Court to adopt an irrebuttable presumption that every prior deed or institutional mortgage was insured.  TIRBOP did not adopt this presumption until 2005.

FA and the agents have testified that this was a significant change in how the Refinance and Reissue rates were to be applied (Ex. 1 ¶ 30; Ex. 11 ¶ 5).  Plaintiffs say they can show that the presumption applies throughout the class period, but they cite only a single page of a FA Bulletin (Doc. 100, p. 5 n. 7 citing App. 127) that does not say that agents can presume the existence of prior insurance.[5]  Proving whether an agent received any of the types of acceptable evidence is just as highly individualized an inquiry as looking for prior policies, and trying to present classwide evidence of verbal confirmations or personal understandings is utterly useless.

The proposed class period does extend to the present, and the presumptions adopted by TIRBOP in 2005 would apply to policies issued after August 1.  Plaintiffs say that FA can determine whether a policy qualifies for a discount because the title search will reveal whether there was a deed to a bona fide purchaser for value or an unsatisfied

---

[5]     Instead, it tells agents that they need actual evidence of prior insurance, but it tells them that they can accept forms of evidence besides the prior policy itself, such as a completed settlement sheet, verbal or written confirmation from the prior title agent, notations on prior recorded instruments by a prior title company, or personal familiarity with local lender practice.  If the agent did not receive such evidence, then the applicant was not entitled to a discount (Ex. 1 ¶ 5, Ex. D).

mortgage to an institutional lender.  This is not entirely true, and Plaintiffs have not

explained to the Court how they would try this case on a classwide basis even if it were so.

Thus, the Court cannot certify a class even as to policies issued after August 1, 2005.

A title search will show the prior deeds and mortgages, but FA does not perform or

get the results of the title search for the policies issued in Pennsylvania by independent

agents.  The agents or the abstracters they hire perform the search, and the agents keep the

abstract or other results in their own files.  FA never gets the agent's file (Ex. 10 ¶¶ 11, 26).

That is why Plaintiffs' counsel went to Mezzo's warehouse of closed files and spent days

poring through old files even though they were looking for nothing more than a prior deed

or unsatisfied mortgage (Ex. 1 ¶ 26).  Notably, they managed to review only 898 of over

2000 Mezzo files within the proposed class period, and Mezzo is only one of 740

independent agents in Pennsylvania.  Plaintiffs have offered no trial plan explaining how the

Court could possibly hear evidence and make findings of fact as to which class members had

qualifying prior deeds or institutional mortgages.  Wachtel, 453 F3d 186-88.

Even as to FA's direct operations, the title evidence would be available since 2002 in

imaged form in FA's FAST system, but scrolling through thousands of scanned abstracts

would be only slightly less tedious than reviewing paper files (Ex. 10 ¶ 24).  FA has no

automated means to identify the class either before or after August 1, 2005.  None of the

computer systems used by FA includes data fields that record sufficient information to

permit FA to search electronically for putative class members (Ex. 10 ¶¶ 18, 23, 24).

FA does not maintain any electronic data that makes it possible to determine

whether a customer was overcharged without the individual file-by-file review of each

transaction outlined above.  Before 2003, FA's direct operation's systems did not maintain

any searchable information related to policies issued (Ex. 10 ¶ 6).  While WINGS, the system

used to maintain information related to policies issued by independent agents, can identify

which policies were reported as sold at the Basic, Reissue, and Refinance rates, other

information critical to determining whether a customer was entitled to receive a discounted

rate under the terms of the TIRBOP Manual (both pre and post 2005 amendment) is not

maintained electronically.   Neither the FAST or WINGS systems have a data field to

capture either the legal description or the property address for Pennsylvania (Ex. 10 ¶ 16).

Nor do they have a data field to capture the mortgagor's (borrower's) name because the

lender (mortgagee) is the insured (Ex. 10 ¶ 17).

Membership in the class simply depends upon information that FA does not have at

all, much less electronically (Ex. 10 ¶ 23).  If either the FAST or WINGS systems indicates

that a policy was a Reissue or Refinance policy, the purchaser of such policy got the discount

and is not a member of the class.   FA cannot determine which policies sold at the Basic

Rate might have qualified for the Refinance or Reissue rates (Ex. 10 ¶ 26).   Because

Plaintiffs cannot demonstrate that injury, an essential element of each of their claims, can be

proved on a classwide basis, common issues do not predominate and class certification is

inappropriate.

