IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY L. SLAPIKAS<br>and ALICE B. SLAPIKAS,<br><br>    Plaintiffs,<br><br>v.<br><br>FIRST AMERICAN TITLE<br>INSURANCE COMPANY,<br><br>    Defendant,<br><br>v.<br><br>MEZZO LAND SERVICES, LLC,<br><br>    Third-Party Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 2:06-CV-00084JFC<br>)<br>)<br>) JUDGE JOY FLOWERS CONTI<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT FIRST AMERICAN'S SUR-REPLY MEMORANDUM
## IN OPPOSITION TO PLAINTIFFS' RENEWED
## <u>MOTION FOR CLASS CERTIFICATION</u>

Plaintiffs sought leave to file a reply brief on their motion for class certification and argued that two developments — a trial court decision from another district and a document recently located by First American — materially affect the calculus whether class certification is appropriate. Neither "development," however, changes First American's clear demonstration that certification of the proposed class is highly inappropriate. Plaintiffs also take the opportunity in their reply to re-argue several of the class certification requirements, including the complete lack of manageability and their unworkable class definition, but they still fail to satisfy their burden to show that any class could be certified. In fact, in contravention of the requirements of Rule 23 and <u>Wachtel v. Guardian Life Insurance Co.</u>, 453 F.3d 179, 185-86 (3d. Cir. 2006), Plaintiffs fail to present this Court with a trial plan or any other proposal suggesting that their claims can be tried on a classwide basis. But if Plaintiffs are not required to meet their burden of proving this case is somehow appropriate for class certification now, First American could be irreparably injured. As a number of Circuit Courts have

recognized the class action device "dramatically affects the stakes for defendants" and "magnifies and strengthens the number of unmeritorious claims." Castano v. American Tobacco Co., 84 F.3d 734, 746 (5th Cir. 1996) (citing In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 165-166 (2d Cir. 1987)). Certification of a class "creates insurmountable pressure on defendants to settle, whereas individual trials would not" because "[t]he risk of facing an all-or-nothing verdict presents too high a risk, even when the probability of an adverse judgment is low." Castano, 84 F.3d at 746.

I.      **INDIVIDUAL ISSUES PREDOMINATE.**

Plaintiffs' reply brief asserts that Cohen v. Chicago Title Ins. Co., --- F.R.D. ---, 2007 WL 1067034 (E.D. Pa. April 5, 2007), mandates that this Court grant class certification (Doc. 126 p. 1). Cohen, however, is premised upon an inaccurate interpretation of the 1999 TIRBOP Manual. Contrary to Cohen, both the clear and unambiguous language of the '99 Manual and Third Circuit precedent establish that evidence of a prior mortgage in the chain of title alone was not sufficient to entitle a customer to a refinance rate discount prior to the 2005 amendments to the Manual. While Cohen also held that the predominance requirement of Fed.R.Civ.P. 23(b)(3) was satisfied in that case, it did so without the detailed analysis and rigor required by Wachtell v. Guardian Life Ins. Co., 453 F.3d 179 (3d Cir. 2006). Additionally, even if Cohen were decided correctly, it did not involve the fraud claims presented in this case and therefore the court was not faced with issues of misrepresentation, reliance or causation that are inherently inappropriate for class certification and unmanageable at trial.

Moreover, Cohen found that case was certifiable as a class action only because Chicago Title failed to present affirmative evidence that it could not electronically search its records for affected class members. Id. at * 5. Unlike Chicago Title, First American presented unrefuted declarations from its Pennsylvania State Manager, Evan Zanic (Doc. 133 Exh. 1), and its Chief Information Officer, Larry Godec (Doc. 133 Exh. 10), outlining the parameters of information maintained

electronically by First American and specifically attesting that it is not possible to electronically search such data to determine which customers were entitled to a discounted Refinance or Reissue premium rate but did not receive it (Doc. 133 Exs. 1 and 10).  Because there is no electronic means to determine liability (and it cannot be presumed), none of the claims in this case are certifiable as a class action.  Reviewing 500,000 files to determine class membership is a "Herculean task" not suitable for class adjudication. E.g..  <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 186 (3d. Cir. 2001).

  A. <u>Cohen</u> **Inaccurately Interprets of the 1999 TIRBOP Manual.**

<u>Cohen</u> held class certification was appropriate because the plaintiffs' HUD-1 Settlement Statement and the title commitment created by Chicago Title's agent indicated the existence of a prior mortgage on the plaintiffs' property and its date and amount.  According to <u>Cohen</u>, the HUD-1 and title search apparently satisfied any requirement that the plaintiff <u>present</u> evidence of <u>prior insurance</u>.  --- F.R.D. ---, 2007 WL 1007034, at * 4.

