## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTHONY L. SLAPIKAS            )
and ALICE B. SLAPIKAS, for themselves and all   )
others similarly situated        )
                       )
         Plaintiffs,          )
                       )
         v.                )
                       )     Civil Action No. 06-00084
FIRST AMERICAN TITLE          )
INSURANCE COMPANY,          )
                       )
         Defendant,         )
                       )
         v.                )
                       )
MEZZO LAND SERVICES, LLC,        )
                       )
         Third-Party Defendant.

## <u>MEMORANDUM OPINION</u>

CONTI, District Judge.

Pending before the court is a renewed motion for class certification (Doc. No. 123) filed pursuant to Federal Rule of Civil Procedure 23(b)(3) in the above-captioned civil action by Anthony L. Slapikas and Alice B. Slapikas ("plaintiffs" or "Slapikas"). Plaintiffs seek class certification for all persons who were overcharged for residential title insurance policies purchased in the state of Pennsylvania from the defendant First American Title Insurance Company (the "defendant" or "First American").

On October 22, 2007, the court held a class certification hearing.  On November 13,

2007, plaintiffs submitted a proposed trial plan (Doc. No. 155), and on January 22, 2008 the

defendant submitted a response to the proposed trial plan (Doc. No. 162).  Because plaintiffs

satisfied the requirements for a class to be certified, the court will grant plaintiffs' motion.[1]

## I. CLASS DESCRIPTION

### A.  Class Definition

Plaintiffs seek certification of a class defined as follows:

> All persons in the Commonwealth of Pennsylvania who, at any time after
> December 19, 1999: (a) paid premiums for the purchase of residential title
> insurance from Defendant FA [First American]; (b) qualified for the Reissue rate
> or Refinance rate discounts provided in the Title Insurance Rate manual filed by
> the Title Insurance Rating Bureau of Pennsylvania; and (c) did not receive the
> discount specified in the Manual.

Plaintiff's Brief in Support of Motion for Class Certification ("Pl.'s Br.") at 1-2 n.3.

### B.  Class Claims

The first amended complaint (Doc. No. 32) alleges that plaintiffs, and thousands of other

Pennsylvania homeowners, were overcharged for title insurance when they refinanced their home

---

[1]There are a number of courts which have certified similar classes.  See Alberton v.
Commonwealth Land Title Ins. Co., Civ. No. 06-3755, 2008 WL 269490, at *1 (E.D. Pa. Jan. 31,
2008) (noting that other courts around the country have certified similar classes of title insurance
purchasers, citing Chesner v. Stewart Title Guar. Co., Civ. No. 06-0476 (N.D. Ohio Jan. 23,
2008); Cohen v. Chicago Title Ins. Co., 242 F.R.D. 295 (E.D. Pa. 2007); Woods v. Stewart Title
Guar. Co., Civ. No. 06-0705, 2007 WL 2872219 (D. Md. Sept. 17, 2007); Mitchell-Tracey v.
United Gen. Title Ins. Co., 237 F.R.D. 551 (D. Md. 2006); Dubin v. Sec. Union Title Ins. Co.,
832 N.E.2d 815 (Ohio Ct. App. 2005); In re Coordinated Title Ins. Cases, 784 N.Y.S.2d 919
(N.Y. Sup. 2004); Mitchell v. Chicago Title Ins. Co., No. 02-017299, 2003 WL 23786983 (Minn.
Dist. Ct. Dec.22, 2003)).

mortgages. Plaintiffs allege that First American charged plaintiffs and others the "Basic Rate" for title insurance even though it knew that they were entitled to premium discounts. Defendant is a member of the Title Insurance Rating Board of Pennsylvania ("TIRBOP"). TIRBOP files a Title Insurance Manual of Rates and Forms (the "Rate Manual"), which provides for premium rates and discounts, with the Pennsylvania Insurance Commissioner. Plaintiffs argue that plaintiffs and others were entitled to premium discounts pursuant to the Rate Manual which is binding on defendant as a member of TIRBOP pursuant to state law. See 40 PA. STAT. ANN. §§ 910-37(h), 910-42.

Plaintiffs assert that (1) pursuant to section 5.3 of the Rate Manual, an insured is entitled to a ten percent discount, known as the "Reissue Rate," if title insurance had been purchased for the same property within ten years preceding the transaction; and (2) pursuant to section 5.6 of the Rate Manual, an insured is entitled to a twenty-eight percent discount , known as the "Refinance Rate," if the prior purchase of title insurance with respect to the same property occurred within three years preceding the transaction.

Plaintiffs allege a total of five counts: count I - breach of express contract; count II - breach of implied contract; count III - fraud; count IV - violation of the Unfair Trade Practices and Consumer Protection Law, 73 PA. CONS. STAT. §§ 201-1 et seq. ("UTPCPL"); count V - unjust enrichment.

## II. FACTUAL BACKGROUND

### A. First American

#### 1. General Information

First American is a national title insurance underwriter that issues title insurance policies to customers throughout Pennsylvania directly and indirectly through a network of agents. (Defendant's brief in opposition to class certification ("Def.'s Br.") p. 2.) First American has 16 direct operation branch offices in Pennsylvania and 740 agents. (Id.) Approximately 40% of First American's residential title insurance business is conducted by direct operations and the other 60%, through its agents. (Id.) Third-party defendant, Mezzo Land Services, LLC ("Mezzo Land"), is one of First American's agents. On November 16, 2001, the two companies entered into an agency agreement (Pl.'s Br. at 5.)

### 2. First American's Procedures

First American sells the majority of its policies through an established network of hundreds of authorized agents (the "agents") to whom it periodically issues bulletins with instructions, guidelines, and standards. (Id. at 4.) First American issued instructions to its agents with respect to calculating title insurance premiums and filling out HUD-1 settlement statements. (Id.) First American provides its Pennsylvania agents with information related to the existence and availability of the Reissue Rate and Refinance Rate. (Def.'s Br. at 4.)

The agents' responsibilities include the following: receiving orders for title insurance from customers, searching the chain of title for prior deeds and mortgages, preparing title insurance commitments that identify prior mortgages unless satisfied, preparing HUD-1s, determining the premium charge for the title insurance, executing title insurance policies (jointly with the consumer), disbursing the loan proceeds (including paying off prior mortgages), issuing the title insurance policies, and sending "remittance reports" to First American informing it of the

rate charged. (Pl.'s Br. at 4.)  The agents retained the majority of the premium charged for title

insurance, and the balance is remitted to First American. (Def.'s Br. at 2.)

**B.  Rate Manual**

1.  1999 - August 2005

First American is a member of the TIRBOP. (Pl.'s Br. at 3).  TIRBOP is licensed by the

Pennsylvania Insurance Department. (Id.).  TIRBOP prepared the Rate Manual which sets forth

the schedule of rates for TIRBOP members.   Pursuant to Pennsylvania law, TIRBOP files its

manual of rates with the Pennsylvania Insurance Commissioner. 40 PA. STAT. ANN. §910-37(b).

Those rates, if approved, become binding on insurance companies that are members of TIRBOP,

including First American. Id. at § 910-2.  The Rate Manual legally obligates First American to

charge the rates set forth in the Rate Manual.  Id. at § 910-37(h).  The Rate Manual establishes a

three-tiered system of rates.  The default Basic Rate applies when the purchaser of title insurance

does not qualify for a special rate. Rate Manual § 5.50 (available at

http://www.firstamne.com/printable/rates_filings/pa_manual.pdf).  The Reissue Rate applies

when a property owner purchases title insurance within ten years of obtaining a policy issued on

the same property. Id. § 5.3. The Refinance Rate applies when a property owner purchases title

insurance within three years of obtaining a previous policy.  Id. § 5.6.

