IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY L. SLAPIKAS, ALICE B. SLAPIKAS, )<br>and IVY FODOR, for themselves and all )<br>others similarly situated )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>FIRST AMERICAN TITLE )<br>INSURANCE COMPANY, )<br> )<br>Defendant, )<br> )<br>v. )<br> )<br>MEZZO LAND SERVICES, LLC, )<br> )<br>Third-Party Defendant. | Civil Action No. 06-084 |

MEMORANDUM OPINION
`

CONTI, District Judge.

Pending before the court is a motion for partial summary judgment (Doc. No. 218) filed

pursuant to Federal Rule of Civil Procedure 56(c) by Anthony L. Slapikas and Alice B. Slapikas

("Slapikas") and Ivy J. Fodor ("Fodor") (collectively "plaintiffs").  Plaintiffs in their complaint

sought relief under state law on several claims and in this motion request partial summary

judgment on two issues for all members of a class who were overcharged for residential title

insurance policies purchased in the state of Pennsylvania from the defendant First American Title

Insurance Company ("defendant" or "First American").  The two issues are: (1) how certain

phrases in the rate manual filed by the Title Insurance Rating Bureau of Pennsylvania

("TIRBOP") with the Pennsylvania Insurance Commissioner during the class period should be

interpreted; and (2) whether summary judgment should be granted on liability with respect to

their breach of implied contract claim.  For the reasons set forth below, the court will grant

plaintiffs' motion.

## FACTUAL BACKGROUND

**First American**

Defendant underwrites title insurance transactions (Plaintiffs' Concise Statement of

Material Facts ("Pls.' Statement") ¶ 51) and appoints agents throughout Pennsylvania

(Defendant's Response to Plaintiffs' Concise Statement of Material Facts ("Def.'s. Resp.") ¶ 28).

Defendant instructed its agents with respect to calculating title insurance premiums and filling

out HUD-1 settlement statements, which are statutorily mandated disclosure documents intended

to standardize the reporting of settlement charges for most mortgage loans. (Combined Concise

Statement of Material Facts ("Combined Statement") ¶¶ 30, 37.)  Defendant entered into an

agency agreement in Pennsylvania with Mezzo Land LLC ("Mezzo Land") (Def.'s Resp. ¶ 28),

third-party defendant, which required Mezzo Land to receive and process applications for title

insurance in accordance with defendant's rules and regulations. (Pls.' Statement ¶ 29.)

When one of defendant's agents handles a title insurance transaction, the agent frequently

receives the applications for title work, processes the orders for title policies, performs all

services necessary to issue the title policies, examines the title evidence, obtains information

from customers' prior lenders to pay off any prior loan, issues title insurance commitments,

prepares HUD-1s and other necessary closing documents, conducts the closing of the transaction,

2

and receives the premium for the title insurance as shown on the HUD-1s. (Combined Statement ¶ 33.)  In each transaction, the agent performs a title examination, which includes a search of land records that would reflect deeds to a bona fide purchaser for value (a "BFP") and outstanding institutional mortgages that existed prior to the date of acquisition of the property by the current owner. (Def.'s Resp. ¶ 34.)

**Rate Manual**

Defendant was a member of the Title Insurance Rating Bureau of Pennsylvania ("TIRBOP") throughout the class period—December 19, 1999 through August 1, 2005. (Combined Statement ¶ 1.)  TIRBOP filed a rate manual (the "Rate Manual") with the Pennsylvania Insurance Commissioner for all its members, including defendant. (Id. ¶ 3.) Section 2.1 of the Rate Manual, as amended through April 1, 2003, required that all charges for title insurance coverage be made in accordance with the Rate Manual. (Id. ¶ 6.)  Throughout the class period the Rate Manual specified a "Basic Rate" in section 5.50 and two discount rates, the "Reissue Rate" in section 5.3 and the "Refinance Rate" in section 5.6. (Id. ¶¶ 7-8.)  During the class period, sections 5.3 and 5.6 of the Rate Manual provided:

> 5.3     REISSUE RATE
> A purchaser of a title insurance policy shall be entitled to purchase this coverage at the reissue rate if the real property to be insured is identical to or is part of real property insured 10 years immediately prior to the date the insured transaction closes <u>when evidence of the earlier policy is produced</u> notwithstanding the amount of coverage provided by the prior policy.
>
> . . .
>
> 5.6     REFINANCE OR SUBSTITUTION LOANS
> When a refinance or substitution loan is made within 3 years from the date of closing of a previously insured mortgage or fee interest and

the premises to be insured are identical to or part of the real property
previously insured and there has been no change in the fee simple
ownership, the charge shall be 80% of the reissue rate.

(Id. ¶¶ 10, 12 (emphasis added).)  During the class period, the Rate Manual did not define the

phrase "when evidence of the earlier policy is produced," which was utilized in section 5.3. (Id. ¶

13.)

Plaintiffs assert that evidence of the earlier policy is produced when the agent during a

title search would find a deed to a BFP or an unsatisfied institutional mortgage recorded within

the applicable look-back period.  Defendant argues that evidence of the earlier policy is only

produced when a customer comes forward with a copy of the previous policy or a settlement

sheet showing payment of a title insurance premium.  In support of their argument, plaintiffs note

that during the class period some of defendant's agents deemed a recorded deed to a BFP or an

unsatisfied institutional mortgage within the three or ten-year periods specified in sections 5.3

and 5.6 of the Rate Manual to be sufficient evidence of insurance entitling a consumer to the

applicable discount rate. (Pls.' Statement ¶ 51.)  Defendant does not deny that some agents

accepted recorded deeds to a BFP and unsatisfied institutional mortgages as sufficient evidence

of an earlier policy, but denies that a recorded deed to a BFP or an institutional mortgage was

sufficient evidence of prior insurance under the pre-2005 refinance and reissue rates. (Def.'s

Resp. ¶ 51.)  Defendant did not notify those agents that they were misapplying the Rate Manual.