### 3.    Individual Issues Pervade Plaintiffs' Breach of Contract Claims (Counts I and II)

Plaintiffs assert that FA breached an express or implied contract by systematically

charging customers the Basic rate when they were entitled to the discounted Reissue or

Refinance rates pursuant to the terms of the TIRBOP Manual (Doc. 100, pp. 13, 15-16).  To

establish breach of express or implied contract, Plaintiffs must prove:  (1) mutual assent to

the same terms; (2) exchanged consideration; and (3) breach.  Omicron Sys., Inc. v. Weiner,

860 A.2d 554, 564 (Pa. Super. Ct. 2004).  As Plaintiffs recognize, the conduct of the parties

and the surrounding circumstances are critical to the determination of whether an implied

contract exists.  E.g., Halstead v. Motorcycle Safety Found., Inc., 71 F. Supp. 2d 455, 459

(E.D. Pa. 1999).

Plaintiffs' unprecedented theory is that the breach of contract claims can be tried on

a classwide basis because all class members should have received a HUD-1 that allegedly

promised to charge the "actual" rate for title insurance.[6]  Several insurmountable individual

factual issues preclude class certification on the breach of contract counts.  First, evidence of

a breach is, obviously, a key element of any breach of contract claim.  Nothing on the

Slapikases' HUD-1 proves that they were overcharged (i.e., charged something other than

the "actual" rate).  Plaintiffs will have to prove breach (overcharging) through evidence other

than the HUD-1, and they cannot do that on any common basis for all the reasons set forth

supra.  Second, the HUD-1 is not common evidence in any event.  Although the HUD-1 is

a standardized form, there is a separate form individually prepared for each unique closing.

They often go through several drafts as the expected loan amount changes, and the final

HUD-1 should be signed by the borrowers and the settlement agent.  Thousands of

individual HUD-1 statements are not common evidence.[7]  Third, FA does not prepare the

HUD-1 for transactions closed by the independent agents including attorneys.  Thus, it is

---

[6]     FA disagrees, of course, since there is an express contract—the lender's title policy—to which the
        Slapikases and any others similarly situated were not a party.  See, e.g., Dass v. Epplen, 162 Colo. 60,
        424 P.2d 779 (Colo. 1967) ("settlement sheet in this transaction creates no contractual rights but is
        merely an arithmetical calculation"); see also Hampden Real Estate, Inc. v. Metropolitan Management
        Group, 2003 WL 23206072 (E.D. Pa. 2003), rev'd on other grounds, 142 Fed.Appx. 600 (3d Cir.
        2005).   That issue, however, is one for later summary judgment.

[7]     Courts routinely deny certification of Rule 23(b)(3) class actions in cases where adjudication of the
        class claims would require a review of each and every class member's transaction on an individual
        basis.  See, e.g., Gardner v. First Am. Title Ins. Co., 2003 WL 221844, * 7-8 (D. Minn. Jan. 27,
        2003)(certification denied where court was required to adjudicate each putative class member's claim
        to demonstrate RESPA violation); Rogers v. Coburn Fin. Corp., 53 F.R.D. 182, 183 (N.D. Ga.
        1971)(denied certification because court would have to physically examine several thousand TILA
        statements furnished to borrowers); Nicodemus v. Union Pac. Corp., 204 F.R.D. 479, 488 (D. Wyo.
        2001)(certification not appropriate because it was necessary to review thousands of deeds of
        individual class members); Trecker v. Manning Implement, Inc., 73 F.R.D. 554, 560-64 (N.D. Iowa
        1976)(class certification denied where class membership would require examination of thousands of
        invoices); Lawson v. Brown, 349 F. Supp. 203, 209 (W.D. Va. 1972)(same).

not a party to any contract "evidenced" by the HUD-1.  Apart from that legal defect in

Plaintiffs' theory, however, the practical problem is that only the 740 independent agents

(plus 200 terminated agents active during the class period who no longer have any

relationship with FA) have the HUD-1s.   Although required by <u>Wachtel</u>, Plaintiffs have not

offered a manageable trial plan demonstrating that the Court can review the final, signed

HUD-1s from all these sources for many thousands of transactions.