To begin with, <u>Cohen</u> incorrectly equates the existence of a prior mortgage with the existence of a prior title insurance policy.  Nothing in the text of the '99 Manual suggests that such an interpretation is permitted.  Section 5.3 of the '99 Manual provides, in pertinent part, that "[a] purchaser of a title insurance policy shall be entitled to purchase this coverage at the reissue rate if the real property to be insured is identical to or is part of real property insured 10 years immediately prior to the date the insured transaction closes when evidence of the earlier <u>policy</u> is produced notwithstanding the amount of coverage provided by the prior policy" (Doc. 133 Exh. 1(E))(emphasis added).  Thus, the prior title policy is the sine non qua of entitlement to the reissue rate.  Section 5.6 similarly provides that a customer is entitled to a discount "[w]hen a refinance or substitution loan is made within 3 years from the date of closing of a previously insured mortgage or

fee interest and the premises to be insured are identical to or part of the real property previously insured and there has been no change in the fee simple ownership." Id.

Although Plaintiffs appear to assert that the text of the '99 Manual is ambiguous (Doc. 126 p. 6), the Third Circuit interpreted this language and held it unequivocally requires the customer to produce evidence of an earlier policy. Ricciardi v. Ameriquest Mortg. Co., 164 Fed. Appx. 221, 222-23 (3d Cir. 2006). Ricciardi alleged Ameriquest failed to charge him the refinance rate discount although he was entitled to it under the '99 Manual. The Third Circuit held he was not entitled to receive the discounted rate *even though a prior unsatisfied mortgage to an institutional lender clearly existed at the time of the transaction.* Id. at 225-26. The Court of Appeals held that under the '99 Manual a borrower: "is entitled to the refinance rate only if the previous mortgage was insured. As Ricciardi presented no evidence prior to or at the loan closing that his previous mortgage was insured, Ameriquest appropriately charged him the default title insurance rate as published in the Rate Manual." Id. at 226. Thus, the Third Circuit has already held that an existing mortgage (and knowledge of it) is insufficient to get the discounted rate and the borrower must produce "evidence" of it. Contrary to Plaintiffs' contention, a customer had a duty to present evidence of the prior policy in order to qualify for the discounts prior to the '05 Manual – which established a presumption of prior insurance based on an unsatisfied mortgage to an institutional lender. Ricciardi is not cited in the Cohen decision, and Cohen did not attempt to distinguish this key precedent or even consider Ricciardi's affect on class certification.

Curiously, Plaintiffs assert that Ricciardi's interpretation of the '99 Manual should be limited only to claims against lenders (as opposed to title insurers).[1] Yet, there is nothing in Ricciardi to

---

[1] Plaintiffs' other argument that Ricciardi does not bind this court because the Third Circuit designated it "not Precedential" holds little weight (Doc. 126 p. 6). The Supreme Court has adopted Federal Rule of Appellate Procedure 32.1, which allows litigants to cite to any "federal judicial opinion, order, judgment, or other written disposition" even if it has been given an "unpublished" or similar designation. Though the rule applies directly

suggest that the Third Circuit's interpretation of the '99 Rate Manual is (or should be) limited to claims brought against lenders. Id. at * 226. The Third Circuit generally interpreted the manual without any caveats, limitations or exceptions holding that "a debtor is entitled to the refinance rate only if the previous mortgage was insured." Id. As Plaintiffs emphasize, lenders do not issue title insurance commitments or policies or determine the premium to be charged. The title agent does that. However, under TILA, the lender is responsible to disclose the finance charges. If the title insurance premium is excessive, the lender must disclose it as part of the finance charges. E.g., Madera v. Ameriquest Mortgage Co. 363 B.R. 718 (Bankr. E.D. Pa. 2007); In re Fields, 2006 WL 2191342, * 4 (E.D. Pa. July 31, 2006). Even though the defendant in Ricciardi was the lender, the issue upon which the case turned as to title insurance was whether the title company had overcharged Ricciardi. As a matter of law, the Third Circuit held there was no overcharge. Ricciardi, 164 Fed. Appx. at 222-23.