Section 5.3 of the Rate Manual, "REISSUE RATE," in effect in 1999 through August

2005 provided:

A purchaser of a title insurance policy shall be entitled to purchase this coverage
at the Reissue Rate if the real property to be insured is identical to or is part of the
real property insured 10 years immediately prior to the date the insured transaction
closes when evidence of the earlier policy is produced not withstanding the

amount of coverage provided by the prior policy. . . The Reissue Rate is set forth in Section 5.50 of this Manual. . . .

Id. § 5.3 (the rate in Section 5.3 is the "Reissue Rate").

Section 5.6 of the Rate Manual, "REFINANCE AND SUBSTITUTION LOANS," in effect in 1999 through August 2005 provided:

When a refinance or substitution loan is made within 3 years from the date of closing of a previously insured mortgage or fee interest and the premises to be insured are identical to or part of the real property previously insured and there has been no change in the fee simple ownership, the Charge shall be 80% of the Reissue Rate. . . .

Id. § 5.6 (the rate in Section 5.6 is the "Refinance Rate").

2. 2005 Amendments to the Rate Manual

As noted, sections 5.3 and 5.6 of the Rate Manual, quoted above, were the provisions which described the Reissue Rate and the Refinance Rates from 1999 until August 2005. During that period, the Rate Manual contained no section that specified what evidence must be produced in order to prove the issuance of prior insurance. First American issued bulletins to its agents explaining what constituted sufficient proof of prior insurance. (Id. at 4.) Although the Rate Manual was amended in 2000, 2002, 2003, and January 2005, the definitions of the Reissue Rate and Refinance Rate remained unchanged in those versions of the Rate Manual. (Id.)

In August 2005, the Rate Manual was amended ("2005 Manual"). The Reissue Rate (§ 5.3) and Refinance Rate (§ 5.6) provisions of the Rate Manual were amended. (Id.). Although the Reissue Rate and Refinance Rate provisions were substantively changed in the 2005 Manual, those changes are not material to our discussion in this case about the interpretation of the Rate Manual from 1999 to August 2005. The amendment to the 2005 Manual which helps to inform

6

the discussion and is relevant to this case is the addition of section 2.8 ("§ 2.8").  In that addition,

§ 2.8, the kind of evidence  an insurer may rely upon in making its determination whether the

Reissue Rate or Refinance Rate will apply to a particular transaction is described as follows:

> (a) the recording (within the period of time specified within the applicable Section of the Manual) of either:
>> (1) a deed to a bona fide purchaser for value, or
>> (2) an unsatisfied mortgage to an institutional lender; or in the alternative,
> (b) any of the following documents produced by or on behalf of the purchaser of the title insurance policy:
>> (1) a copy of the prior policy;
>> (2) a copy of the marked-up commitment;
>> (3) a settlement sheet showing payment of a title insurance premium; or
>> (4) other written evidence acceptable to the Insurer that title insurance coverage was purchased for the property

(Id. § 2.8.)  Defendant argues that the addition of § 2.8 in the 2005 Manual lessens the

evidentiary requirements customers must satisfy to be entitled to the Reissue Rate or Refinance

Rate, and creates the presumption that prior insurance exists if a deed of a bona fide purchaser

for value or unsatisfied mortgage to an institutional lender was recorded during the applicable

"look-back" period.  Plaintiffs argue that the new § 2.8 is not a substantive change in the

evidentiary requirements, but a clarification of the already existing requirements.  Plaintiffs

maintain that the clarification was necessary due to the ambiguous language of the previous

version of the rate manual.

## C.  Real Estate Settlement Procedures Act

The Real Estate Settlement Procedures Act, 12 U.S.C. § 2607 ("RESPA") requires

lenders and mortgage brokers to provided customers with a HUD brochure that informs them of

the Reissue and Refinance Rates. (Id. at 5.)  The brochure, given to every customer who applies

for a federally related mortgage loan, states, "If you are buying a home which has changed hands within the last several years, ask your title company about a 'Reissue Rate,' which would be cheaper." (<u>Id.</u> at 5.)

### D. The Slapikases' Transaction

Plaintiffs purchased a home in Pittsburgh, Pennsylvania in 1990, obtained a mortgage, and purchased title insurance. (<u>Id.</u> at 6.) Between 1992 and 2003, plaintiffs refinanced their home five times (1992, 1998, 2000, 2001, and 2003). (<u>Id.</u>) In 2003, they refinanced their home with National City Mortgage Corporation ("National City"), who required plaintiffs to pay a premium for a lender's title policy. (<u>Id.</u>)

Plaintiffs subsequently hired Mezzo Land to perform the settlement and closing services related to the 2003 financing. (<u>Id.</u>) Mezzo Land dealt directly with plaintiffs' new lender, National City, in issuing a title insurance commitment, preparing a HUD-1 settlement statement, closing the transaction, keeping $1,036.90 of the $1,198.75 premium as its share, and remitting the remaining premium and remittance report to First American. (<u>Id.</u> at 7.)

Plaintiffs were charged the non-discounted Basic Rate of $1,198.75, despite the title search revealing evidence of multiple prior title policies, including a prior institutional mortgage recorded less than three years before plaintiff's 2003 refinancing. (Pl.'s Br. at 6.) Plaintiffs also had a HUD-1 statement from a premium paid in 2001 for a loan policy insuring their prior lender. (Def.'s Br. at 11.) Plaintiffs allege that they were entitled to the Refinance Rate (an 80% discount of the Reissue Rate), and allege they were overcharged by **$335.65**. (Pl.'s Br. at 6.) Neither Mezzo Land nor First American informed plaintiffs of the availability of the Reissue or

Refinance Rate before their transaction closed. (Pl.'s Br. at 6.)[2]  In connection with the National

City refinancing, First American performed underwriting, including a search for prior deeds and

mortgages in the chain of title for the property, and this underwriting disclosed a prior mortgage.

### E.  Scope of Class

Plaintiffs, on behalf of thousands of other Pennsylvania homeowners, allege that they

were overcharged by First American for title insurance when they refinanced their home

mortgages between the years 1999 and 2005.  First American sold over 500,000 policies during

the proposed class period.  (Pl.'s Br. App. 132.)  Plaintiffs claim that defendant's records show

evidence of over $10 million in overcharges.

Plaintiffs issued a subpoena directly to Mezzo Land to inspect its paper files. (Def.'s Br.

at 13.)  Plaintiffs reviewed a sample of Mezzo Land's files for overcharges.[3]  Id.  Plaintiffs

applied the evidentiary standard they claim is applicable.  ( Brean Caldwell Vaske Aff. ("Vaske

Aff.") ¶ 3.) They examined files of customers who were charged the Basic Rate to see if a deed

of a bona fide purchaser or an institutional mortgage was present in the title search for the

applicable look-back period.  (Id.) Plaintiffs found that 723 out of 898 or 81 percent of the files

contained evidence of a prior title insurance policy that would have qualified the borrower for the

Reissue Rate or Refinance Rate. (Def.'s Br. at 13.)   Of those 723 files with evidence of a prior

title insurance policy, only 116 received a discounted rate.  (Pl.'s Br. App. 131.)  According to

plaintiffs' review of Mezzo Land's files, 607 out of the 898 files or 67 percent should have paid a

---

[2]Defendants dispute this assertion, and claim that plaintiffs had notice of the availability of discounted rates through HUD disclosure pamphlets provided by previous lenders.