(Combined Statement ¶ 54.)  Several of defendant's former and current employees testified that

they did not always presume a prior title insurance policy existed based on a prior recorded deed

to a BFP or an unsatisfied institutional mortgage. (Def.'s Stat. of Additional Material Facts

("Additional Facts") ¶ 15).

4

On May 5, 2005, before filing a revised Rate Manual, TIRBOP discussed amendments to the Rate Manual at the annual meeting. (Id. ¶ 23.)  Defendant's representatives attended TIRBOP meetings during which the 2005 amendments were drafted and discussed. (App. to Pls.' Concise Stat. of Material Facts ("Pls.' App.") 214, 216, 221, 223.)  The official minutes of the meetings noted that the proposed amendments sought to "clarify the application of reduced rates set forth in Section 5.3 . . . and 5.6 of the Rate Manual." (Id. ¶ 23.)  On May 10, 2005, TIRBOP filed an amended Rate Manual with the Deputy Insurance Commissioner with a proposed effective date of August 1, 2005. (Id. ¶ 14.)  The cover letter that accompanied the filing stated:

> The purposes for the proposed revisions to the Rate Manual are to clarify, among other things, the nature of the evidence of previous insurance that would entitle the purchaser of title insurance to a reduced rate.

(Id. ¶ 15.)  In response to a letter from the Pennsylvania Department of Insurance, TIRBOP eliminated some of the proposals, but retained "revisions to the Rate Manual to clarify the application of discounts associated with reissue and refinance transactions." (Id. ¶¶ 16-17.)  The Department of Insurance approved the reissue and refinance rate provisions to the Rate Manual with an effective date of August 1, 2005. (Id. ¶ 18.)

New section 2.8 and the amended versions of sections 5.3 and 5.6 provided:

> 2.8      Sections 5.3, 5.4 and 5.6 of the Manual provide that reduced rates are applicable when evidence of previous insurance is provided within a specified time period.   As evidence of previous insurance, an Insurer will rely upon:
> a.       the recording (within the period of time specified within the applicable Section of the Manual) of either:
> i.       a deed to a bona fide purchaser for value, or
> ii.      an unsatisfied mortgage to an institutional lender; or in the alternative,

5

b.      any of the following documents provided by or on behalf of the purchaser of the title insurance policy:

iii.      a copy of the prior policy;

iv.      a copy of the marked-up commitment;

v.      a settlement sheet showing payment of a title insurance premium; or

vi.      other written evidence acceptable to the Insurer that title insurance coverage was purchased for the property.

. . .

5.3     REISSUE RATE

A purchaser of a title insurance policy shall be entitled to the reissue rate if the real property to be insured is identical to or part of real property insured 10 years immediately prior to the date the insured transaction closes.  Evidence of previous insurance in accordance with the provisions of Section 2.8 of this Manual must be considered in order to apply the reissue rate.  Insurer shall comply with the written notice provisions of Section 2.9.

. . .

5.6     REFINANCE AND SUBSTITUTION LOANS

When a refinance or substitution loan is made within 3 years from the date of closing or a previously insured mortgage or fee interest and the premises to be insured are identical to or part of the real property previously insured and there has been no change in the fee simple ownership, the Charge shall be 80% of the reissue rate.  Evidence of previous insurance in accordance with the provisions of Section 2.8 of this Manual must be considered in order to apply this Charge. Insurer shall comply with the written notice provisions of Section 2.9.

(Id. ¶¶ 20-22.)  The amended Rate Manual contains the revisions to sections 5.3 and 5.6 and the new section 2.8. (Id. ¶ 26.)

Plaintiffs argue that the 2005 amendments sought to clarify the discounted rate provisions of the Rate Manual and did not constitute a substantive change in how the Rate Manual was applied.  Plaintiffs assert that the TIRBOP cover letter and the official minutes show that

6

TIRBOP intended to clarify the meaning of the Rate Manual and that the clarifications represent the intent of the parties before the 2005 amendments.

Defendant argues that the amendments cannot be retroactively applied.  First, it argues that since the amendments had an "effective date" of August 1, 2005, the amendments can only be prospectively applied.  Second, defendant argues that the use of the word "clarify" in TIRBOP's official minutes and the cover letter is inconclusive evidence of TIRBOP's intent, and the amendments constituted a substantive change in how the Rate Manual was applied. Defendant argues that this evidence does not show that TIRBOP intended to apply retroactively the 2005 amendments to the Rate Manual.

**Slapikas' Transaction**

Mezzo Land acted as defendant's agent in connection with Slapikas' refinancing transaction. (Pls.' Statement ¶ 56.)  Slapikas claim that Mezzo Land issued a First American title insurance commitment to them, which identified satisfaction of an institutional mortgage dated September 21, 2001 as a pre-condition to the issuance of the policy. (Pls.' Statement ¶ 57.) Defendant denies that the document is a complete copy of the title commitment and rather alleges that it is a "preliminary commitment." (Def.'s Resp. ¶ 57.)  Additionally, Slapikas asserts that the title search performed by Mezzo Land showed that ownership of the property was vested in Slapikas and provided Mezzo Land with a legal description of the property. (Plaintiffs' Response to Statement of Additional Material Facts ("Pls.' Resp.") ¶¶ 18-19.)   Despite this evidence of the prior policy which Slapikas argue shows they were eligible for the Refinance Rate, Mezzo Land applied the Basic Rate. (Second Amended Complaint ("Am. Compl.") ¶ 27.)