### 4.   Individual Issues of Misrepresentation, Reliance and Injury Preclude Plaintiffs' Fraud and UTPCPL Claims (Counts III and IV)

It is widely recognized that "fraud and misrepresentation claims are not readily

susceptible to class action treatment."  <u>Gariety v. Grant Thornton, LLP</u>, 386 F.3d 356, 362

(4th Cir. 2004).  "Proof of the statements made to each plaintiff, the nature of the varying

material misrepresentations, and the reliance of each plaintiff upon those

misrepresentations" are issues that need to proven on an individual basis for each class

member.  <u>Moore v. PaineWebber, Inc.</u>, 306 F.3d 1247, 1253 (2d Cir. 2002).

In Pennsylvania, fraud and UTPCPL claims require that a plaintiff prove a

misrepresentation, justifiable reliance, and resulting injury.  <u>Wilson v. Donegal Mut. Ins. Co.</u>,

410 Pa. Super. 312, 40-41, 598 A.2d 1310, 1315 (1991); <u>Santana Prods., Inc. v. Bobrick</u>

<u>Washroom Equip., Inc.</u>, 401 F.3d 123, 136 (3d Cir. 2005); <u>Baker v. Family Credit Counseling</u>

<u>Corp.</u>, 440 F. Supp.2d 392, 412 (E.D. Pa. 2006).  The impropriety of certifying Plaintiffs'

fraud and UTPCPL claims is clear.  Plaintiffs allege that FA made misrepresentations "on

the HUD-1 of an illegal, inflated premium for title insurance" (Doc. 100, p. 21).  First,

individual facts are necessary just to determine whether a <u>misrepresentation</u> occurred.

Practices related to disclosing the existence of Reissue and Refinance rates to borrowers

varied from agent to agent and transaction to transaction (Ex. 8 ¶ 5; Ex. 9 ¶ 6; Ex. 11 ¶ 10).

What any particular borrower was told (or not told) is inherently an individual issue that

cannot be proved on a classwide basis.  Furthermore, whether any class member <u>justifiably</u> <u>relied</u> upon FA's alleged misrepresentations necessarily depends on a fact-intensive inquiry into the background of each plaintiff and what information each plaintiff actually had and when.  It is not permissible to presume reliance in fraud or UTPCPL actions.  Similarly, the issue of <u>injury</u> unequivocally varies from class member to class member.  Plaintiffs' only "evidence" of a common fraudulent scheme is based on an inaccurate and misleading summary of one agent's files.

(a)    <u>Proof of Misrepresentation Is Individualized</u>

The crux of Plaintiffs' fraud and UTPCPL claims is that FA has participated in a "statewide scheme to overcharge customers [ ] for title insurance" (Doc. 100, p. 20). Plaintiffs represent to this Court that their review of Mezzo's records reveals that "FA has overcharged at least tens of thousands of Pennsylvania customers tens of millions of dollars for title insurance by failing to pass along the mandatory premium discounts…" (Doc. 100, pps. 7-8).  Plaintiffs' assertions are nothing more than conjecture premised on improper assumption yielding an inaccurate analysis of one agent's files.   There is no <u>evidence</u> of any uniform scheme.

After individually reviewing 898 of Mezzo's files (a process that took several days), Plaintiffs were almost always wrong about whether a borrower qualified for a discount (Ex. 1 ¶¶ 27-32).  In fact, only 4.4% of the files indicate any overcharge at all (Ex. 1 ¶ 23).  Plaintiffs exponentially increased the "error rate" by improperly applying the presumptions from the '05 Manual though <u>none</u> of the files Plaintiffs reviewed was from 2005, and the 2005 amendments did not apply (Ex. 1 ¶ 32).  Consistent with <u>Ricciardi</u>, it is not appropriate to apply the presumptions of the 2005 Manual to policies issued previously.  164 Fed.Appx. at 222-23.