      Finally, First American presented evidence in opposition to class certification showing that one cannot assume that a prior policy exists simply because a HUD-1 or a title commitment mentions a prior institutional mortgage. (Doc. 133 Ex. 1 ¶¶ 29-30). Not all sales or loans are insured. There are instances when an owners' policy is not purchased at the time of a sale, and other instances when a lenders' policy is not purchased at the time of a mortgage to an institutional lender. Id. Moreover, the evidence Plaintiffs presented in support of class certification contained glaring errors. Plaintiffs undertook a review of 898 closing files subpoenaed from Mezzo (Doc. 126 Pl App. 130-31). Plaintiffs reviewed the files with the assumption that a prior mortgage is evidence of prior insurance – the very assumption upon which the Cohen decision is based. Plaintiffs maintain that in 81% of the files the borrower was entitled to the Reissue or Refinance Rate, but did not receive it (Doc. 133 Ex. 1 ¶¶ 19-20). First American reviewed 10% of these files and found Plaintiffs were

---

to unpublished opinions after January 1, 2007, it shows a clear policy against limiting the citation of such opinions.

consistently wrong about whether a borrower qualified for the Reissue or Refinance Rate (Doc. 133 Ex. 1 ¶ 23). In fact, First American's review uncovered only four borrowers who were overcharged (Doc. 133 Ex. 1 ¶ 2). Absent a provision in the rate manual requiring a title insurer to presume the existence of insurance from a prior institutional mortgage, there is simply no legal or factual basis to do so. First American's evidence shows that the analysis provided in the Cohen decision is not applicable in this case.

### B. Cohen Does Not Indicate That Fed.R.Civ.P. 23(b)(3)'s Predominance Requirement is Satisfied in this Case.

Predominance only exists "when there [is] generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." Lockwood Motors, Inc. v. General Motors Corp., 162 F.R.D. 569, 580 (D. Minn. 1995); see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 157, 187 (3d. Cir. 2001). "A question is not common … if its resolution turns on consideration of the individual circumstances of each class member." Thorn v. Jefferson-Pilot Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006). Here, there is no "common" evidence Plaintiffs can present to prove that any other class member was overcharged. Certainly nothing in the Slapikases' transaction documentation proves any other putative class member had a prior title insurance policy within the required number of years insuring the same property and involving the same fee owners that qualified for the Refinance or Reissue rate. Nor have Plaintiffs come forward with any other way to prove injury on a classwide basis, and none exists.[2]

---

[2] Although Wachtel advises parties to present the District Court with a trial plan to facilitate Rule 23(c)(1)(B) compliance regarding the claims, issues, or defenses subject to class treatment, Plaintiffs failed to provide such a plan or otherwise describe how they intend to try their claims as a class action. Wachtel v. Guardian Life Ins. Co. of America, 453 F.3d 179, 186 n. 7 (3d. Cir. 2006).

Even accepting Plaintiffs' (and Cohen's) interpretation of the '99 TIRBOP Manual (that evidence of a prior institutional mortgage is proof of title insurance), predominance still is not proven. Plaintiffs have adduced no "common" evidence to show even that any particular property had a prior institutional mortgage in the chain of title within the relevant time period. The only way to make this determination is to review each putative class member's HUD-1, the loan documentation and title commitment. Plaintiffs ignore the realities of the title insurance process when they mis-describe the HUD-1 and title commitment as "two documents provided to First American" in every transaction. First American, which sold of vast majority of its policies through independent agents, would have these documents for the minority of policies issued through its direct operations. But it would have neither document for the great majority of policies that are issued through independent agents. (Doc. 133 Exh. 1 ¶ 8). The agent provides the HUD-1 to the borrower, and the commitment to the lender. It provides neither to First American. Only after the closing and the agent issues the final policy does it advise First American of the issuance of the policy and — sometimes — provides a copy of the final policy, but the final policy shows nothing about the identity of the prior lender. (Doc. 133 Ex. 1 ¶¶ 12, 17).

Furthermore, the evidence produced by First American proves it does not maintain electronic information that makes it possible to determine which customers may have been entitled to a discounted rate without a file-by-file review of the loan and closing documentation. For policies issued by agents (which constitute approximately 60% of First American's business in Pennsylvania), First American does not maintain or have access to information sufficient to determine whether a customer was overcharged. (Doc. 133 Exs. 1 ¶ 25, 10 ¶¶ 23-31). The only relevant information that agents occasionally remit to First American and that is in a database identifies whether a policy was sold at the Basic, Reissue or Refinance rate. (Doc. 133 Exh. ¶ 23-31). For Basic rate policies, agents do not remit information sufficient to determine whether: (1) the transaction was a refinance; (2) a