[3]  Plaintiff reviewed 898 of 2148 First American policies issued by Mezzo Land from 2000 to 2005.

discounted rate, but paid the Basic Rate. First American's vice president and Pennsylvania state manager, Evan Zanic ("Zanic"), reviewed 91 Mezzo Land files[4] (approximately 10% of plaintiffs' sample) and applied the evidentiary standard advanced by First American. Zanic checked to see if the purchaser was charged the Basic Rate despite the presence of definitive evidence of a previous title insurance policy, i.e., a copy of the previous policy. Zanic found that four of the ninety-one borrowers or 4.4% were overcharged. (Id. at 6.) Defendant claims that the overcharges correspond to a *de minimis* error rate of approximately 4.4 percent. (Id. at 14.) The court notes, however, that if that error rate was consistent among First American's agents throughout the class period, First American would have overcharged approximately 22,000 customers. (See Pl.'s Br. App. p. 132 (showing that First American sold approximately 513,000 policies in Pennsylvania during the class period).)

## III. Procedural Background

On December 19, 2005, plaintiffs filed a class action complaint in the Allegheny Court of Common Pleas. On January 19, 2006 the case was removed to federal court. Plaintiffs bring this action on their own behalf, and on behalf of similarly situated individuals who bought title insurance policies from First American, qualified for either the Reissue Rate or Refinance Rate, but were overcharged and denied the applicable rate.

Plaintiff's initial complaint alleged a total of eight counts: count I - breach of express contract; count II - breach of implied contract; count III - fraud; count IV - violation of the

---

[4] Defendant points to Zanic's review as evidence that the class would be unmanageable. Zanic, who had more than twenty years of experience in the title insurance field, spent approximately fifteen hours reviewing each closing file (for an average of ten minutes per file). (Def.'s Br. at 14.) Defendant notes that a review of 500,000 First American transactions over the class period would take experienced reviewers a total of 83, 333 hours. (Def.'s Br. at 14.)

UTPCPL; count V - conversion; count VI - unjust enrichment; count VII - breach of duty of good faith and fair dealing; and count VIII - violation of the bad faith insurance statute, 42 Pa. Stat. Ann. § 8371.

Defendant filed a motion to dismiss that complaint which the court granted in part and denied in part at a hearing held on May 8, 2006. Specifically, the court denied the motion to dismiss with respect to count I (breach of express contract), count II (breach of implied contract) and count VI (unjust enrichment);and granted the motion to dismiss with respect to count III (fraud), count IV (UTPCPL), count V (conversion), count VII (breach of duty of good faith) and count VIII (bad faith).

On June 6, 2006, plaintiffs filed an amended complaint. In the first amended complaint, plaintiffs reasserted the breach of express contract (count I), breach of implied contract (count II), fraud (count III), violation of UTPCPL(count IV), and unjust enrichment (count V) claims. Plaintiffs made additional averments in the first amended complaint with respect to counts III (fraud) and IV (UTPCPL) to satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

First American filed a motion to dismiss counts III (fraud) and IV (UTPCPL) and filed an answer with respect to counts I (breach of express contract), II (breach of implied contract), and V (unjust enrichment). First American filed a third-party complaint against Mezzo Land alleging that Mezzo Land is its agent for the purpose of selling title insurance policies, and that Mezzo Land not First American, dealt directly with plaintiffs, and asserting four claims against Mezzo Land: breach of contract (count I), contractual indemnity (count II), common law indemnity (count III), and contribution (count IV).

Mezzo Land filed a motion to dismiss the third-party complaint as well as a motion to dismiss the first amended complaint arguing that plaintiffs failed to exhaust administrative remedies provided to them under the Title Insurance Company Act**,** citing <u>Moy v. Schreiber Deed Sec. Co.</u>, 572 A.2d 758, 759-60 (Pa. Super. Ct. 1990).  First American joined Mezzo Land's motion to dismiss plaintiffs' first amended complaint, citing 40 PA. STAT. ANN. §§ 910-44(b) and 910-46(b), and filed a motion for judgment on the pleadings asserting the same ground.  At a hearing held on December 21, 2006, the court denied First American's motion to dismiss and motion for judgment on the pleadings as well as Mezzo Land's motions to dismiss the first amended complaint and the third-party complaint. On March 2, 2007, upon joint motion by First American and Mezzo Land, this court certified the order of December 21, 2006 for interlocutory appeal concerning an exhaustion of administrative remedies issue and stayed proceedings pursuant to 28 U.S.C. § 1292(b).   On May 25, 2007, the United States Court of Appeals for the Third Circuit denied the petition for permission to appeal.

On May 31, 2007, plaintiffs filed the present renewed motion to certify class.  On October 22, 2007, this court held a hearing on the motion to certify.  Plaintiffs filed a proposed trial plan on November 13, 2007.

**IV. DISCUSSION**

To be certified, a class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  FED. R. CIV. P. 23(a).  If the Rule 23(a) requirements are met, the court must then find that the class fits within one of the three categories of class actions set forth in Federal Rule

of Civil Procedure 23(b).  In re Community Bank of Northern Virginia, 418 F.3d 277, 302 (3d Cir. 2005); see  Chiang v. Veneman, 385 F.3d 256, 264 (3d Cir. 2004); In re LifeUSA, 242 F.3d 136, 143 (3d Cir. 2001); Georgine v. Amchem. Prods., Inc., 83 F.3d 610, 624 (3d Cir. 1996), aff'd, Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997); Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

The proponent of class certification has the burden of proving each of the prerequisites of a class action under Rule 23(a) and that the class fits within one of the three categories of class actions set forth in Rule 23(b).  Chiang, 385 F.3d at 264.  The court notes, however, that it is not necessary for a plaintiff to establish the merits of his case at the certification stage, and that in determining whether the class will be certified, the substantive allegations of the complaint must be taken as true.  Chiang, 385 F.3d at 262 (citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974)).  Indeed, the class certification inquiry cannot evolve into a "preliminary inquiry into the merits."  Eisen, 417 U.S. at 177.

Although the court shall not determine the merits of plaintiffs' claim, his claim must be scrutinized in light of the factual record in order to determine whether it is suitable for class-wide adjudication.  See Johnston v. HBO Management Films, Inc., 265 F.3d 178, 189 (3d Cir. 2001). Because class certification questions are often "enmeshed in the factual and legal issues comprising the plaintiff's cause of action," the court may need to "delve beyond the pleadings to determine whether the requirements for class certification are satisfied."  Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006)(quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 167 (3d Cir.2001)); see Robinson v. Texas Auto Dealers Ass'n, 387 F.3d 416, 421 (5th Cir. 2004)("[W]e take care to inquire into the substance and structure of the

underlying claims without passing judgment on their merits. 'Although "the strength of a plaintiff's claim should not affect the certification decision," the district court must look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."'")(quoting McManus v. Fleetwood Enterprises, Inc., 320 F.3d 545, 548 (5th Cir. 2003)(quoting Castano v. Am. Tobacco Co., 84 F.3d 734, 740 (5th Cir.1996))).

The United States Court of Appeals for the Third Circuit has also held that under the 2003 amendments to Rule 23, and in particular due to subdivision (c)(1)(B), which provides in relevant part that "[a]n order certifying a class action must define the class and the class claims, issues, or defenses . . . .," that the plain text of the subdivision, especially considered in light of parallel provisions of the rule, "requires district courts to include in class certification orders a clear and complete summary of those claims, issues, or defenses subject to class treatment." Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of America, 453 F.3d 179, 184-85 (3d Cir. 2006). In deciding a motion for class certification, the court must be satisfied "after a rigorous analysis" that all the requirements for class certification are met. General Telephone Co. v. Falcon, 457 U.S. 147, 160 (1982). As the United States Court of Appeals for the Third Circuit has made clear, failure to follow the procedures required before approving a class action is an abuse of discretion. In re Community Bank of Northern Virginia, 418 F.3d 277 (3d Cir. 2005) (settlement-only class).