7

**Fodor's Transaction**

Mezzo Land also acted as defendant's agent in connection with Fodor's refinancing transaction. (Combined Statement ¶ 60.)  Mezzo Land prepared a title insurance commitment for Fodor's refinancing and listed satisfaction of an institutional mortgage as a pre-condition to the issuance of a First American title insurance policy. (Id.)  Fodor asserts that a legal description of the property was included in the "Commitment" issued by defendant. (Pls.' Resp. ¶ 17.)  Despite this evidence which Fodor claims shows she was eligible for the Reissue Rate, Fodor was charged and paid the Basic Rate for title insurance. (Am. Compl. ¶ 43.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  When assessing a motion for summary judgment, the court must draw all justifiable inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).  An alleged factual dispute will not defeat a motion for summary judgment unless it creates a genuine issue of material fact.   Id. at 247.  Substantive law will determine what constitutes a material fact. Id.

**DISCUSSION**

**I.  Interpretation of the Rate Manual**

The court must first determine what legal standard to apply under Pennsylvania law[1] in interpreting the Rate Manual.  The Rate Manual is not a statute because it was not enacted by the legislature.  The Rate Manual is not a regulation because it was not promulgated by an administrative agency.  It is not part of a contract because the title insurance contract did not incorporate the terms of the Rate Manual.  The most analogous situation under Pennsylvania law is that of a tariff or filed rate which highly regulated industries, such as utilities, are required to file with a state regulator.  Tariffs have the force of law and bind the regulated industry to its terms.  See Brockway Glass Co. v. Pa. Pub. Util. Comm'n, 437 A.2d 1067, 1070 (Pa. Commw. Ct. 1981) (citing Behrend v. Bell Tel. Co., 363 A.2d 1152 (Pa. Super. Ct. 1976)).

While the Pennsylvania Supreme Court has not yet considered how to interpret a rate manual filed by a title insurance rating bureau, the United States District Court for the Northern District of Ohio recently considered this issue under Ohio law in Chesner v. Stewart Title Guaranty Co., No. 1:06CV00476, 2009 U.S. LEXIS 22453, at *12 (E.D. Oh. Jan. 9, 2009).  As in Pennsylvania, insurance companies in Ohio must file a schedule of rates with the superintendent of insurance and may fulfill this requirement by joining a licensed rating bureau that files rates, i.e. a rate manual, on behalf of its members.  Id.  Once the superintendent of insurance approves the rates filed through the rate manual, Ohio law permits insurers to make contracts and policies only in accordance with the filings.  Id.

---

[1]The parties do not dispute that Pennsylvania law applies.

When considering how to construe the rates filed through the rate manual, the district court in Chesner recognized that the rate manual is neither "a statute [nor] a contract." Id.  Since no legislature approved the rate manual, it was not a statute. Id. at *13.  The court rejected the defendant's argument that the rate manual was a "regulation," reasoning that a government entity did not promulgate the rate manual, and it was not found in Ohio's Administrative Code. Id. at **13-14.  A private group of title insurers drafted the rate manual and submitted it for approval to the Ohio Department of Insurance. Id. at *14.  The court accepted the plaintiffs' view that the rate manual should be interpreted as a tariff or filed rate, reasoning that "in other similarly situated industries . . . participating businesses are required to file their rates with the state." Id. at *15.

This court finds the district court's  rationale in Chesner persuasive and will construe the Rate Manual under Pennsylvania law as a filed rate or tariff.

**Standard for Filed Rates**

When a court interprets a filed rate, it must look "first to the four corners of the tariff and consider the entire instrument as a whole." PPL Elec. Utils. Corp. v. Pa. Pub. Util. Comm'n, 912 A.2d 386, 400 (Pa. Commw. Ct. 2006).  Looking at the words in the entire instrument, the court should attribute them "the meanings which are generally used, understood, and accepted." Id. at 400-01.  Only when a court determines that a tariff is ambiguous, may it then consider extrinsic evidence to determine the tariff's meaning. Id. at 403.  A court should construe an ambiguous tariff "against the framer and in favor of the consumer."  Lewistown-Reedsville Water Co. v. Pub. Serv. Comm'n, 169 A. 406, 408 (Pa. Super. Ct. 1933).  When a tariff is filed, a greater or lesser rate cannot be charged, and when more than one rate is applicable, the rate charged should

be the "most advantageous to the patron."  Bell Tel. Co. v. Pa. Pub. Util. Comm'n, 452 A.2d 86,

88 (Pa. Commw. Ct. 1982).

**Whether the Rate Manual is Ambiguous**

Like statutes, courts construe tariffs "so as to give effect to all of [the] terms." PPL Elec.

Utils. Corp., 912 A.2d at 403.  When effect is given to all the terms, a tariff is ambiguous when

"it is reasonably susceptible of different constructions and capable of being understood in more

than one sense."  Hutchison v. Sunbeam Coal Corp., 519 A.2d at 390.  An undefined term is not

necessarily ambiguous; rather, courts presume that the term is used in its "popular and plain

everyday sense, and the popular meaning of such words must prevail." Centolanza v. Lehigh

Valley Dairies, Inc., 658 A.2d 336, 340 (Pa. 1995) (citing Harris-Walsh Inc. v. Borough of

Dickson City, 216 A.2d 329 (Pa. 1966)).  In determining whether a tariff is ambiguous, the court

must first look to the language at issue and consider the proffer of the parties who dispute the

tariff's meaning.  PPL Elec. Utils. Corp., 912 A.2d at 402.

The parties proffer two alternative meanings to the phrase "when evidence of the earlier

policy is produced" as it was used in section 5.3 of the Rate Manual during the class period.  The

parties differ on their interpretations of two aspects of the phrase.  First, the parties question what

is "evidence of the earlier policy" which would show the existence of a previous policy.  Second,

the parties question what the phrase "is produced" means in this context.