26

Even if it were proper to apply the '05 Manual to earlier transactions, Plaintiffs cannot prove FA made any misrepresentations absent a file-by-file review of each class member's transaction.  The issues that preclude class certification of Plaintiffs' breach of contract claims also prevent certification of their fraud and UTPCPL claims.  The Slapikases' evidence does not prove these elements for any other transaction, and FA does not electronically maintain this information. Whether FA misrepresented the 'actual' cost of title insurance to any particular class member on a HUD-1 can only be determined from a detailed review of the documents for and participants in each transaction.

> **(b)** **Failure to Disclose the Existence of the Reissue or Refinance Rate Is an Individual Issue**

Plaintiffs ignore another critical impediment to class certification:  the extent to which FA or its agents disclosed the existence of the Reissue or Refinance rates to class members cannot be tried on a classwide basis.  Before any class member can prove FA made an actionable misrepresentation to them, the trier of fact must determine: (1) whether there was a disclosure regarding the availability of the refinance rate; (2) who received the disclosure; (3) if someone besides the borrowers received the disclosure, what did that person tell them; and (4) what did the closing agent say (if anything) to the class member regarding the title insurance rate?

The Slapikases maintain that they did not know about the reissue or refinance rates and that no one from Mezzo asked them for evidence of prior insurance (Doc. 100, p. 6).  Mezzo's principal disputed this allegation (Ex. 5 37, Ins. 4-15).[8]  Whether Mezzo disclosed

---

[8]      "Q. Did you make any effort to tell consumers dealing with Mezzo that they might qualified [sic] for the reissue or refinancing discount?
A. My policy at my company was to ask if they had a prior policy.  If they had a prior policy within the requisite timeframes, then they would have an opportunity of having either of those, either the reissue or the substitution rate.
(Cont'd)

the discounted rates or asked for the prior policy is a fact issue that remains for trial both as to the Slapikases and the putative class.  None of the "common" evidence Plaintiffs presented to this Court in their motion for class certification resolves this question for any other class members.  The Court cannot assume a non-disclosure, and the burden is on Plaintiffs to prove it by clear and convincing evidence for each class member.  E.g., TransPenn Wax Corp. v. McCandless, 50 F.3d 217, 232 (3d Cir. 1995).

Plaintiffs wrongly assert that FA has a policy of not disclosing the existence of the discounted rates (Doc. 100, p. 5).  They cite no evidence, and the evidence submitted by FA directly refutes it.  FA's direct operations in Pittsburgh routinely asked refinancing borrowers directly for copies of their prior title policies or other evidence of prior insurance, such as a HUD-1 (Ex. 9 ¶ 6).  FA's direct operations in eastern Pennsylvania would ask the mortgage broker, real estate agent, or borrower for proof of prior insurance (Ex. 8 ¶ 5).  Similarly, Mezzo is just one of many agents that asked for copies of prior policies (Ex. 5 55-58).  Plaintiffs would need individual proof as to the practices of each of the 740 current and 200 terminated agents as to what their practice was and whether it was followed in each individual case.

Unlike some other states, neither Pennsylvania law nor the '99 Manual required any particular form of disclosure.  Compare In re Coordinated Title Ins. Cases, 2004 WL 690380, at * 3 (N.Y. Sup. Jan. 8, 2004).   The lack of a specific required disclosure means that each of FA's 740 agents and its direct branches had the discretion to set its own disclosure procedure, a far cry from a "uniform" case of non-disclosure.  Furthermore, since

---

Q. So was it your instruction to your employees to specifically ask the consumers if they had a prior policy?
A. That was my policy." (Ex. 5 p. 37, lns. 4-15).

the 2005 amendment, there is a specific disclosure of the discounts, and FA and the agents routinely give the disclosure (Ex. 11 ¶ 7) that would defeat the fraud claims, though the issue of compliance (i.e., whether a particular class member received notice of the discounted rates), would still require individual determination for each class member.

> **(c)**  **Proof of Reliance Depends on a Fact-Intensive Inquiry into What Information Each Class Member Had**

Courts have routinely held that "the reliance element of fraud and negligent misrepresentation claims is not readily susceptible to class wide proof; rather, proof of reasonable reliance depends on a fact-intensive inquiry into what information each plaintiff actually had." Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 435 (4th Cir. 2003); see also Gavron v. Blinder Robinson & Co., Inc., 115 F.R.D. 318, 325 (E.D. Pa. 1987). The same is true for UTPCPL claims as they also require proof of reliance. Baker v. Family Credit Counseling Corp., 440 F. Supp.2d 392, 412 (E.D. Pa. 2006).