prior policy insured the property (or under plaintiffs' theory of the case the existence of a prior recorded institutional mortgage); (3) the date of the prior policy (or under plaintiffs' theory of the case the date of the prior recorded mortgage); or (4) whether there have been any changes in the fee ownership.  Id.  So while First American can determine which customers did not receive a discounted rate by running a query to locate all policies sold by agents at the Basic rate during the proposed class period, it has no means to electronically determine which of those customers was entitled to a discounted rate.  Literally, the only way to determine if an agent's customer falls within the proposed class is to subpoena the applicable closing files from First American's 740 current and 200 former agents and conduct a file-by-file review.  In the WINGS system, "there is no report that can be produced to identify the class.  Rather, it would be absolutely necessary to review, individually, each file for every policy issued by First American Title in Pennsylvania."  (Doc. 133 Exh. 10 ¶ 25).   Plaintiffs tried this for one agent, quit after reviewing less than 900 files, and still got the eligibility determination wrong most of the time.  (Doc. 133 Exh. 1 ¶¶ 16-27).

Similarly, First American also does not have electronic information from its direct operations sufficient to determine which customers were overcharged.  (Doc. 133 Exh. 10).   Before February 2003, First American did not maintain any searchable electronic information related to policies issued by First American's direct operations.  Rather, it only has images of policies that must be searched manually in the same way as a paper document.  (Doc. 133  Ex. 10 ¶ 24; Ex. 1 ¶ 14).   Even after 2003, one would have to look individually at each file, each commitment, and each HUD-1 handled by direct operations to determine eligibility even if one indulged in plaintiffs' presumptions that every prior mortgage and every prior sale was insured.  According to First American's Chief Information Officer:  "[t]his review, while it could be done on a computer screen displaying imaged documents, would be tedious, labor-intensive and the same as reviewing paper documents."  (Doc. 133 Exh. 10 ¶ 25).

Cohen did not even address this critical issue much less explain how common issues could ever predominate under these circumstances. In fact, Cohen glosses over Rule 23(b)(3)'s predominance requirement merely stating without any analysis that "class certification is appropriate under Rule 23(b)(2) and (b)(3) as the fair and efficient method for adjudication because the essential issues, both factually and legally, are common to the class as a whole and predominate over any individual questions." Id. at *5.[3] It does not even identify the allegedly common factual or legal issues. Cohen's cursory predominance finding does not comply with Wachtel's requirements for class certification, and it certainly does not provide any meaningful precedent for this Court to follow. Wachtel v. Guardian Life Ins. Co., 453 F.3d 179, 185-86 (3d. Cir. 2006).

Moreover, Cohen also completely ignores Third Circuit precedent that holds predominance does not exist when an individual review of each class member's transaction is necessary to determine injury and, therefore, liability. Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 157, 187 (3d. Cir. 2001). In Newton, investors brought a putative class action against their brokers alleging that the brokers failed to buy or sell class members' stock at the best available price. Id. at 169-70. The Third Circuit upheld denial of class certification, noting that assessing liability to a class member would first require examining whether a particular trade provided an investor with the 'best reasonably available price.' Id. at 187, 190. The Third Circuit characterized this type of individual review as a "Herculean task" that destroyed predominance. Id. Just as in Newton, liability cannot be presumed in this case and there is no way to prove it on a classwide basis. This case involves some 500,000 transactions conducted by over 900 present and former agents. Even after subpoenaing the necessary files from those agents, it would take an experienced reviewer at

---

3   Cohen's certification of a single class under two subsection of Rule 23(b) is wrong as a matter of law because the purposes and applications of Rule 23(b)(2) and (b)(3) are different, and their requirements are incompatible. E.g., Thorn, 445 F.3d at 318, 31; Zimmerman v. Bell, 800 F.2d. 386, 389-90 (4th Cir. 1986).

least 10 minutes per file to determine if the transaction was entitled to a discounted rate.  (Doc. 133 Ex. 1 ¶ 15).  Basic calculation reveals that to make a liability determination for each putative class member would take upwards of 83,000 hours.  (Doc. 133 p. 14).  So far, plaintiffs and First American have reviewed only the 900 Mezzo files and have come to sharply differing conclusions as to who was entitled to any discount, which suggests that individual adjudications by the Court could not be avoided.  (Doc. 133 Exh. 1 ¶¶ 16-23).  Despite having filed at least three briefs in support of class certification, Plaintiffs have not yet explained to this Court how to prove liability without this individual review and no alternative in fact exists.  Because liability cannot be presumed, the process of ascertaining which class members sustained injury defeats the predominance requirement.  Newton, 259 F.3d at 190.

For all of these reasons, nothing in the Cohen decision indicates that Rule 23(b)(3)'s predominance requirement is satisfied for any of Plaintiffs' claims in this case and, as demonstrated fully in First American's opposition, individual issues of fact overwhelm any common ones.