**A. Rule 23(a) Prerequisites to a Class Action**

To be certified, a class must satisfy the four requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. FED. R. CIV. P. 23(a). Rule 23(a) specifically provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The United States Court of Appeals for the Third Circuit has explained that the requirements of Rule 23(a) are meant to ensure that class action treatment is necessary and efficient and that it is fair to absentees under the particular circumstances of a case. Baby Neal, 43 F.3d at 55 (Becker, J.). Numerosity addresses the first of these concerns (i.e., the necessity of class action treatment) while commonality, typicality, and adequacy address whether the class action can be maintained in a fair and efficient manner. Id.

### 1. Numerosity

Rule 23(a)'s numerosity requirement focuses on the necessity of class action treatment where the class is so numerous that joinder of all members is impracticable. See FED. R. CIV. P. 23(a). The proposed class here consists of approximately 22,000 and 340,000 members.[5] While no number definitively establishes numerosity, a class as large as the lower end of the range here

---

[5]Plaintiffs maintain that First American sold about 513,000 policies in Pennsylvania during the class period. (Pl.'s Br. APP 132). Plaintiffs summary of sample files from Mezzo Land alleges an error rate of 67%. (Def.'s Br. at 13). Defendant does not dispute the number of policies sold, but maintains that only 4.4% were overcharged. (Id. at 13).

is sufficiently numerous for joinder to be impracticable.  As the United States Court of Appeals for the Third Circuit has explained:

> On the subject of how many is enough, Professor Moore has written "While the attitude taken towards a given number may vary, each opinion reflects a practical judgment on the particular facts of the case. Thus no hard and fast number rule can or should be stated, since 'numerosity' is tied to 'impracticability' of joinder under the specific circumstances. Nevertheless, some general tendencies can be observed. While there are exceptions, numbers under twenty-one have generally been held to be too few. Numbers between twenty-one and forty have evoked mixed responses and again, while there are exceptions, numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement."

Weiss v. York Hosp., 745 F.2d 786, 808 n.5 (3d Cir.1984) (citing 3B J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 23.05[1], at 23-150 (2d ed. 1982) (footnotes omitted)).

The sheer number alone, however, does not necessarily make joinder impracticable. Practicability of joinder depends on a number of factors, including: the size of the class, ease of identifying members and determining addresses, ease of service on members if joined, geographical dispersion and whether proposed members of the class would be able to pursue remedies on an individual basis.  Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp., 149 F.R.D. 65, 74 (D.N.J. 1993) (citations omitted).  The potential size of the class in this case is the major factor making joinder very difficult if not impossible.  Additionally, the size of the individual claims makes it unlikely that individual plaintiffs would prosecute claims on their own.[6]  The court, looking at the totality of the circumstances before it, concludes that joinder is

---

[6]  The named plaintiffs' claim is only for $335.65.  From the evidence presented by the parties, the size of the named plaintiffs' claim is generally representative of the size of potential class members' claims.

sufficiently impracticable, and finds that the numerosity requirement set forth in Rule 23(a) is satisfied.

### 2. Commonality

The commonality requirement set forth in Rule 23(a) is satisfied if the named plaintiff shares at least one question of fact or law with the grievances of the prospective class. Baby Neal, 43 F.3d at 56 (citations omitted). As the United States Court of Appeals for the Third Circuit has noted, the commonality requirement "is not a high bar." Chiang, 385 F.3d at 265; see Baby Neal, 43 F.3d at 56 ("Because the requirement may be satisfied by a single common issue, it is easily met. . . .").

In this case, plaintiffs allege that the entire class, by its definition, (a) paid premiums for the purchase of residential title insurance from First American; (b) qualified for the Reissue Rate or Refinance Rate discounts provided in the Rate Manual filed by TIRBOP; and (c) did not receive the discount specified in the Rate Manual. Defendants argue that the proposed class did not qualify for a discounted rate, because they did not present evidence as required by the TIRBOP Rate Manual. Plaintiffs argue that the presence of a deed or institutional mortgage in the chain of title constitutes clear evidence that a previous title insurance policy was issued and satisfies the TIRBOP Rate Manual, even prior to the 2005 amendments. As evidence of this, plaintiffs point to the 2005 Amendment to the Rate Manual in which TIRBOP "clarified" this position by explicitly providing that a deed or institutional mortgage constitutes evidence of a prior title insurance policy. Defendant maintains that the 2005 Amendment to the Rate Manual was not a clarification, but a substantive change in policy lowering the evidentiary requirements for a discounted rate.

Reviewing the dispute between First American and plaintiffs, the court finds that the named plaintiffs share at least two questions of fact or law with the grievances of the prospective class members who purchased title insurance from 1999 until August 2005, specifically: (1) what evidence was required by the Rate Manual prior to the 2005 Amendment for potential class members to qualify for discounted rates, and (2) was the 2005 Amendment to the Rate Manual a clarification of the previous requirements or a substantive change. These issues will be addressed at the merits stage of the case. For the purposes of deciding the certification motion, however, at least one common question of law or fact is shared by plaintiffs and the members of the putative class who purchased title insurance from 1999 until August 2005. In light of this finding, the court concludes that the commonality requirement of Rule 23(a) is met.[7]

### 3. Typicality

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED.R.CIV.P. 23(a)(3). It has been noted that "[t]he concepts of commonality and typicality are broadly defined and tend to merge" and both seek to assure that the interests of absentees will be fairly and adequately represented. Baby Neal, 43 F.3d at 56 (citing 7A CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1764, at 247 (1986)); see In re Community Bank, 418 F.3d at 303. Neither commonality nor typicality, however, mandates that all putative class members share identical claims. In re Community Bank, 418 F.3d at 303; Baby Neal, 43 F.3d at 56.

---

[7]Defendant does not directly contest commonality in its memorandum in opposition to class certification. Defendant argues, however, that plaintiffs failed to show that common issues of fact or law predominate as required by Rule 23(b). This court addresses commonality here and will address predominance below.

Moreover, despite their similarity in seeking to protect the interests of absentees, commonality and typicality are distinct requirements.  Id. at 56.  Where commonality evaluates the sufficiency of the class, typicality evaluates the sufficiency of the named plaintiff.  Id. (citing Hassine v. Jeffes, 846 F.2d 169, 177 n.4 (3d Cir. 1988).[8]

Typicality assesses whether the named plaintiff has incentives that are aligned with those of absent class members so as to assure that the absentees' interests will be fairly represented by the named plaintiff.  Id. at 57.  In other words, "[t]he typicality criterion is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the named absentees."  Id.  Typicality, it has been explained, entails an inquiry whether the named plaintiff's individual circumstances are markedly different, or the legal theory upon which the named plaintiff's claims are based is different from one upon which the claims of other class members will be based.  Id. (citing Hassine, 846 F.2d at 177; Eisenberg, 766 F.2d at 786).

_____

[8]The court in Baby Neal noted further:

> We underscore at the outset that neither [typicality nor commonality] mandates that all putative class members share identical claims, and that factual differences among the claims of the putative class members do not defeat certification.

Baby Neal, 43 F.3d at 56; see Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir. 1985) (certifying securities fraud class action despite differences in injuries); Troutman v. Cohen, 661 F.Supp. 802, 811 (E.D.Pa. 1987) (certifying subclass of 1,973 nursing home patients challenging reductions in levels of nursing care designations over commonality and typicality objections "because it is not the unique facts of the individual appeals which give rise to this action but rather the decision making process").

Inquiries related to typicality ask whether the plaintiff's individual circumstances are different from that of absentees and whether the plaintiff's legal theory is different from that of absentees. Yet, as the United States Court of Appeals for the Third Circuit explained with respect to typicality in Baby Neal, even claims marked by factual differences in injury, but in which the same course of conduct gives rise to claims based on the same legal theory, are not necessarily rendered atypical by virtue of those factual differences:

> Commentators have noted that cases challenging **the same unlawful conduct** which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement **irrespective of the varying fact patterns underlying the individual claims**. . . . Actions requesting declaratory and injunctive relief to remedy conduct directed at the class clearly fit this mold.