Plaintiffs argue that evidence of the earlier policy includes either direct or circumstantial

evidence of the existence of an earlier policy.  Defendant does not dispute that institutional

lenders generally require title insurance before granting a mortgage.  Plaintiffs argue that an

unsatisfied institutional mortgage constitutes evidence of an earlier policy.  "Evidence" is defined

11

as "[a] thing or things helpful in forming a conclusion or judgment."  THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 636 (Anne H. Soukhanov et al. eds., 3rd ed. 1996).  If there is an unsatisfied institutional mortgage of record, a title insurer could conclude that there was a previous title insurance policy.  The Rate Manual does not specify what kind of evidence is required.  It does not read "when direct evidence of the earlier policy is produced," and it does not require "conclusive evidence" of an earlier policy.  If TIRBOP intended to require conclusive evidence or absolute proof of a previous policy for a consumer to qualify for the discounted rate, it could have included the phrase "when a previous policy is produced" rather than "when evidence of a previous policy is produced."  Plaintiffs' interpretation of the language in question – the discounted rate is available when some evidence, i.e. a thing or things helpful in concluding that a prior policy existed, is produced – is reasonable.

Plaintiffs argue that the phrase "is produced" in the context of section 5.3 of the Rate Manual does not require that the evidence be produced by the consumer, but rather allows the evidence to come from another source such as the title insurance agent.  Specifically, plaintiffs argue that evidence can be "produced" when an unsatisfied institutional mortgage or deed to a BFP are part of the title record during the agent's initial title search.  The Rate Manual does not specify who is required to produce the evidence or from what source the evidence needs to derive.  Importantly, the phrase "when evidence of a previous policy is produced" does not require a particular source of the evidence.  If TIRBOP intended that the consumer had to produce the evidence of a previous policy, the phrase could have explicitly stated "when the consumer produces evidence of a previous title insurance policy."  Given the context of section

12

5.3 of the Rate Manual, plaintiffs' interpretation that the evidence of a previous policy can be produced by the agent during an initial title search is reasonable.

Defendant interprets the Rate Manual to require <u>direct</u> evidence of a prior title insurance policy limited to a copy of a previous policy or a HUD statement showing a payment for a previous policy.  A previous policy or HUD statement is not specified in the Rate Manual as being the kind of evidence required.  Defendant's interpretation that direct evidence is required, however, is a reasonable alternative interpretation of the evidence requirement.

Defendant also argues that the phrase "when evidence of the earlier policy is produced," required the consumer to come forward with the evidence and does not allow for the evidence to come from any other source.  Although there is no requirement in the Rate Manual that the consumer produce the evidence of a previous policy, defendant's interpretation is a reasonable alternative to plaintiffs' interpretation.

 Since the terms of the Rate Manual at issue are susceptible to differing and reasonable constructions, those terms are ambiguous.

**Ambiguous Terms Construed in Favor of Consumer**

Similar to a contract, in which ambiguous terms are construed against the drafter of the contract, and an insurance policy, in which ambiguous terms are construed in favor of the insured, ambiguous terms in a tariff should be construed  "against the framer and in favor of the consumer."  <u>Lewistown-Reedsville Water Co.</u>, 169 A. at 408; <u>see</u> <u>Rusiski v. Pribonic</u>, 515 A.2d 507, 510 (Pa. 1986) (noting with respect to ambiguous terms in a contract that "doubtful language is construed most strongly against the drafter thereof"); <u>Standard Venetian Blind Co. v. American Empire Ins.</u>, Co. 469 A.2d 563, 566 (Pa. 1983) ("Where a provision of a policy is

13

ambiguous, the policy provision is to be construed in favor of the insured and against the insurer,

the drafter of the agreement.").  Likewise, when more than one rate is applicable, the rate charged

should be the "most advantageous to the patron."  Bell Tel. Co., 452 A.2d at 88.  In this case,

since the rates charged are considered under the same standards applied to a tariff, the court will

construe the ambiguous terms in favor of plaintiffs - the consumer - and against defendant.[2]

      Defendant argues that the Rate Manual, unlike an insurance contract, should not be

construed against the drafter.  Defendant cites Kramer v. State Farm Mutual Insurance Co., 505

P.2d 646, 650 (Kan. 1973), and Southwest-Texas Leasing Co. v. Bomer, 943 S.W.2d 954, 958

(Tex. App. 1997), in support of this argument. Those decisions are inapposite.   In both decisions

cited by defendant, the court recognized the general rule that an insurance manual or insurance

---

    [2]Having found the applicable sections of the Rate Manual ambiguous, the court could
also look to extrinsic evidence to interpret the ambiguous terms.  PPL Elec. Utilities Corp, 912
A.2d at 403.  The 2005 amendments, along with the official minutes and the cover letter, show
TIRBOP's intent to address the varying applications of the Rate Manual and to clarify what
constituted "evidence of the earlier policy."  "Clarify" is defined as "to make clear or easier to
understand; elucidate: *clarified her intentions*."  THE AMERICAN HERITAGE DICTIONARY OF THE
ENGLISH LANGUAGE 351 (Anne H. Soukhanov et al. eds., 3rd ed. 1996)(emphasis in original).
    Section 2.8, one of the 2005 amendments, outlined and defined what TIRBOP considered
to be sufficient "evidence of the earlier policy" and considered title record evidence of
unsatisfied institutional mortgages and deeds to a BFP sufficient.  This extrinsic evidence shows
that TIRBOP and its members intended to clarify and define the meaning and application of the
Reissue and Refinance Rates found in the Rate Manual.  These clarifications support plaintiffs'
interpretation of the ambiguous terms of the Rate Manual.
    Defendant argues that, although the official minutes and cover letter contain the word
"clarify," TIRBOP substantively changed the Rate Manual with the 2005 amendments, rather
than clarifying it.  Before the 2005 amendments, some of defendant's agents, however, accepted
recorded unsatisfied institutional mortgages or recorded deeds to a BFP as sufficient evidence of
an earlier policy and charged the discounted rates.  Defendant did not object to that practice.
Since these agents applied the Rate Manual in that way before the amendments, the 2005
amendments could not be considered a substantive change to the Rate Manual.  Considering the
language of the cover letter and official minutes, the court would conclude, even assuming the
Rate Manual could not be construed in favor of the consumer, that no reasonable fact finder
could find in favor of defendant on this matter.