This case is no different. Plaintiffs cannot prove reliance without establishing what information they had regarding the discounted rates at the time of their closing. A borrower's awareness of the discounted rates could come from her agent's disclosure, a mortgage broker, her lender, prior experience, or the media. As discussed above, agent practices relating to disclosing the discounted premiums varied and there was no uniform practice.

Regardless of whether a class member received information about the discounted rates from her title agent, she very well may have received a disclosure from her lender. Throughout the class period, RESPA required mortgage brokers to provide borrowers with a disclosure pamphlet that informs them of the potential availability of Reissue and Refinance rates. 24 C.F.R. § 3500.6. The Slapikases received this (or similar) disclosures from their lenders in connection with their four prior refinancing transactions (Ex. 9).

Furthermore, lenders, mortgage brokers, and real estate agents, who often order the title work on their customer's behalf, are usually quite familiar with the discounted rates (Ex. 8 ¶ 6).  FA's experience in direct operations is, for example, that mortgage brokers handling refinances, more often than not, ask about the availability of a discount when ordering the title insurance (Ex. 8 ¶ 5).  Other agents get questions from mortgage brokers or real estate agents (Ex. 11 ¶ 9).  These examples show that plaintiffs cannot presume ignorance of the discounts but must prove it on an individual basis.  Additionally, the availability of discounted title insurance rates has been, and continues to be, widely publicized in the mainstream media (Ex. 4 Exs. 1-14).  Obviously some borrowers knew of the availability of the discounted rates.  What each class member knew and whether she justifiably relied on an alleged misrepresentation on a HUD-1 cannot be determined on a classwide basis.

Finally, there is no support under Pennsylvania law for Plaintiffs' assertion that reliance can be presumed in either fraud or UTPCPL actions.  E.g., Baker, 440 F. Supp.2d at 412.  Depending upon the level of knowledge, a borrower's reliance on an alleged misrepresentation on a HUD-1 may not have been justifiable.  Plaintiffs cannot ask this Court to ignore disclosures made by agents, lenders, brokers or others or their failure to present evidence of their prior title policies.  Whether reliance is justified is something the trier of fact cannot determine without a look into each class member's state of mind – a process that is not conducive to class adjudication.  E.g., Thorn v. Jefferson-Pilot Ins. Co., 445 F.3d 311, 321 (4th Cir. 2006).

### (d)    There Is No Common Evidence of Injury

It is settled law that a plaintiff must suffer an ascertainable injury in order to prove fraud and UTPCPL claims.  Wilson v. Donegal Mut. Ins. Co., 410 Pa. Super. 312, 40-41, 598 A.2d 1310, 1315 (1991);  Baker, 440 F. Supp.2d at 412.  As discussed above, injury requires

an individual determination of each putative class member's transaction.  Since liability

cannot be presumed, the process of ascertaining which class members sustained injury

defeats the predominance requirement.  Newton, 259 F.3d at 190; Sanneman, 191 F.R.D. at

449-50.

>    **5.    Plaintiffs' Unjust Enrichment Claim Is Also Fraught with Individual
>            Issues (Count V)**

In order to prove unjust enrichment, Plaintiffs must prove that FA received the

alleged premium overcharge and retained it.  Commerce Bank/Pennsylvania v. First Union

Nat'l Bank, 911 A.2d 133, 143-44 (Pa. Super. Ct. 2006).  In Pennsylvania, FA agents retain

the vast majority of the premium charged for title insurance (Ex. 1 ¶ 5).  The specific

premium split varies from agent to agent, from time period to time period, and is specified in

agreements with FA (Ex. 1 ¶ 5).  Even if Plaintiffs can prove that it is inequitable for FA to

retain the overcharge, Plaintiffs could only recover from FA the percentage of the policy

premium it received.  This calculation would, in turn, require a separate file-by-file review to

determine the agent involved and applicable premium split.  Again, none of these

determinations is suitable for class adjudication.[9]