**C.     Plaintiffs' Fraud and Misrepresentation Allegations Destroy Predominance.**

In Cohen, the plaintiffs only sought certification of counts for money had and received, unjust enrichment, and the UTPCPL.  --- F.R.D. ---, 2007 WL 1067034, * 2.  All of the claims were premised upon the legal theory that Chicago Title failed to supervise, train, or require its agents to charge the refinance and reissue rates.  Id. at * 3.  Unlike this case, Cohen did not seek certification of fraud claims and did not have UTPCPL claims on based on allegations of fraud or misrepresentation. Id. These are critical differences that make this case inappropriate for class certification.

It is universally recognized that "fraud and misrepresentation claims are not readily susceptible to class action treatment" because "[p]roof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those

misrepresentations" are issues that need to be proven on an individual basis. Gariery v. Grant Thornton, LLP, 386 F.3d 356, 362 (4th Cir. 2004) and Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d. Cir. 2002). To begin with, in this case individual facts are necessary to determine whether a misrepresentation occurred. What any particular agent or direct operation told (or did not tell) a particular customer cannot be proved with common evidence. First American brought forth evidence illustrating how disclosure practices varied from agent to agent and even among its direct operation offices. (Doc. 133 Ex. 9 ¶ 6; Ex. 11). Plaintiffs' non-answer to the dilemma of variations in practice is that individual fact issues do not exist because the purpose of filed rates is to apply those rates in an non-discriminatory fashion. (Doc. 126 p. 6). "Non-discriminatory" does not mean that the requirements of the applicable TIRBOP Manual are fulfilled or a fraud is perpetrated. The issues presented in Plaintiffs' fraud and UTPCPL claims go beyond rate misapplication: an overcharge alone does not constitute a misrepresentation, and Plaintiffs' fraud and UTPCPL claims clearly include allegations that First American made misrepresentations or non-disclosures to each putative class member (otherwise they could not state a claim for fraud or misrepresentation). First American's undisputed evidence of variation in practices of disclosure proves this is not a case of uniform non-disclosure and cannot be proved by the Slapikases' dealings with their agent. (Doc. 133 p. 26-28).

Next, Plaintiffs assert that justifiable reliance is met because "no consumer would ever knowingly choose to pay a higher premium for the same policy." (Doc. 126 p. 6 fn. 5). Plaintiffs cite no evidence or law to support this proposition; indeed, it ignores well-settled law that justifiable reliance cannot be presumed but rather requires a trier of fact to look into each class member's state of mind. E.g., Gavron v. Blinder Robinson & Co., Inc., 115 F.R.D. 318, 325 (E.D. Pa. 1987). Because no evidence exists to prove Plaintiffs' misrepresentation allegations on a classwide basis, Plaintiffs' fraud and UTPCPL claims cannot be certified as a class action.

### D. The National Agency Spreadsheet Does Not Make Common Issues Predominate.

Aside from the Cohen decision, the other supposedly new development Plaintiffs stress in their reply is a state-by-state matrix prepared by First American's National Agency Division in Florida summarizing the requirements for reissue or refinance rate discounts. However, Plaintiffs do not tell the whole story about what the matrix says for Pennsylvania. It does not say that any recorded institutional first mortgage is sufficient to qualify for the discount. It specifically adds for Pennsylvania that the agent "should confirm that [deed of] trust indicates, as is routine, who the insurer [of the prior policy] is or has a Return to an insurer on it." (Doc. 126 p. 2 Exh. 1). Thus, the matrix is not evidence that an institutional prior lender is sufficient to trigger the discount. Instead, it requires that the agent see that the recorded mortgage specifically identifies the prior title insurance company or at least indicates that a title insurance agent presented the mortgage for recording and instructed the recorder to return the recorded documents to the insurer.

The practice of marking the title company's name on the deed is common in the Philadelphia area (Doc. 133 Exh. 8 ¶ 5; Exh. 11 ¶ 10) but is rarely followed in the rest of Pennsylvania (Doc. 133 Exh. 9). The former practice of putting a return address to a title agent on a deed has been replaced throughout Pennsylvania by instructing the recorder to return the deed of trust directly to the lender (Ex. A p. 124-25) (hereinafter "Zanic Dep.").