> [F]actual differences will not render a claim atypical if the claim arises from the **same event or practice or course of conduct** that gives rise to the claims of the class members, and if it is **based on the same legal theory**. . . . Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories. Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice. . . .

43 F.3d at 58 (internal citations and quotations omitted) (emphasis added).

In this case, Rule 23(a)'s typicality requirement is satisfied for much the same reasons that the commonality requirement is satisfied. Every potential class members' claim is based upon the same legal theory advanced by plaintiffs: (1) the class definition identifies a group of individuals, including plaintiffs, who were eligible for a discounted rate for title insurance, but paid the full basic rate and (2) the class definition is limited to individuals whose factual circumstances, though potentially different in multiple respects, are similar in that they were customers of First American who were eligible for, but did not receive the discounted rate

through a pattern of alleged behavior and course of conduct undertaken by First American which included an allegedly incorrect application of the TIRBOP Rate Manual.

Plaintiffs and the members of the putative class were allegedly denied discounted rates based upon identical language in the Rate Manual and First American's interpretation of the Rate Manual. Here, there is a kind of harm that is common to the class - paying the Basic Rate and not a discounted rate. Plaintiffs and the members of the putative class, taking as true the substantive allegations of the complaint, were subject to similar conduct by First American and the claims here are based on the same legal theory. See Chiang, 385 F.3d at 262 (substantive allegations of the complaint are taken as true for purposes of deciding the class certification motion); see also Baby Neal, 43 F.3d at 58 ("[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."). Considering the record before the court, the typicality requirement of Rule 23(a)(3) is, therefore, satisfied in this case.

### 4. Adequacy

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The adequacy requirement addresses the sufficiency of the named plaintiffs. As the United States Court of Appeals for the Third Circuit explained, "[a]dequacy of representation assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." Baby Neal, 43 F.3d at 55.

The adequacy requirement "encompasses two distinct inquiries designed to protect the interests of absentee class members: 'it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees,' and it tests the qualifications of the counsel to represent the class.'"  In re Community Bank, 418 F.3d at 303 (3d Cir. 2005) (quoting In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 800 (3d Cir. 1995).

The court notes, as an initial matter, that plaintiffs have the burden of proving that the prerequisites for a class action are met, and the initial burden to adduce evidence to support a finding that they will fairly and adequately protect the interests of the class.  With respect to adequacy, however, "in most cases, adequate representation presumptions are usually invoked in the absence of contrary evidence by the party opposing the class."  ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 7:24 (4th ed. 2002).  More specifically:

> On the issue of no conflict with the class, one of the tests for adequate representation, the presumption fairly arises because of the difficulty of proving negative facts.  On the issue of professional competence of counsel for the class representative, the presumption fairly arises that all members of the bar in good standing are competent.  Finally, on the issue of intent to prosecute the litigation vigorously, the favorable presumption arises because the test involves future conduct of persons, which cannot be prejudged adversely.

Id. (citations omitted). Further,

> **[i]f there are any doubts about adequate representation or potential conflicts, they should be resolved in favor of upholding the class, subject to later possible reconsideration**, or subclasses might be created initially.  Alternatively, notice should be sent to the class inviting others to come in as additional class representatives.

Id. (citations omitted) (emphasis added).

Regarding plaintiffs' ability and incentive to prosecute the case, the court finds that plaintiffs' interests are perfectly inline with that of the absent class members, because plaintiffs'

case is based on the same legal theory as the absent members. Therefore, plaintiffs have sufficient incentive to prosecute the litigation vigorously in favor of the class. With respect to this first prong of the adequacy analysis, the court finds the proposed plaintiffs adequate.

Defendant argues that plaintiffs can not provide adequate representation to the class, because plaintiffs failed to exhaust their administrative remedies. As discussed in part III above, this court rejected First American's argument in an order dated December 21, 2006 (Doc. No. 115), and held that Pennsylvania's Title Insurance Act and specifically 40 PA. STAT. ANN. §910-44(b), provides a discretionary statutory remedy, and plaintiffs are not required to exhaust administrative remedies before bringing this action.

Regarding the second prong of the adequacy analysis, whether plaintiffs' counsel is qualified to represent the class, plaintiffs' proposed class counsel have extensive experience in complex litigation and class actions, including extensive experience in similar title insurance overcharge cases currently pending in Pennsylvania, Ohio, Connecticut and New Jersey. ( Pl.'s Br. at 10 n.12). With respect to this second prong of the adequacy analysis, the court finds the proposed class counsel adequate. Given the reasons set forth above, the adequacy requirement of Rule 23(a) is satisfied in this case.

### B. Certification of a Class Action Pursuant to Rule 23(b)(3)

In deciding a motion for class certification, if the Rule 23(a) requirements are met, the court must then find that the class fits within one of the three categories of class actions set forth in Federal Rule of Civil Procedure 23(b). In re Community Bank, 418 F.3d at 302; Chiang, 385 F.3d at 264; In re LifeUSA, 242 F.3d at 143; Baby Neal, 43 F.3d at 55.

This action invokes Rule 23(b)(3), which provides:

An action may be maintained as a class action if the prerequisites of [Rule 23(a)] are satisfied, and in addition:

    . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

FED. R. CIV. P. 23(b)(3). The court will addresses whether common questions of fact or law predominate over individual questions and whether the class action device is the superior method of adjudication of the controversy.

### 1. Common Questions of Fact or Law Predominate Over Individual Questions

The predominance inquiry focuses on whether the proposed class is sufficiently cohesive to warrant adjudication by representation. In re Community Bank, 418 F.3d at 308-09. "A proper predominance inquiry 'trains on the legal or factual questions that qualify each member's case as a genuine controversy, questions that preexist any settlement.'" Id. (citing Amchem, 521 U.S. at 623-24). In this vein, the predominance inquiry is related to, but more strenuous than, the commonality requirement set forth in Rule 23(a). Chiang, 385 F.3d at 273 ("[B]ecause the Rule 23(b)(3) predominance requirements incorporate the commonality requirement of 23(a), it is possible that 'even if Rule 23(a)'s commonality requirement is satisfied. . . the predominance criterion is far more demanding.'") (quoting Amchem, 521 U.S. at 623-24). The predominance requirement is that "the common issues must constitute a 'significant part' of the individual cases." Id. (citations omitted). The predominance requirement's relation to Rule 23(a)'s

24

typicality requirement has been noted as well.  See In re Community Bank, 418 F.3d at 308-09

("[A] predominance analysis 'is similar to the requirement of Rule 23(a)(3) that claims or

defenses of the named representative must be 'typical of the claims [or] defenses of the class.'")

(quoting Amchem, 521 U.S. at 623-24).

Several preliminary legal and factual issues related to the Rate Manual predominate

across the entire class, and across each one of the class claims.  At the merits stage the court must

first interpret the meaning of certain language contained in sections 5.3 and 5.6 of the Rate

Manual; specifically, what constitutes "evidence of a prior policy" and what is meant by "when

evidence of the prior policy is produced."  The court must determine whether the language is

ambiguous, and if so, what the legal consequences are.   At this stage, the court refrains from

making any determination about the merits of this claim.  The court, however, recognizes for the

purpose of deciding the class certification motion that determining whether contract language is

ambiguous is a question of law for the court.  In re Montgomery Ward & Co., Inc., 428 F.3d 154,

161 (3d Cir. 2005).  If an agreement is unambiguous, the court can declare its meaning as a

matter of law.  Id. (citations omitted).  If an agreement is ambiguous, its meaning is a question of

fact.  Id.  The next issue related to the interpretation of the Rate Manual is the effect of the 2005

Amendment to the Rate Manual which added § 2.8: was it a substantive change to the evidentiary

requirements of the discounted rates as argued by the First American or was it a clarification of

previously ambiguous language as argued by plaintiffs?  The court would need to determine

whether the presence of a prior mortgage from an institutional lender or a deed to a bona fide

purchaser in the chain of title within the applicable look-back periods constitutes "evidence of a

prior policy" within the meaning of the Rate Manual.  Finally, the court would need to determine

25

whether the purchaser has the burden of producing evidence of a prior policy or if information produced as a result of the title examination or during the settlement process satisfies the evidentiary requirements of the Rate Manual.