policy is construed against the insurer, but declined to follow the rule for circumstances which are not present in this case.  In <u>Kramer</u>, the court considered whether the insured's employer's pickup truck qualified as a private passenger automobile entitled to coverage under the insured's policy.  <u>Kramer</u> 505 P.2d at 646.    Plaintiff argued that the insurance company was bound by its interpretation of a pickup truck as a private passenger automobile because in an unrelated section of the insurance manual filed with the state, a pickup truck and passenger automobile are grouped in the same category for rating purposes.  <u>Id.</u> at 650.  The court rejected this argument noting:

> Although the company, in rating them for premium purposes, puts passenger automobiles and utility vehicles (including small pickups) in the same classification, it hardly follows that they are the same thing for other purposes. Indeed, the difference between them is expressly recognized in the manual, just as it is in the policy.

<u>Id.</u>

In <u>Bomer</u>, the insured contended that the terms in the insurance policy conflicted with the Texas Department of Insurance ("TDI") rules, and that the insurance policy should be construed strictly against the insurer, the Workers' Compensation Insurance Facility ("WCIF").  <u>Bomer</u>, 943 S.W. 2d at 959 n.5.  The court concluded that the policy terms were consistent with the insurance commissioner's interpretation of the TDI rules.  <u>Id.</u> at 960.  The court recognized the general rule of construction that insurance contracts are construed against the insurance company, but declined to apply the rule there because of the quasi public nature of the WCIF (created by statute to serve the public purpose of providing workers' compensation insurance to those who are otherwise unable to obtain it).  <u>Id.</u>  at 959 n. 5.  The court noted:

> the fact that this case involves a unique quasi-public relationship
> rather than the typical private relationship dictates that we
> disregard the general rule of contract construction espoused in
> *Clemtex* and attempt, instead, attempt [sic] to harmonize the
> contract with the Commissioner's reasonable interpretation of TDI
> rules.

Id.  Those circumstances are not present in this case.

The terms at issue in the Rate Manual are susceptible to reasonable alternative

interpretations and are ambiguous.  As a matter of law, those terms must be construed in favor of

the consumers - plaintiffs.  Plaintiffs' interpretation - that the phrase "when evidence of the

earlier policy is produced" in section 5.3 of the Rate Manual is satisfied when there is a recorded

deed to a BFP or an unsatisfied institutional mortgage uncovered in a title search - is reasonable.

Under those circumstances, the language in the Rate Manual at issue should be construed in

accordance with plaintiffs' interpretation.

**Defendant's Precedent Argument**

Defendant argues that numerous courts have rejected plaintiffs' interpretation of the Rate

Manual—that a title insurer was required to charge the reissue or refinance rate when there was

evidence in the chain of title of a prior recorded deed to a BFP or unsatisfied institutional

mortgage.[3] (Def's Br. 3.)  None of the opinions cited by defendant, however, dealt with the

situation present in this case, i.e., a suit by home buyers against a title insurance company

---

[3]Defendant cites Chesner v. Stewart Title Guaranty Co., No. 1:06CV00476, 2009 WL
585823 (N.D. Oh. Jan. 9, 2009), in support of its argument.  Chesner, however, does not support
defendant's argument.  The language at issue in Chesner is markedly different from the language
at issue here.  The provision in the rate manual at issue in Chesner required that the insurer be
provided  "a copy of the prior policy, or other information sufficient to enable the Insurer to
identify such prior policy upon which reissue is request. . . ." Chesner, 2009 WL 585823, at *4.
TIRBOP's Rate Manual, unlike the rate manual in Chesner, did not require information to be
given to the insurer in order for the insurer to be able to identify the policy.

asserting that certain terms in the Rate Manual are ambiguous.  The decisions relied upon by

defendant involved cases in which a borrower asserted a claim against a lender pursuant to the

Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), seeking to rescind a loan for various

reasons.  One of the reasons set forth by the borrower was that the borrower had been charged an

unreasonable rate for title insurance because the borrower was eligible for a discounted rate and

charged the basic rate.  See e.g., Fields v. Option One Mortgage Corporation (In re Fields), 283

F. App'x 897, 898 (3d Cir. 2008) (plaintiff borrower brought action against lender to rescind

defaulted loan pursuant to TILA for nondisclosure based upon overcharge for title insurance).

The courts considering that issue imputed a duty on the borrower to produce evidence that the

lender knew or should have known about the eligibility for the discounted rate.  See e.g., Escher

v. Decision One Mortgage Co., LTC (In re Escher), 369 B.R. 862, 877 (Bankr. E.D. Pa. 2007)

("if a borrower contends that a lender failed to obtain the lowest title insurance rate permitted by

law, she has an affirmative burden to demonstrate that the lender knew or should have known of

the facts justifying that lower rate.").  This burden is placed on the borrower, not because of the

terms of the Rate Manual, but because "typically, a plaintiff bears the burden of proving her

claims." Id. (citations omitted).  In each of the decisions cited by defendant, the court denied the

borrower's claim because insufficient evidence was produced to put the lender on notice that the

borrower was eligible for a discounted rate.  See Ricciardi v. Ameriquest Mortgage Co., 164 F.

App'x 221, 226 (3d Cir. 2006) (holding that no evidence was presented that plaintiff's prior

mortgage was insured); Chiles v. Ameriquest Mortgage Co., 551 F. Supp. 2d 393, 397 (E.D. Pa.