**C.    A Class Action Is Not the Superior Method of Adjudicating Plaintiffs' Claims**

Under Rule 23(b)(3), a class must not be certified unless certification is superior to all

other methods for the fair and efficient adjudication of the controversy.  Id.  Here, class

---

[9]    As Plaintiffs have submitted no trial plan, it is unclear whether they seek certification of their punitive
damage claim.  It too is unsuitable for certification.  Punitive damages are intended to punish
wrongdoers and deter future conduct.  Feingold v. Southeastern Penn. Transp. Auth., 512 Pa. 567,
579, 517 A.2d 1270, 1276 (1986); see also Kirkbride v. Lisbon Contractors, 521 Pa. 97, 102, 555 A.2d
800, 802 (1989).  Of course, deterring future conduct is a moot point since TIRBOP amended the rate
manual in 2005.  Whether FA or its independent agents acted in such a manner to justify punitive
damages necessarily involves analyzing the conduct of every agent involved in every transaction.  In
Pennsylvania, a significant percent of transactions are conducted by the 740 independent agents (Ex. 1
¶¶ 5, 8).  In the vast majority of cases, FA did not deal directly with borrowers in any transactions.
The evidence the Slapikases may present against Mezzo in their transaction would not necessarily
apply to other transactions Mezzo conducted and certainly would not apply to other agents or FA's
direct operations.

members have other superior methods of dispute resolution available to them.  The Pennsylvania legislature has enacted a comprehensive statutory scheme in the Pennsylvania Title Insurance Act.  40 P.S. § 910-1 et seq.  It provides a specific statutory remedy for customers who believe they have been charged an incorrect rate.  40 P.S. § 910-44(b).  This administrative process is much simpler and more effective than litigation, and it provides Plaintiffs with the same remedies as they seek through this litigation.

Further, when the law provides for the recovery of attorneys' fees, "individual suits are feasible" and "the most compelling rationale for finding superiority in a class action – the existence of a negative value suit – is missing …" Castano v. American Tobacco Co., 84 F.3d 734, 748 (5th Cir. 1996); In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360, 375 (E.D. La. 1997); Jones v. CBE Group, Inc., 215 F.R.D. 558, 570 (D. Minn. 2003); Gardner v. First Am. Title Ins. Co., 2003 WL 221844, at *8 (D. Minn. Jan. 27, 2003).  Thus, since the UTPCPL provides for both attorneys' fees and treble damages, 73 P.S. § 201-9.2(a), the alleged damages to each class member are not de minimis, and individual suits are economically viable and more important for each individual class member.  See Fisher v. Bristol-Myers Squibb Co., 181 F.R.D. 365, 373 (N.D. Ill. 1998).

## D.      If Certified, This Case Would Be Unmanageable

Under Rule 23, the Court is also required to examine "the difficulties likely to be encountered in the management of a class action," which encompass "the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974); see also Sanneman v. Chrysler, 191 F.R.D. 441, 449-450 (E.D. Pa. 2000).  Prosecution of this case creates a morass of legal and factual issues ill-suited for certification.

As outlined above, the 740 independent agents that issue most of FA policies in Pennsylvania are critical to prosecuting and defending against Plaintiffs' class claims. These agents alone have possession of the customer's closing files (which may or may not have evidence of any prior title policies). These agents also are the only ones with knowledge of their practices regarding disclosure of the existence of the discounted rates. Just as the Slapikases required information from Mezzo to attempt to prove their claims, each class member will need similar information from her settlement agent. In order to prosecute this action, Plaintiffs will need discovery from over 740 agents, many of which are lawyers or law firms. Finding the files of the 200 terminated agents will be even more difficult. Tens of thousands of transactions will need to be reviewed (Doc. 100, pps. 6-8). The process will take years and years. It is hard to imagine a case that is less manageable as a class action.

**E.      Plaintiffs Are Inadequate Class Representatives**

Plaintiffs are not adequate class representatives because they failed to exhaust the administrative remedy provided in the Pennsylvania Title Insurance Act. E.g., International Union v. Clark, 2006 WL 2687005 (D. D.C. 2006). In Clark, the Court held that the plaintiffs were inadequate representatives because they had failed to exhaust their administrative remedies prior to filing suit, and that failure had the effect of depriving the court of jurisdiction over the claims they sought to maintain as a class action. Id. at 6. Because Plaintiffs did not pursue the remedies provided in § 910-44(b), their claims are premature and, as in Clark, they cannot adequately protect the interests of the class.