It is critical to note that even in the Philadelphia area, neither the HUD-1 nor the title commitment would contain the notation. One would need to see a copy of the prior deed of trust, which may or may not be in the agent's file. Searching each file is, as we have said, a Herculean task. If the file does not contain a copy of the old deed of trust, plaintiffs would then have to search the title records in all of the recorder's offices across the Commonwealth. Furthermore, none of this helps in western Pennsylvania, where such notations are not common practice. The most one

would find would be a return address to the lender, which would not show that a title company was involved.

Plaintiffs also act as if the practice of title company notations on a deed of trust is something new that was revealed to them for the first time with the production of the National Agency matrix. It is not. They submitted to the Court with their original motion a 2002 First American bulletin to agents that mentioned the practice (". . . notations on a prior recorded document . . .")(Doc. 133 Exh. 1(D)), and First American submitted affidavits in opposition to class certification describing the practice in eastern Pennsylvania (Doc. 133 Exhs. 8, 11). If, however, a Philadelphia-area agent followed First American's guidance and looked for such notations on a prior deed of trust, one could not tell it from anything in First American's databases, from the title commitment, or from the HUD-1. There is simply no way of avoiding a laborious individual adjudication.

## II.     PLAINTIFFS' CLAIMS ARE NOT MANAGEABLE AS A CLASS ACTION.

Cohen found the plaintiffs' claims against Chicago Title were manageable because "[a]bsent some affirmative evidence searches are impossible, this Court may reasonably infer and find a search for affected class members is not impossible." --- F.R.D. ---, 2007 WL 1067043, * 5. To begin with, even if a class can be identified, it is not necessarily manageable at trial. Cohen does not explain how that case can be tried on a classwide basis and its cursory analysis of manageability therefore does not satisfy Wachtel. Moreover, such an inference (even if consistent with Rule 23(b)) cannot be made in this case because First American submitted unrebutted affirmative evidence that the data it maintains electronically does not provide any means to determine whether a customer was overcharged (Doc. 133 Exs. 1 and 10). The unopposed declarations of Larry Godec, First American's Chief Information Officer, and Evan Zanic, First American's Pennsylvania State Manager, clearly outline the limited parameters of electronic data First American receives and maintains from both its agents and direct operations. Id.

Critically, the declarations also clearly establish that it is not possible to search any of the electronic databases maintained by First American to determine which customers during the class period were allegedly overcharged.  Id.  The information First American receives from agents is stored on the WINGS system (Doc. 133 Ex. 10 ¶ 11).  The WINGS system can identify which policies were sold at the Basic Rate, Reissue Rate, and Refinance Rate if that data was provided by the agent (Doc. 133 Ex. 10 ¶ 13).  WINGS could be used to identify persons who received the discount, but such a report would not identify anyone who did not receive the discount but were entitled to it (Doc. 133 Ex. 10 ¶ 15).  To begin with, WINGS does not have a data field to capture either the legal description or the property address for Pennsylvania (Doc. 133 Ex. 10 ¶ 16).  Nor does it have a data field to capture the mortgagor's (borrower's) name for a lender's policy because the lender (mortgagee) is the insured (Doc. 133 Ex. 10 ¶ 17).  There is also no field for policies issued at the Basic Rate to record if a prior policy existed, or the date thereof.  Id.  Nor is there any way to get the necessary electronic information from the agents.  There are no automated links or interfaces between any agent in Pennsylvania and WINGS that would allow the transfer of data directly from an agent to First American (Doc 133 Ex. 10 ¶ 11).

For much of the class period, data maintained for policies issued by First American's direct operations also cannot be searched electronically to determine who was overcharged.  From the beginning of the putative class period to February 2003, the computer systems only had images of policies issued by its direct operations that cannot be electronically searched (Doc. 133 Ex. 10 ¶ 6).  While it has used the FAST system, which contains the title abstract, examination and closing, in its branches in Pennsylvania to store data on the policies First American has issued directly since February 2003 (Doc. 133 Ex. 10 ¶ 5), these transactions constitute a very small percentage of class Plaintiffs seek to certify (Doc. 133 Ex. 10 ¶ 8).  Moreover, no field in FAST or WINGS captures data as to whether there was a deed to a bona fide purchaser for value, or an unsatisfied mortgage to

an institutional lender, or the date of either of those instruments (Doc. 133 Ex. 10 ¶ 28).  Even under Plaintiffs' theory of the case, First American does not have access to sufficient electronic data to run a search to determine who may be a member of the putative class.  (Doc. 133 Ex. 10 ¶ 24; Ex. 1 ¶ 14).  While First American also has a "back policy" system in operation in Pennsylvania called AgentNet (Doc. 133 Ex. 10 ¶ 29), it only contains scanned images of prior First American policies issued in Pennsylvania.  The AgentNet system in Pennsylvania dates back only to September 2002; prior policies are not in AgentNet and it does not contain any images of title insurance policies issued by underwriters other than First American (Doc. 133 Ex. 10 ¶ 29).