These issues all lend themselves to class-wide treatment. The legal and factual interpretation of the Rate Manual will apply to each member of the putative class, and adjudication of these issues may be possible at the summary judgment stage. Because these issues span the entire class, and all the class claims, resolution of these issues related to the Rate Manual could result in summary judgment for First American, negating the need for further costly litigation or, if resolved in favor of plaintiffs, could help facilitate class-wide settlement of all the claims.

In addition to the legal and factual issues common to all class claims, each count has its own set of common legal and factual issues which predominate over individual questions. The court will address the issues by considering each separate count.

### a. Count I - Breach of Express Contract

To establish a breach of contract claim under Pennsylvania law, a plaintiff must prove three elements: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) damages. Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa.Super.Ct. 1999)).

Here, plaintiffs allege First American, through its agents, entered into an express contract with plaintiffs. Plaintiffs allege that the terms of the contract are set forth in the HUD-1 settlement statement. Plaintiffs allege that for the consideration recited on line 1108 of the HUD-1 settlement statement, First American would (a) prepare the HUD-1 settlement statement, (b)

enter "actual" or "true" and accurate charges on the HUD-1 settlement statement, and (c) charge a true and accurate amount for the title insurance, all as set forth in the HUD-1 settlement statement. Plaintiffs allege First American breached the express contract by (a) failing to prepare true and accurate HUD-1 settlement statements, (b) stating false and inaccurate charges for title insurance on the HUD-1 settlement statements, and (c) charging an amount for title insurance that was not true and accurate.

First American argues that the HUD-1 settlement statement is not a legally enforceable contract between plaintiffs and First American, but instead is a statutorily mandated disclosure document intended to standardize the reporting of settlement charges for most mortgage loans. First American also argues that even if the HUD-1 settlement statement was an express contract, First American did not breach the contract. First American asserts it was under no legal obligation to give customers, who did not provide a copy of a previous title insurance policy, a discounted rate.

The court will not resolve the merits of the parties' arguments at this class certification stage, but finds that the common issues involved predominate over individual issues. The HUD-1 settlement statement is a standardized form used throughout the class, and present at every closing performed by First American or its agents. The question whether the HUD-1 settlement statement is evidence of an express contract is common to all putative class members. Likewise, the interpretation of an alleged contract created by the HUD-1 settlement statement and its essential terms is based on standard forms and not representations made by any specific agent. The question of the validity, existence or interpretation of any express contract between class members is common to the class and amenable to class treatment. Finally, the question whether

there was a breach of the contract, i.e., charging a rate over the "actual rate," is a matter of interpretation of the Rate Manual which, as discussed above, is a common question to all members of the putative class. The court finds that common issues of fact and law predominate the breach of express contract claim.

### b. Count II - Breach of Implied Contract

Plaintiffs argue in the alternative that even if there is no express contract between plaintiffs and First American or its agents, there is an implied contract. Under Pennsylvania law, an implied contract is formed when "the parties assent to formation of a contract, but instead of being expressed in words, the intention to incur an obligation is inferred from the conduct of the parties in light of the surrounding circumstances, including the course of dealing." Crawford's Auto Center, Inc. v. Commonwealth, 655 A.2d 1064, 1066 (Pa. Commw. Ct. 1995)(citing Cameron v. Eynon, 3 A.2d 423 (Pa. 1939); RESTATEMENT (SECOND) OF CONTRACTS § 4 (1981)). Once a plaintiff proves the existence of an implied contract, he must then satisfy the last two elements of a breach of contract claim: (1) a breach of a duty imposed by the contract, and (2) damages. Ware, 322 F.3d at 225.

Here, plaintiffs argue that the consumers agreed to pay the premium for title insurance from First American, and First American agreed to provide title insurance coverage to the customers. As is the case of an express contract, the existence and essential terms of an implied contract are dependant on standardized forms and procedures followed by First American or its agents during standard closing transactions. These issues are common to all class members and appropriate for class treatment. Plaintiffs further contend that an implied term of the contract would be that First American would provide a title insurance policy at a legal premium rate

within the guidelines of the Rate Manual. Resolution of this issue will depend upon the interpretation of sections 5.3 and 5.6 of the Rate Manual which, as discussed above, is an issue common to all putative class members. The court finds that common issues of fact and law predominate the breach of implied contract claim.

### c. Count III - Fraud

To prove a common law fraud claim in Pennsylvania, a plaintiff must establish by clear and convincing evidence six elements: (1) a representation; (2) the representation was material to the transaction at hand; (3) the representation was made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) the representation was made with the intent of misleading another into relying on it; (5) the plaintiff justifiably relied on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Youndt v. First Nat'l Bank, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (citing Gibbs v. Ernst, 647 A.2d 882 (Pa. 1994)). To prove fraud based on non-disclosure, it is necessary to establish a duty to disclose, which arises when one party has information "that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." See Chiarella v. United States, 445 U.S. 222, 227-28, 235 (1980)(Rule 10b-5 case, but discussing common law fraud; quoting RESTATEMENT (SECOND) OF TORTS § 551(2)(a)).

Plaintiffs allege a fraud claim based upon the allegation that First American, in connection with its direct business or agency business, uttered false and materially misleading representations regarding the applicable charge for title insurance or failed to disclose material information while under a duty to disclose. Plaintiffs further allege that (1) First American's agents, including but not limited to, Mezzo Land, were acting within the scope of their

employment; (2) by knowingly overcharging consumers, Mezzo Land and other First American agents engaged in fraud, deceit, concealment, misrepresentation or other malfeasance; (3) First American is legally responsible for the fraudulent and deceptive conduct of its authorized agents acting within the scope of their employment.

More specifically, concerning First American's knowledge, plaintiffs allege that First American knew that a substantial number of agents were overcharging consumers and encouraged it. Plaintiffs assert that plaintiffs and the putative members of the proposed class would not have paid the Basic Rate but for the material misrepresentations, omissions, and misleading conduct alleged by plaintiffs. Plaintiffs argue that First American acted with the intent to deceive by: (a) employing authorized agents who, acting within the scope of their employment, intentionally overcharged consumers, (b) encouraging its authorized agents to overcharge consumers, or (c) recklessly disregarding evidence that consumers were being overcharged by First American's authorized agents. Plaintiffs allege that plaintiffs and each putative member of the proposed class justifiably relied on the misrepresentations, omissions, and misleading conduct alleged by plaintiffs.

Plaintiffs ask the court to consider the circumstances as a whole, including but not limited to: a) First American's knowledge of the eligibility of consumers for mandatory discounts, b) the influence of First American on the standardized transactions at issue, c) the structure of the transactions in which consumers received no economic benefit by paying the Basic Rate, d) the misrepresentations included in the HUD-1 settlement statements, e) First American's knowledge or reckless disregard that large numbers of consumers were being overcharged, and f) First American's fiduciary duty to plaintiffs and the members of the plaintiff class. Under those

circumstances plaintiffs allege that by virtue of the special duties First American owed to plaintiffs, First American did not - although legally obligated to do so - disclose the applicable rates under the Rate Manual, did not - although required to do so - correct the misrepresentations to plaintiffs and the putative members of the proposed class, did not - although required to do so - make timely, appropriate, and regular disclosures to consumers, and did not - although required to do so - charge eligible persons the Reissue Rate or the Refinance Rate.