2008) ("Plaintiff admit[ted] that he did not provide [lenders] with evidence of a prior policy,

therefore there exists no basis to find that [borrower] was improperly charged the basic rate for

17

insurance."); <u>Davis v. Deutsche Nat'l Trust Co.</u>, No. 05-CV-4061, 2007 WL 3342398, at *4 (E.D. Pa. Nov. 8, 2007) (holding that there was insufficient evidence to determine the issue whether or not the borrowers were entitled to the lower rate); <u>Jones v. Aames Funding Corp.</u>, No. 04-CV-4799, 2006 WL 2845689, at **6-7 (E.D. Pa. Mar. 7, 2006) ("[P]laintiffs fail to present evidence to indicate that they were entitled to the reissue rate. Neither plaintiffs nor plaintiffs' expert, Margot Saunders ("Saunders"), an attorney for the National Consumer Law Center, provide the eligibility criteria for the reissue rate.  Nor do they suggest how the facts of this litigation qualify plaintiffs for the reissue rate under the standards promulgated in the Manual."); <u>Stump v. WMC Mortgage Corp.</u>, No. Civ. A. 02-326, 2005 WL 645238, at *5 (E.D. Pa. Mar. 16, 2005) ("Because the record before this Court is devoid of any indication that Plaintiffs' previous mortgage was insured by a title insurance policy, we find that, as a matter of law, Plaintiffs were not entitled to the Refinance Rate."); <u>Madera v. Ameriquest Mortgage Co. (In re Madera)</u>, 388 B.R. 586, 600 (Bankr. E.D. Pa. 2008) ("Knowledge of a prior loan, without the loans terms or other related documents, is also insufficient to show that [the lender] had constructive notice that it was the type of loan that should have or did require title insurance."); <u>Glauser v. Deutsche Bank Nat'l Trust Co. (In re Glauser)</u>, 365 B.R. 531, 538-39 (Bankr. E.D. Pa. 2007) (holding that nothing in the record showed that the defendant lender knew or should have known about the prior policy); <u>Escher</u>, 369 B.R. at  877 (holding that there was no evidence in the record demonstrating that the defendant lender knew about the existing title insurance policy).

Importantly, all these cases involve the lender as the defendant and not the title insurance provider as in this case.  The title insurance provider is in a much different position in the transaction than the lender.  The title insurance provider is a member of TIRBOP, which drafted

the Rate Manual, and is bound by the terms of the Rate Manual by law.  The terms of the Rate

Manual, like a tariff, are construed in favor of the consumer.  The title insurance provider

conducts through its agents a title search in the normal course of its business which would reveal

the presence of an unsatisfied institutional mortgage or a deed to a BFP  -  evidence of a previous

title policy.  The rationale of the decisions cited by defendant do not apply in the context of this

case.

**Filed-Rate Doctrine**

Defendant argues that retroactive application of the 2005 amendments would violate the

filed-rate doctrine.  The filed-rate doctrine prohibits courts from imposing rates different than

those approved by the commission and from retroactively altering rates.  Ark. La. Gas Co. v. Hall,

453 U.S. 571, 578 (1981).  It prohibits customers from being charged a rate different from the

filed rate, and mistakes or misquotes are insufficient for avoidance of a charging a filed rate.

Phila. Suburban Water Co. v. Pa. Pub. Util. Comm'n., 808 A.2d 1044, 1054-55 (Pa. Commw. Ct.

2002).  The filed-rate doctrine permits actions against individual defendants, but bars collateral

attacks on filed rates.  Commonwealth v. Tap Pharm. Prods., Inc., 885 A.2d 1127, 1145 (Pa.

Commw. Ct. 2005).

The Pennsylvania Supreme Court considered the filed-rate doctrine in Ciamaichelo v.

Independence Blue Cross, 909 A.2d 1211 (Pa. 2006).  In Ciamaichelo, the plaintiffs brought suit

against an insurance provider alleging that it "amasse[d] an excess in surplus funds for purposes

inconsistent with its non-profit status." Id. at 1213.  The Pennsylvania Supreme Court reversed

the commonwealth court's dismissal of the plaintiffs' claim under the filed-rate doctrine. Id. at

1218.  The supreme court did not view the claim as an attack on the filed rate, but rather as

19

"whether [the defendant] violated the Non-Profit Law and committed breaches of contractual and fiduciary duties . . . ." <u>Id.</u> at 1217.  The court, however, noted that the claim would have been dismissed if it were a "rate injury claim." <u>Id.</u> at 1218.

Like <u>Ciamaichelo</u>, the issue in this case is whether defendant carried out its duties to its customers, i.e. charging the appropriate rates for title insurance.  Since plaintiffs are not collaterally attacking the reasonableness of the filed rates, it is not a rate injury claim.  Plaintiffs allege that defendant did not meet its legal obligation to charge the appropriate filed rates for its title insurance policies.  Plaintiffs brought this action against defendant, the company which sold the title insurance policy to plaintiffs, not TIRBOP or the Pennsylvania Department of Insurance, which approved the Rate Manual.  This approach comports with the rationale of <u>Tap Pharm. Prods.,</u> since plaintiffs brought suit against defendant for not charging the filed rate and are not collaterally attacking the filed rates. <u>See</u> <u>Tap Pharm. Prods.,</u> 885 A.2d at 1145.

Because plaintiffs qualified for the lower rate, the court would not be altering the filed rates or applying the amendments retroactively by imposing the lower rate on defendant; rather, the filed-rate doctrine would be followed.  Defendant is required to charge the applicable filed rate that it should have initially charged.  The lower rate is present in the pre-2005 Rate Manual and the court is not rewriting the applicable rates or questioning the rate-making ability of TIRBOP or the Pennsylvania Department of Insurance.  The court may interpret ambiguous tariffs, and defendant must charge the proper filed rate.  Plaintiffs here qualified for the lower rate and defendant is required to charge that rate, i.e. the filed rate.  The filed-rate doctrine is not violated in these circumstances.