**F.      Plaintiffs' Proposed Class Definition Is Defective**

The only persons included in the proposed class are those who qualified for the Reissue or Refinance discounts and did not receive them (Doc. 95, 97). Thus, class membership is impermissibly based on a determination of liability and only binds class

members if they are successful on their claims (<u>i.e.</u>, a "fail safe" class). Many courts have criticized fail-safe classes. <u>E.g.</u>, <u>Adashunas v. Negley</u>, 626 F.2d 600, 604 (7th Cir. 1980); <u>Nicodemus v. Union Pacific Corp.</u>, 204 F.R.D. 479, 489 (D. Wyo. 2001); <u>Intratex Gas Co. v. Beeson</u>, 22 S.W. 3d 398, 405 (Tex. 2000). A "fail-safe" class deprives the court and defendants of any certainty about the scope of the preclusive effect of a judgment. <u>E.g.</u>, <u>Intratex</u>, 22 S.W. 3d at 405.

Under the class Plaintiffs seek to certify, if a class member fails to prove he was overcharged, she is not a member of the class and not bound by any judgment. Conversely, if a class member shows that she was charged more than she should have been, she is a member of the class and entitled to relief. This is a classic "heads I win, tails you lose" situation that courts abhor and in which they have denied class certification. <u>See</u> <u>Forman v. Data Transfer, Inc.</u>, 164 F.R.D. 400, 403 (E.D. Pa. 1995); <u>Hagen v. City of Winnemucca</u>, 108 F.R.D. 61, 63 (D. Nev. 1985); <u>Dunn v. Midwest Buslines, Inc.</u>, 94 F.R.D. 170, 172 (E.D. Ark. 1982); <u>Sperberg v. Firestone Tire & Rubber Co.</u>, 61 F.R.D. 70, 75 (N.D. Ohio 1973).

## IV.    CONCLUSION

Defendant First American Title Insurance Company requests that this Court deny Plaintiffs' Renewed Motion for Class Certification.

July 17, 2007                                   Respectfully submitted,

                                                BRYAN CAVE LLP

                                        By:  _____/s/ James M. Weiss_____
                                                Charles A. Newman (admitted *pro hac vice*)
                                                Douglas W. King (admitted *pro hac vice*)
                                                Elizabeth T. Ferrick (admitted *pro hac vice*)
                                                James W. Weiss (admitted *pro hac vice*)

                                                One Metropolitan Square
                                                211 North Broadway, Suite 3600
                                                St. Louis, Missouri 63102
                                                Telephone: 314.259.2000
                                                Facsimile: 314.259.2020

                                                COHEN & GRIGSBY, P.C.

                                                Larry Elliott (PA35261)
                                                Email: leliott@cohenlaw.com
                                                David F. Russey (PA84184)
                                                Email:  drussey@cohenlaw.com
                                                Cohen & Grigsby, P.C.
                                                11 Stanwix Street
                                                15th Floor
                                                Pittsburgh, Pennsylvania 15222
                                                Telephone: 412.297.4925
                                                Facsimile: 412.209.0672

                                                Counsel for First American
                                                Title Insurance Company

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was filed electronically on this 17th day of July, 2007, to be served by operation of this Court's electronic filing system on the following counsel of record:

Adrian N. Roe
Watkins Dulac & Roe P.C.
Two Gateway Center, 17 East
603 Stanwix Street
Pittsburgh, Pennsylvania 15222

Mark R. Koberna
Sonkin & Koberna Co., LPA
55 Public Square, Suite 1660
Cleveland, Ohio 44113

David D. Yeagley
Ulmer & Berne LLP
1660 West 2nd Street
Cleveland, Ohio 44112

Attorneys for Plaintiffs Alice and Anthony Slapikas

Samuel H. Foreman
Weber, Gallagher, Simpson, Stapleton, Fires & Newby
603 Stanwix Street
Suite 1450, 14th Floor
Two Gateway Center
Pittsburgh, Pennsylvania 15222

Attorney for Third-Party Defendant Mezzo Land Services, LLC

/s/ James M. Weiss