The Godec and Zanic declarations illustrate it is not possible to identify the class using First American's systems or data.  First American cannot identify the Class from FAST, WINGS, or any of its computer systems and databases.  Simply put, membership in the Class depends upon information that First American does not have (Doc. 133 Ex. 10 ¶ 23).

The Seventh Circuit recently upheld denial of class certification in a case that suffers from many of the same manageability problems presented here.  Pastor v. State Farm Mut. Auto Ins. Co., --- F.3d ---, 2007 WL 1487350 (7th Cir. 2007).  In Pastor, the plaintiff purchased a State Farm automobile insurance policy that contained a provision that entitles the insured to "$10 per day if you do not rent a car while your car is not usable."  Id. at * 1.  The period of entitlement begins "if your car can run, when you leave it at the shop for agreed repairs."  Id.  If your car cannot run, the period starts with the accident. Either way, the period ends when the car has been repaired.  While the policy did not require State Farm to inform insureds of entitlements due under its provisions, State Farm had internal memoranda that instructed its employees to explain claim options to insureds, including the $10 entitlement.  Id.  Plaintiff sued State Farm alleging it had breached a contractual duty to notify her that she was entitled to the $10 reimbursement when she filed a claim under the policy.  Id.  Plaintiff sought certification a class of "all State Farm insureds who during the

limitations period received payments for claims for damage to their vehicles, did not rent a car, yet did not receive any payment pursuant to the $10 a day clause." Id.

The Seventh Circuit upheld the district court's denial of class certification holding the case was not manageable as a class action. Recognizing that "[i]ndividual hearings would be necessary to determine whether a class member made a claim for his $10 a day, whether his car was unusable, and if so for how long," the Seventh Circuit held:

> The picture of a federal district judge presiding over thousands of evidentiary hearings each involving a trivial amount of money is not a pretty one. In these circumstances the judge was right to deny class certification, Isaacs v. Sprint Corp., 261 F.3d 679, 681-82 (7th Cir. 2001); Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 677-78 (7th Cir. 2001), though not because class actions are poorly suited to aggregating small claims…[W]hen a separate evidentiary hearing is required for each class member's claim, the aggregate expense may, if each claim is very small, swamp the benefits of class-action treatment. And that is the case here.

Id. The Seventh Circuit recognized that the practical effect of denying class certification was that "no member of the class, except [the plaintiff], will recover under the $10 a day clause in a court of general jurisdiction even if entitled to such relief" because the "claim would be too slight to make a lawsuit worth bringing." Id. at * 5. Nonetheless, it held denial of class certification was appropriate because "there would be no significant economies from consolidating the class members' tiny claims, each requiring its own evidentiary hearing; the expense and burden to the parties and to the judiciary would exceed the value of the claims. This does not mean that the class members are remediless, but they will have to seek their remedies in small-claims court." Id.

Like Pastor, adjudication of this case as a class action would require hundreds of thousands of individual hearings. The Court cannot determine whether First American failed to inform a customer of the availability of the Refinance Rate or Reissue Rate and if so, whether such failure resulted in injury to the class member without holding separate evidentiary hearings to resolve individual fact issues that determine First American's liability including: (i) who presented evidence

of a prior policy (and what that evidence was) at or before closing; and (ii) regardless of the presentation requirement, who in fact had prior qualifying insurance.  Even under Plaintiffs' theory of the case, this would require individual evidence illustrating whether the title search reflected a prior qualifying mortgage.  Once liability (i.e. injury) is proved, other transaction-specific evidence will need to be presented to calculate damages including the amount of the current mortgage on the property.  Plaintiffs do not challenge these facts, but rather suggest the information may be obtained from a review of each putative class member's HUD-1 and title commitment (Doc. 126 p. 5), a process that requires an individual file by file review of hundreds of thousands of transactions that will take years and years to perform (Doc. 133 Ex. 1).  Pastor,  --- F.3d ---, 2007 WL 1487350, * 5.

Moreover, unlike in Pastor, denial of class certification does not effectively leave Plaintiffs without a remedy to recover any overcharge from First American.  Here, Plaintiffs are asserting consumer protection claims against First American under the UTPCPL, a statute that explicitly permits courts to "award to the plaintiff, in addition to other relief, costs and reasonable attorneys' fees." 73 P.S. 201-9.2.  Putative class members and their attorneys, therefore, will not be left without a remedy or impetus to pursue it by a denial of class certification.