First American argues that justifiable reliance is an issue that requires an individual inquiry into the circumstances surrounding each putative class member's transaction, and is particularly ill suited for class treatment. First American is correct that fraud in general, because of the issue of reliance, is seldom amenable to class certification. Debbs v. Chrysler Corp., 810 A.2d 137, 155 (Pa. Super. Ct. 2002) (citing Klemow v. Time, Inc., 352 A.2d 12, 16 n. 17 (Pa. 1976)). An exception, however, exists if there is a fiduciary relationship between a defendant and the plaintiff. Id. at 157. Plaintiffs allege that a fiduciary relationship exists between the putative class members and First American based upon First American's maintenance of an "overmastering influence" in the title insurance transaction and the reliance by putative class members on First American to calculate and apply the appropriate premium rate. This issue is a common question to all putative class members because the relationship between First American and them is dependant on the standardized forms and procedures utilized by First American and its agents in carrying out the transactions in question and calculating the applicable rate. This court also notes, as many other courts considering the same issue have, that the questions of nondisclosure and reliance can be proven on a class-wide basis through the implausibility that class members eligible for a discount would voluntarily choose to pay a higher rate for the same

policy.  See Mitchell-Tracey v. United General Title Ins. Co., 237 F.R.D. 551, 557-58 (D. Md. 2006) (stating "it is difficult to comprehend, that a borrower who is made aware of the opportunity to save money knowingly would elect to pay a higher rate and forgo significant savings", citing In re Coordinated Title Ins. Cases, 784 N.Y.S.2d 919, *9 (N.Y. Sup. Ct. 2004) ("In logical terms, it is not plausible to think that a consumer, made aware of the opportunity to save hundreds of dollars, would choose to pay the higher rate and forego a savings mandated by law. . . .")).

### d.  Count IV - Violation of UTPCPL
To prevail on a claim under the UTPCPL a plaintiff must prove that he or she: (1) "purchased or leased goods or services primarily for personal, family or household purposes", 73 PA. STAT. ANN. § 201-9.2; (2) and suffered an "ascertainable loss of money or property"; Id.  (3) as a result of "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  Id. § 201-2 (xxi).

The first element lends itself to class treatment, because the proposed class is limited to purchasers of  residential title insurance policies.  The second element may require an individual inquiry into the amount of money each class member lost, but the issue whether there was an "ascertainable loss of money" is a common issue to all class members that can be determined when determining liability.  The third element requires that all the elements of common law fraud are met.  Toy v. Metropolitan Life Ins. Co., 928 A.2d 186, 202 (Pa. 2007)(finding that claims brought under the fraud "catchall" provision of the UTPCPL require proof of the

traditional elements of common law fraud including justifiable reliance).[9]  For the reasons set forth in the discussion above relating to plaintiffs' fraud claim, the legal and factual questions in determining fraud under these circumstances are common to all class members and are appropriate for class treatment.

### e. Count V - Unjust Enrichment

To prove unjust enrichment under Pennsylvania law, a plaintiff must prove: (1) benefits conferred on the defendant by the plaintiff; (2) appreciation of those benefits by the defendant; and (3) acceptance and retention of those benefits under those circumstances that it would be inequitable for the defendant to retain the benefit without payment of value.  Pennsylvania State Employees Credit Union v. Fifth Third Bank, 398 F.Supp.2d 317, 331 (M.D. Pa. 2005) (citing Temple University Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc., 832 A.2d 501 (Pa. Super. Ct. 2003); Walter v. Magee-Womens Hosp., 876 A.2d 400, 407 (Pa. Super. Ct. 2005)). "The most important factor . . . is whether the enrichment of the defendant is unjust." Id. (quotations omitted). A claim for unjust enrichment cannot be made simply because the defendant may have been benefitted in some way. Id

---

[9] Toy was decided based on the UTPCPL before it was amended in 1996.  As noted in Alberton, there is currently a split in authority among the intermediate appellate courts in Pennsylvania whether the fraud "catchall" provision under the 1996 amendments to the UTPCPL requires proof of reliance.  See Com. ex rel. Corbett v. Manson, 903 A.2d 69 (Pa. Commw. Ct. 2006) (finding no proof of reliance required and recognizing split of authority); Debbs v. Chrysler Corp., 810 A.2d at 155 (Pa. Super. Ct. 2002) (finding proof of all elements of fraud required).  The Pennsylvania Supreme Court has not yet resolved this issue.  See Toy, 928 A.2d at 203 n.20 (declining to reach interpretation of the 1996 amendments because the decision was based on the UTPCPL prior to 1996 amendments). For class certification purposes in this case, the court will apply the more strict standard espoused by the Pennsylvania Superior Court. As discussed above, however, plaintiffs allege a fiduciary relationship between putative class members and defendant which makes the fraud count and therefore the UTPCPL count appropriate for class treatment regardless of the justifiable reliance requirement.

This claim is common to all the putative class members. Any putative class members who were overcharged when they were entitled to a discounted rate would be in exactly the same position. First American followed the same standard procedures, used the same standard forms, and calculated the applicable rates in exactly the same way for each putative class member. First American also interpreted the evidentiary provisions of the Rate Manual in the same way. A determination whether an overcharge by First American is "unjust" is common to all putative class members and appropriate for class treatment.

### f. Individual determinations of injury and damages

Defendant also argues that individual inquiries would be required to determine each putative class members' unique injury and damages. The fact that some individualized inquiry may be required with respect to other issues in the litigation, or with respect to damages, does not impugn the court's ability to certify a class for the purpose of deciding the issue concerning what evidence is required to show a previous title insurance policy. That issue underlies plaintiffs' claims and similar claims of the putative class members. As noted above, some amount of individualized inquiry can, but does not necessarily, defeat class certification on some or all issues. See Chiang, 385 F.3d 256 at 267 (Becker, J.) ("We note in this regard that courts commonly use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual adjudication–or, perhaps more realistically, settlement."); Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.) ("[I]t may be that if and when the defendants are determined to have violated the law, separate proceedings of some character will be required to determine the entitlements of the individual class members to relief."). Courts have flexibility to certify a class with respect to certain issues pursuant to Rule

34

23(c)(4)(A), which provides that "[w]hen appropriate an action may be brought or maintained as a class action with respect to particular issues."  The United States Court of Appeals for the Third Circuit has long recognized and affirmed this flexibility.  See, e.g., Chiang, 385 F.3d 256 at 267, 273; Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985); Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977).

Courts have recognized, particularly with respect to damages, that the necessity to engage in some individual inquiry at the damages stage does not necessarily defeat certifying a class for the purposes of determining liability over issues that are properly considered as part of a class action.  See In re Community Bank, 418 F.3d at 305-6 (3d Cir. 2005).  As the court explained in Carnegie v. Household International Inc., 376 F.3d 656, 661 (7th Cir. 2004):

> Often . . . there is a big difference from the standpoint of manageability between the liability and remedy phases of a class action. . . . [I]t may be that if and when the defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlements of the individual class members to relief. . . . . That prospect need not defeat class treatment of the question whether the defendants violated [the law].

Id. (internal citations omitted).  The court also noted:

> Once [the question of liability] is answered, if it is answered in favor of the class, a global settlement . . . will be a natural and appropriate sequel. And if there is no settlement, that won't be the end of the world.  Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues.  Those solutions include "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class."

Id.  (Posner, J.) (quoting In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 141 (2d Cir. 2001)).