## II.  Implied Contract Claim

Plaintiffs move for summary judgment on liability with respect to their implied contract claim.  Plaintiffs argue that there was an implied contract between a class member and First American under which a home buyer would pay for a title insurance policy on the property the home buyer was purchasing, and First American would provide the title insurance policy and charge the home buyer the rate it was required by law to charge pursuant to the Rate Manual. Plaintiffs argue that given their interpretation of the Rate Manual, class members, by definition, were eligible for the discounted rates, but were charged the basic rate contrary to the Rate Manual.  Plaintiffs claim that because defendant is required by law to apply the Rate Manual, when defendant charged a higher rate, defendant breached the implied contract.  Plaintiffs proffer that if the court adopts their interpretation[4] of the Rate Manual, there is no question of material fact with respect to liability.

Defendant makes several arguments against summary judgment with respect to the implied contract claim: (1) plaintiffs have not set forth sufficient facts to satisfy the essential elements of an implied contract claim; (2) determining whether an implied contract existed would require an individualized determination of what each agent said to each consumer, and

---

[4]The first issue addressed in this opinion related to the interpretation of certain language in section 5.3 of the Rate Manual (Reissue Rate).  There was no issue raised with respect to the interpretation of any language in section 5.6 (Refinance Rate).  The court understands that if plaintiffs' interpretation of the language in section 5.3 is followed, section 5.6 would likewise contemplate that the discount rate would be applied if there was a recorded deed to a BFP or an unsatisfied institutional mortgage in the appropriate land records within the applicable look-back period.

this is inappropriate for class treatment; and (3) defendants could not be party to an implied

contract because they had no interactions with the class member.

**Elements of Implied Contract**

Under Pennsylvania law, an implied contract is formed when "the parties assent to

formation of a contract, but instead of being expressed in words, the intention to incur an

obligation is inferred from the conduct of the parties in light of the surrounding circumstances,

including the course of dealing." Crawford's Auto Center, Inc. v. Commonwealth, 655 A.2d

1064, 1066 (Pa. Commw. Ct. 1995)(citing Cameron v. Eynon, 3 A.2d 423 (Pa. 1939);

RESTATEMENT (SECOND) OF CONTRACTS § 4 (1981)). Once a plaintiff proves the existence of an

implied contract, he or she must then satisfy the last two elements of a breach of contract claim:

(1) a breach of a duty imposed by the contract, and (2) damages.   Ware v. Rodale Press, Inc.,  322

F.3d 218, 225 (3d Cir. 2003) (citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058

(Pa.Super.Ct. 1999)).

In this case, the court concludes that there were implied contracts between class members

and defendant.  There is no issue of material fact with respect to the existence of an implied

contract because the undisputed facts of record establish the following essential terms:  1) a class

member agreed to purchase a title insurance policy from defendant by paying the premium at

closing, and 2) defendant, as evidenced by its acceptance of its portion of the premium and

issuance of a policy, agreed to provide a title insurance policy as to the class member's lender in

exchange for the payment of the premium by a class member.  Because defendant is a member of

TIRBOP and is regulated by the Pennsylvania Department of Insurance, defendant agreed, and is

bound by law, to apply the rates set forth in the Rate Manual and only charge premiums for title insurance in accordance with the Rate Manual.

The court finds that defendant breached a duty imposed by the implied contract when it charged class members for title insurance policies at the basic rate when a discount rate should have been charged. Given the court's interpretation of the Rate Manual in section I, there is no material fact at issue with respect to the breach. Class members by definition are home buyers who were eligible for discounted rates, but were charged the basic rate.[5] Based upon the court's interpretation of the Rate Manual, in order for a home buyer to be a class member, he or she must show that there was a recorded deed to a BFP or an unsatisfied institutional mortgage uncovered in a title search for the property being bought for the applicable look-back period, and that he or she was charged the basic rate. Once a home buyer shows that he or she is a class member, a breach of the implied contract is established. The result is the same for every class member. The class member was eligible for the discounted rate, defendant was required by law to apply the discounted rate, and defendant breached its duty under the implied contract to apply the Rate Manual when it charged the class member the basic rate.

---

[5] The class definition reads:

> All persons in the Commonwealth of Pennsylvania who, at any time after December 19, 1999 through July 31, 2005: (a) paid premiums for the purchase of residential title insurance at the Basic or Reissue Rate from defendant First American; (b) who had either an unsatisfied mortgage from an institutional lender or a deed to a bona fide purchaser in the chain of title within ten years of the payment of the premium; and (c) did not receive a discount specified in the Title Insurance Rate Manual.

Order dated March 24, 2008, at 1 (Docket No. 167).

The final element of damages is established when defendant overcharged for the policy. It is undisputed that a policy issued at the basic rate is identical to the policy issued at a discounted rate, and the home buyer gets no benefit from overpaying for the policy.  All class members were damaged when they were overcharged for a title insurance policy.

**Individualized determinations**

Defendant argues that individualized inquiries would be required to determine whether an implied contract existed and cites Chesner in support.  In Chesner, plaintiffs made an argument that a prior recorded mortgage qualified a consumer for a discounted rate on title insurance under the Ohio rate manual.  Chesner, 2009 WL 58583, at *1.  The plaintiffs claimed that the defendant was charging customers the full rate when they were eligible for the discounted rate.  Id.  The court certified a class with respect to the plaintiffs' implied contract claim based upon the plaintiffs' allegations.  Id.  The court, however, decertified the class at summary judgment with respect to the implied contract claim because individual issues, related to whether the plaintiffs were eligible for discounted rates, would predominate.  Id. at *11.  Defendant argues that this case is analogous and summary judgment should be denied because individual issues would predominate with respect to plaintiffs' implied contract claim.