The unopposed evidence First American presented in opposition to class certification shows this case is not manageable as a class action and denial of class certification will not deprive putative class members of a remedy against First American.

### III. PLAINTIFFS' PROPOSED CLASS DEFINITION SEEKS CERTIFICATION OF AN IMPROPER "FAIL-SAFE" CLASS.

Under the class Plaintiffs seek to certify, if a class member fails to prove he was overcharged, he is not a member of the class and not bound by any judgment.  Conversely, if a class member shows that she was charged more than she should have been, she is a member of the class and entitled to relief.  This is a classic "heads I win, tails you lose" situation that courts abhor and in which they have denied class certification.  See Forman v. Data Transfer, Inc., 164 F.R.D. 400, 403

(E.D. Pa. 1995); <u>Hagen v. City of Winnemucca</u>, 108 F.R.D. 61, 63 (D. Nev. 1985)(inappropriate for class to be defined as all persons whose constitutional rights were violated); <u>Dunn v. Midwest Buslines, Inc.</u>, 94 F.R.D. 170, 172 (E.D. Ark. 1982)(denying certification of class of "those who have been actually discriminated against"); <u>Sperberg v. Firestone Tire & Rubber Co.</u>, 61 F.R.D. 70, 75 (N.D. Ohio 1973)(refusing to certify class of alleged patent infringers).  The class Plaintiffs seek to have certified – which include only those persons overcharged – suffer from the same genetic flaw as the illegitimate classes proposed and rejected in these cases.

In addition to the manifest unfairness to First American, putative class members cannot be identified or given notice because the trial court has no way of ascertaining whether a given person is a member of the class until a determination of ultimate liability to that one individual is made. <u>Clay v. American Tobacco Co.</u>, 188 F.R.D. 483, 490 (S.D. Ill. 1999).

Finally, this is not a situation in which the class definition can be re-written to correct the "fail-safe" defect in the current definition.  Rather, Plaintiffs' inability to properly define a class results from the fact that their claims are inherently individualized and thus inappropriate for class treatment.  There is no way to determine class membership short of individualized fact-finding on each loan transaction in the Commonwealth of Pennsylvania involving First American.  "If [] an individualized inquiry is needed to determine the membership of a workable class, it is clear that common issues do not predominate."  <u>Lienhar v. Dryvit Sys, Inc</u>, 255 F.3d 138, 149 (4th Cir. 2001).

**IV.     CONCLUSION**

Defendant First American Title Insurance Company requests that this Court deny Plaintiffs' Renewed Motion for Class Certification.

July 27, 2007                                                     Respectfully submitted,

                                                                          BRYAN CAVE LLP

                                                                          Charles A. Newman (admitted *pro hac vice*)
                                                                          Douglas W. King (admitted *pro hac vice*)

Elizabeth T. Ferrick (admitted *pro hac vice*)
James W. Weiss (admitted *pro hac vice*)
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Telephone: 314.259.2000
Facsimile: 314.259.2020

COHEN & GRIGSBY, P.C.

By:    /s/ David F. Russey
Larry Elliott (PA35261)
Email: leliott@cohenlaw.com
David F. Russey (PA84184)
Email: drussey@cohenlaw.com
Cohen & Grigsby, P.C.
11 Stanwix Street
15th Floor
Pittsburgh, Pennsylvania 15222
Telephone: 412.297.4925
Facsimile: 412.209.0672

Counsel for First American
Title Insurance Company

**CERTIFICATE OF SERVICE**

       The undersigned hereby certifies that a true and correct copy of the foregoing was filed electronically on this 27th day of July, 2007, to be served by operation of this Court's electronic filing system on the following counsel of record:

Adrian N. Roe
Watkins Dulac & Roe P.C.
Two Gateway Center, 17 East
603 Stanwix Street
Pittsburgh, Pennsylvania 15222

Mark R. Koberna
Sonkin & Koberna Co., LPA
55 Public Square, Suite 1660
Cleveland, Ohio 44113

David D. Yeagley
Ulmer & Berne LLP
1660 West 2nd Street
Cleveland, Ohio 44112

Attorneys for Plaintiffs Alice and Anthony Slapikas

Samuel H. Foreman
Weber, Gallagher, Simpson, Stapleton, Fires & Newby
603 Stanwix Street
Suite 1450, 14th Floor
Two Gateway Center
Pittsburgh, Pennsylvania 15222

Attorney for Third-Party Defendant Mezzo Land Services, LLC

                                                                    /s/  David F. Russey