After the question of liability is answered concerning interpretation of the provisions in the Rate Manual, the court can take whatever appropriate steps, including decertification of the class, that may be necessary to determine damages.  The court finds that questions of law or fact common to the members of the class predominate over questions affecting only individual members.  In particular, the court finds that the question concerning what evidence is required to show a previous title insurance policy is a question common for all the putative class members who paid the Basic Rate for the policy when they were allegedly entitled to a discounted rate.

### 2. Class Action is Superior Method of Adjudication of the Controversy

As explained by the United States Court of Appeals for the Third Circuit most recently in In re Community Bank, "[t]he superiority requirement asks a district court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of "alternative methods" of adjudication.'" 418 F.3d at 277 (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996), aff'd, 521 U.S. 591 (1997)).  Matters pertinent to this inquiry include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

FED .R. CIV. P. 23(b).

Here, considering the interest of putative members of the proposed class in individually controlling the prosecution or defense of separate actions, and balancing the merits of the class

action device with respect to efficiency and fairness with individual prosecutions, the court determines that the interests of the putative members of the proposed class weigh in favor of certification because the costs of prosecution and the potentially numerous amount of class members inform the court's determination that a class action is the superior method. Considering the extent and nature of any litigation concerning the controversy already commenced by or against putative members of the proposed class, the record reflects that this civil action is the only pending litigation against First American in Pennsylvania, and determines that this factor weighs neither in favor of nor against certification. Considering the desirability or undesirability of concentrating the litigation of the claims in this particular forum, the court notes that the title insurance policies were issued in Pennsylvania and that no other alternative forum readily presents itself as more desirable than this one. Considering the difficulties likely to be encountered in the management of a class action, the court is sensitive to both the efficiency gains and losses that are potentially attributable to certifying the class. On the one hand, certification should bring substantial efficiency gains because the multiple claims could be litigated in one forum, at one time. On the other hand, the court is aware of the administrative burdens that maintaining and litigating a class action, especially one pursuant to Rule 23(b)(3) which requires adherence to the rule's notice provisions, can cause. On balance, efficiency concerns weigh in favor of class certification.

Reviewing plaintiffs' proposed trial plan and First American's response, the court understands that plaintiffs assert that the main issues of defendant's liability relating to the insurance policies in issue readily lend themselves to class disposition, and that if liability on these issues can be resolved as a class action, then liability may be resolved at the summary

judgment stage. Plaintiffs' trial plan envisions class certification at least as to the question of interpretation of sections 5.3 and 5.6 of the Rate Manual. A motion for summary judgment concerning that issue may well impact the possibility of settlement. With respect to damages, plaintiffs envision that if the class is certified and a decision favorable to the class is obtained with respect to the liability issues, the court could then determine the appropriate manner in which to proceed with respect to the issue of damages.

First American argues that the large size of the class and number of legal issues would make trial as a class action unmanageable. Further, First American claims that no database exists easily and efficiently to make the determinations that would be required for each file. This argument is not persuasive. As the court in <u>Alberton</u> observed:

> In its opposition to class certification, defendant raises the same objection that has been rejected by a number of courts facing almost identical cases. Defendant argues that a class action is not manageable in this case because an individual review of each file will be necessary to determine whether an insurance purchaser is even a class member and also to compute individual damages awards. While it may be true that each file must be reviewed individually, under plaintiff's theory, this will be a virtually automatic process that looks only at whether the title search showed a prior mortgage or refinancing and whether the customer received a discounted rate. <u>Cf</u>. <u>Cohen</u>, 242 F.R.D. at 302 (" 'it strains credulity to suggest, as defendants do, that the defendants (and their agents) lack the ability to compile information on insurance policies that they have issued' ") (quoting <u>Mitchell-Tracey</u>, 237 F.R.D. at 560). Moreover, "[t]he size of the class and the need for individual damages calculations is not a reason to deny class certification." <u>Cohen</u>, 242 F.R.D. at 300 (citing <u>In re Cmty. Bank of N. Va.</u>, 418 F.3d 277, 305-06 (3d Cir.2005)). Like other courts that have rejected arguments like defendant's, this Court concludes that the class will be manageable.

<u>Alberton</u>, 2008 WL 269490 at *11.

The court is satisfied that certification at this stage is appropriate. If the liability issue is determined unfavorably to the class then the case will be resolved. If the liability issue is

determined in favor of the class, then the court may consider on a fully developed record whether to decertify the class or to take other appropriate action.

Finally, First American argues that plaintiffs' class definition is defective, because it is a "fail safe" class that impermissibly determines membership based upon a determination of liability.[10] The court agrees and will amend plaintiffs' proposed class definition to replace "(b) qualified for the Reissue rate or Refinance rate discounts" with "(b) had either an unsatisfied mortgage from an institutional lender or a deed to a bona fide purchaser in the chain of title within ten years of the payment of the premium." This change overcomes the "fail safe" issue and ensures that class members are bound by the determination of liability.

## IV. PLAINTIFF SUBCLASSES

Liability in this case is largely dependent upon whether § 2.8 was a clarification or a substantive change to the Rate Manual. There may also be consideration of the interpretation and application of section 5.3 and section 5.6 of the Rate Manual. The language of sections 5.3 and 5.6 is different. Section 5.3 states that the Reissue Rate is available, "when evidence of the earlier policy is produced." Section 5.6 refers to a "previously insured mortgage or fee interest,"

_____

[10] In its response to plaintiffs' proposed trial plan, First American also objected to including putative class members who paid the Reissue Rate, but were allegedly entitled to the Refinance Rate. First American argues that plaintiffs have belatedly proposed inclusion of those putative class members and failed to adduce any evidence in support of their inclusion. The court disagrees. Plaintiffs' renewed motion for class certification was filed May 31, 2007 and included as part of the proposed class definition homeowners who "paid premiums for the purchase of residential title insurance" without limiting the putative class to members who paid the Basic Rate for title insurance. Plaintiffs' first amended complaint also contained general allegations of overcharging by First American not limited to customers who paid the Basic Rate. In addition, plaintiffs submitted specific evidence in the form of summary spreadsheets of Mezzo Land's closing files that included customers who paid the Reissue Rate, allegedly qualified for the Refinance Rate and did not receive the appropriate discount. See Vaske Aff. Ex. B.

without referring to the evidence of an earlier policy being produced. The difference in the language may be irrelevant if § 2.8 is only a clarification and First American during the relevant time frame in practice required the customer to furnish a copy of the prior policy in order to obtain a discount under either section 5.3 or section 5.6. It, however, is arguable that the evidentiary requirement for the Refinance Rate may be less stringent than for the Reissue Rate. As the court noted in <u>Alberton</u>, this creates a possible conflict between the putative class members claiming eligibility for the Reissue Rate and the putative class members claiming eligibility for the Refinance Rate. <u>Alberton</u>, 2008 WL 269490 at *7 (dividing the putative class into two subclasses, those eligible for the Reissue Rate and those eligible for the Refinance Rate). Under the circumstances of this case, the creation of subclasses, although not raised by the parties here, may be appropriate for this court to consider. The parties are directed to meet and confer and file a statement with the court within twenty days of the entry of this opinion, indicating whether they agree that subclasses would be appropriate. If so, the parties should define the subclasses and plaintiffs should identify a named plaintiff to represent the interest of each subclass, and may amend the complaint to add additional plaintiffs if necessary. If the parties do not agree on whether subclasses are appropriate or a definition of subclasses, the parties are to file briefs with the court concerning their respective positions regarding subclasses within thirty days of the entry of this opinion.

## V. CONCLUSION

For the foregoing reasons, plaintiffs' renewed motion for class certification (Doc. No. 123) is GRANTED. An appropriate Order will be entered.

_____

_____        By the court,


          /s/ Joy Flowers Conti
          Joy Flowers Conti
Dated:  March 24, 2008      United States District Judge


cc:    Counsel of Record