Chesner, however, supports this court's conclusion that an implied contract existed.  The court's decision in Chesner was largely dependent upon the language of the rate manual in issue there.  The language in the Ohio rate manual is significantly different than the language in the Rate Manual.  In Chesner, the applicable portion of the Ohio rate manual provided that a discounted rate would apply "provided the Insurer is given a copy of the prior policy, or other information sufficient to enable the Insurer to identify such prior policy upon which reissue is

24

requested. . . .”  Id. at *4.  The plaintiffs conceded that not all mortgages needed a lender's

policy and they did not give a copy of the prior policy to the insurer.  Id. at ** 7, 9.  The court

rejected the plaintiffs' argument that a prior mortgage constituted “other information sufficient to

enable the Insurer to identify such a prior policy. . . .” Id. at *7.  The court identified the

“pertinent question [to be] whether the existence of a prior mortgage would enable [the insurer]

to identify the prior policy.”  Id. at *9.  The court could not answer that question because there

needed to be a further “inquiry to determine whether the prior mortgage was accompanied by a

lender's policy.”  Id. at *7.  That inquiry was necessary because:

> [p]ursuant to the language of the [Ohio] Rate Manual, even with the
> purported ambiguities construed in Plaintiffs' favor, the “other
> information” is inextricably tethered to the requirement that it “enable the
> Insurer to identify [the] prior policy[.]”

Id.  The court decertified the class with respect to the implied contract claim because individual

inquiries would be required to determine whether class members purchased a prior lender's

policy.  Id. at *11.

The focus in this case is not on evidence of a prior mortgage; rather, the focus is on

evidence of an unsatisfied institutional mortgage.  The court determined in section I that a

recorded deed to a BFP or an unsatisfied institutional mortgage uncovered in a title search is

evidence of a prior policy under section 5.3 of the Rate Manual.  No individual inquiry is

required.  Unlike in Chesner, the plaintiffs in this case established that a recorded deed to a BFP

or an unsatisfied institutional mortgage constituted “evidence of the earlier policy.”  The court in

Chesner acknowledged that the plaintiffs' implied contract claim would be viable if the plaintiffs

could show that "proof of a prior mortgage . . . was sufficient to trigger application of the

discount." Id. at *8.  The court quoted its own class certification opinion:

> "Plaintiffs' theory regarding breach is that the discounted rates
> must be applied whenever the purchaser is eligible, that eligibility
> turns on the existence of a prior mortgage in the look-back period,
> and therefore failure to charge the discounted rate violates
> applicable law.  If that is correct, circumstantial evidence would be
> of no assistance to the court."

Id. n.12 (quoting Chesner v. Stewart Title Guar. Co., Civ. No. 06-476, 2008 WL 553773, at * 41

(N.D. Oh. Jan. 23, 2008)).[6]  Plaintiffs here showed that evidence of an unsatisfied institutional

mortgage or recorded deed to a BFP in the applicable look-back period was evidence of a prior

policy under the Ohio Rate Manual.  Unlike the Ohio rate manual, the Rate Manual does not

require plaintiffs affirmatively to identify the policy.  Defendant here was required to apply the

discounted rates whenever the purchaser is eligible for those rates.  A purchaser is eligible when

a recorded deed to a BFP or an unsatisfied institutional mortgage is uncovered in the applicable

look-back period in a title search.


**First American's Noninvolvement**

First American argues that it could not be a party to an implied contract.  The actions of

First American's agents, however, can be imputed to it. Joyner v. Harleysville Ins. Co., 574 A.2d

664, 669 (Pa. Super. Ct.1990) ("It requires no extended discussion or citation of authorities to

establish the proposition that a person authorized to deliver a policy of insurance and receive and

---

[6]In the context of the opinion, the phrase "circumstantial evidence" appears to refer to
evidence of each individual class member's particular circumstances surrounding his or her
purchase of title insurance.

receipt for the premiums is the agent of the company for that purpose. . . .").  The record is clear, and First American does not dispute, that its agents were acting on behalf of First American when they were selling the insurance policies.  First American is arguing that it did nothing that could imply an agreement or imply terms or obligations under a contract, and that anything its agents may have done to imply a contractual term was done on an individual basis, and would need to be individually analyzed.  Looking at each individual agent's course of dealing, defendant argues, would not be suitable for a class action.

The court does not find an individualized inquiry is necessary.  As discussed above, First American impliedly agreed to provide a title insurance policy in exchange for payment when it accepted its portion of the premium from the home buyer and issued a policy to the lender.  First American, as a member of TIRBOP, is bound by the terms of the Rate Manual, and conducted business as an insurance company in Pennsylvania regulated by the Pennsylvania Department of Insurance.  First American through its agents entered into the implied contracts with plaintiffs. The only finding a reasonable jury could make is that First American was a party to the implied contract.

## CONCLUSION

Plaintiffs' motion for summary judgment must be granted in favor of plaintiffs with respect to plaintiffs' interpretation of the Rate Manual.  A recorded deed to a BFP or an unsatisfied institutional mortgage in the appropriate land records in the applicable look-back period is sufficient evidence of a prior policy to qualify a home buyer for a discounted rate. Since defendant had a duty to apply the discounted rate for eligible home buyers, and a home buyer to be a class member must show he or she was eligible for the discount rate and charged

27

the basic rate, there is no genuine issue of material fact in dispute with respect to the breach of an

implied contract claim.  Summary judgment will be granted in favor of plaintiff and against

defendant for the implied breach of contract claim.  For the reasons set forth above, plaintiffs'

motion for partial summary judgment will be granted.  An appropriate order will be entered.


By the court:


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge


Dated: September 4, 2009

28